**United States District Court for the District of Columbia**

| | |
|---|---|
| Connie K. Morris, an individual, | ) |
| 12300 Hillmeade Station Dr. | ) |
| Bowie, Maryland  20720 | )  Civil Action No. |
| | ) |
|       Plaintiff, | ) |
| | ) |
| | ) |
|         v. | ) |
| | ) |
| Stephen L. Johnson, Administrator, | ) |
|    United States Environmental | ) |
|    Protection Agency | ) |
| 1200 Pennsylvania Avenue, N.W. | ) |
| Washington, D.C.  20460 | ) |
| | ) |
|       Defendant. | ) |
| | ) |
| Serve: | ) |
| | ) |
| United States Attorney | ) |
| 555 4th St., NW | ) |
| Washington, DC  20001 | ) |
| | ) |
| U.S. Attorney General | ) |
| Department of Justice | ) |
| 950 Pennsylvania Ave., NW | ) |
| Washington, DC  20530 | ) |
| | ) |

**COMPLAINT FOR DISCRIMINATION IN EMPLOYMENT
IN VIOLATION OF THE REHABILITATION ACT, AND
RETALIATION**

Plaintiff Connie K. Morris, for her complaint against Stephen L. Johnson, Administrator,

United States Environmental Protection Agency, alleges:

1.  This is an action for failure to accommodate, in violation of the Rehabilitation Act, 29

U.S.C. §794(a), and retaliation for engaging in protected activity thereunder.

**Jurisdiction and Venue**

2.  This court has jurisdiction over this action pursuant to 28 U.S.C. §1346, because it is an action against an agency of the United States, and 28 U.S.C. §1331, because it arises under the laws of the United States, particularly 29 U.S.C. §794(a).

3.  Venue is proper in the United States District Court for the District of the District of Columbia, pursuant to 28 U.S.C. §1402(b), because substantially all of the events giving rise to the claim occurred in the District of Columbia.

**Parties**

4.  Plaintiff Connie K. Morris is an individual who resides in Bowie, Maryland.  At all relevant times, Ms. Morris was employed by defendant the United States Environmental Protection Agency ("EPA") in its Washington, D.C., headquarters.

5.  Defendant Stephen L. Johnson, is sued in his official capacity as Administrator of EPA.  The claims alleged herein arise out of the failure and refusal of responsible management officials of Defendant to accommodate Ms. Morris, a qualified individual with a disability, under the Rehabilitation Act (the "Act"); and for taking adverse action against Ms. Morris in retaliation for her seeking reasonable accommodation and to secure her rights under the Act.

**Administrative Remedies**

6.  Plaintiff has exhausted her administrative remedies.  She applied to receive a reasonable accommodation of her disability on April 29, 2005. EPA on or about July 7, 2005, determined that she had a disability requiring a reasonable accommodation, assigned Ms. Morris to an EPA work site designated the "clean space," in Crystal City, Virginia, on or about July 13, 2005, not consistent with the reasonable accommodation she sought.  Ms. Morris initiated the

EEO informal and formal complaint process in a timely manner within 45 days thereafter, alleging that she was entitled to a reasonable accommodation that included the ability to work from home.

7.  Ms. Morris submitted to and cooperated fully with the Equal Employment Opportunity counseling procedure; filed a formal complaint with the agency EEO office on or about August 10, 2005; and within the past 90 days, on or about December 19, 2006, received an adverse decision from the agency.

8.  All other actions and omissions by EPA, from on or about August 10, 2005 to the present time, were within the scope of and related to the EEOC investigation of Ms. Morris' administrative complaint, and/or constitute retaliation, for which there is no separate requirement of exhaustion of administrative remedies.

**Statement of Facts**

**A.  Ms. Morris' Employment**

9.  Ms. Morris has been employed by EPA for approximately four years, and performs a variety of duties, all relating to programming and the development of document templates for Agency use, and communicating with others about such document template development.

10. The essential functions of Ms. Morris' position are set forth in the Position Description, and require neither physical presence nor face-to-face contact with others, either explicitly or implicitly:

> "This is a non-supervisory/non-managerial position. . . responsible for the categorization and organization of material within seven digit interlocking classification schemes, editorial preparation, and processing of all OPPTS documents for publication in the Federal Register. . . provides leadership in executing editorial policy and priorities and coordinating the document preparation efforts of other information liaison specialists

3

when size, complexity and time constraints require a full team of people work on a single
Federal Register document package . . . provides specific guidance and leadership to other
members of the staff by implementing policy and procedural guidelines . . . liaison with
the program offices and Docket Control Officer to ensure proper document numbering
and tracking . . . reviews work generated by less experienced members of the staff . . .
liaison activities with material authors . . . Instruct and assist program personnel who are
not familiar with the electronic regulatory distribution process . . . "

11. In addition to being allowed to work from home temporarily in 2004 and 2005, Ms.

Morris was assigned to work in the Crystal Station "clean space" for a number of months, where

she did not have in-person contact on a day-to-day basis with her coworkers or others.  Even at

her subsequent duty station, Potomac Yards, she had little face-to-face contact with her group or

others with whom she worked.

**B.  Ms. Morris Suffers from a Disability**

12. At all relevant times, Ms. Morris has suffered from a disability.  Her physicians have

reported to EPA the nature of her condition, and reasons why it is harmful to her health to report

to work at various EPA work sites.  Dr. Christopher Holland, of EPA, spoke with Ms. Morris's

physician and learned that she suffers from a yeast sensitivity which in turn causes her to be

sensitive to small concentrations of other molds and even chemicals in the workplace and

elsewhere.  Ms. Morris' physician reported to EPA that Ms. Morris has sensitivities to mold and

dust mites, causing muscle weakness, breathing problems, problems with walking, thinking,

elevated blood pressure, and swelling.  Because of these conditions, he requested that Ms. Morris

be allowed to work from home, where, he wrote, she would not experience these problems.  Ms.

Morris's disabling reactions at EPA work sites have been well known to Ms. Morris' supervisor,

John Richards, and others within the Agency.

13. EPA concurred, and found on July 7, 2005 that Ms. Morris was an individual with a

4

disability.

**C. Ms. Morris is a Qualified Individual with a Disability**

14. All essential functions of Ms. Morris' job can be performed remotely. Ms. Morris has worked from home on a temporary basis in the past, and had complete access to all necessary persons and materials. If allowed to work at home, Ms. Morris is qualified and able to perform the essential functions of her position.

15. EPA has offered to accommodate other disabled employees with permanent work-at-home arrangements, and has permitted employees to work from home, either on a full time or part time basis, and either temporarily or permanently, including members of Mr. Richards' own Federal Register staff. In fact, the first type of "no cost/low cost accommodation" listed in EPA's Reasonable Accommodation Procedures, is "Allowing employees to work from home, telecommuting centers or alternate EPA work locations."

16. Mr. Richards has worked closely with her during periods when she was working primarily from home, directing her work, and commending her progress. Mr. Richards has never said anything to suggest that Ms. Morris delayed or hampered a project by virtue of working from her home.

**D. Ms. Morris Requested a Reasonable Accommodation**

17. Ms. Morris and her physician requested that she be allowed to perform substantially all of her job duties from her home as a reasonable accommodation.

18. The accommodation which Ms. Morris has requested is reasonable, and would not present an undue hardship to her Agency. She has worked from home on many occasions using EPA's Lotus Notes e-mail system to transmit documents back and forth, and e-mail or telephone

to communicate effectively with coworkers.  For over two years, there have been no assignments Ms. Morris has worked on that could not have been worked on in this manner.

19. Work-at-home arrangements, where possible, are appropriate accommodations under ADA and the Rehabilitation Act which should be offered to otherwise qualified, disabled employees.  EPA was under a duty to offer Ms. Morris a work-at-home arrangement as a reasonable accommodation.

20. Even if it were demonstrated that Ms. Morris needed constant access to EPA's Local Area Network (LAN), it is generally accepted that employees in the federal government can have such access, and EPA has done nothing to explain who gets remote access to the EPA's LAN.

**E.  Ms. Morris was not Granted the Requested Accommodation**

21. Mr. Richards did not attempt in good faith to find a solution to accommodate Ms. Morris, but rather, delayed initiation of the reasonable accommodation process, admitting that having Ms. Morris work within an EPA worksite was his preference, and not essential to her job performance, when he said, in substance, "we really need Connie inside the complex to be most effective in the work she is doing."

22. Ms. Morris was working in an EPA headquarters office, EPA Connecting Wing and East, when she had her most severe reactions and initially sought a reasonable accommodation. Ultimately, Ms. Morris was moved from EPA's Connecting Wing to EPA East and subsequently to the "clean space," a desolate office space in Crystal City, Virginia, which was operated by EPA with various environmental limitations.  Wearing a face mask and sometimes goggles, and taking frequent outdoor breaks, Ms. Morris was generally able to work in the "clean space."

**F.  Ms. Morris' Accommodation Was Withdrawn by EPA for No Reason**

23. On or about June 5, 2006, Ms. Morris was moved from the "clean space," which EPA had proffered as her "reasonable accommodation," into Potomac Yard, a so-called "green building."  Up to that point in time, her assignment to the Crystal Station "clean space" had been the accommodation offered to her for her disability.  That accommodation was withdrawn, and no effort was made to identify or negotiate a substitute accommodation.  At Potomac Yards, Ms. Morris was the only employee from her group to be volunteered to work with the program office, and was stationed in one of the smallest cubicles in contractor space, across from the men's room, a service elevator, a stairwell, and the entrance/exit doors which lead to/from the main elevator. Shortly thereafter, on June 19, 2006, the AFGE Union circulated a memorandum noting that it was beginning to receive complaints of health issues apparently relating to the environment within Potomac Yards.

**G.  EPA Refused to Engage in the Interactive Process with Ms. Morris**

24. Under no obligation to do so, Ms. Morris nonetheless submitted additional medical documentation establishing her need to be accommodated, which Mr. Richards arbitrarily disregarded.  She suffered numerous severe allergic reactions in her workplace, many witnessed by Mr. Richards, and has provided extensive OSHA documentation and numerous physician's notes to Mr. Richards.  This chain of health crises, known to Mr. Richards, establish the Agency's duty to accommodate Ms. Morris, at least temporarily, by creating conditions which would permit her to stabilize her health and her job performance.

25.  Over the course of the summer and fall of 2006, Ms. Morris suffered repeated severe reactions in the Potomac Yards space.

26.  She reported to Mr. Richards on June 26, 2006 that the Federal Occupational Health (OSHA) clinician advised her to seek immediate medical attention, and that her physician advised her to rest for the remainder of that day and the following.  She requested advance sick leave on July 12 and 13, 2006 for a "workplace allergic reaction."  Mr. Richards responded, "I still need more information on what you are referring to as 'workplace allergic reaction,'" to which Ms. Morris promptly replied:

> "Same situation I previously encountered and reported.  After I arrive in the workplace building, I am continuing to encounter all the previously mentioned allergic reactions (elevated blood pressure and heart rate, body swelling, congestion, muscle weakness, difficulty breathing, etc.)  I am also encountering chest pain."

Ms. Morris reminded Mr. Richards that the Federal OSHA clinician, after taking her vital signs on June 29, 2006, advised her to seek medical attention immediately, and that she had called Mr. Richards to advise of Ms. Morris' allergic reaction and need for medical attention off site.  Ms. Morris provided Mr. Richards with a doctor's note for June 29 and 30, 2006.

27. Mr. Richards asserted that July 13, 2006 was the first time he had been advised that Ms. Morris' health issues were "linked" to a "work place issue," or that an OSHA form had been completed.  He requested a copy of the form to send to facilities to notify them of the issue.

28. On Monday, July 17, 2006, while in the Potomac Yard Building, Ms. Morris experienced another reaction, of which she notified Mr. Richards.  Her blood pressure was checked by EPA's OSHA nurse three times.  Each reading was higher than the previous.  She experienced elevated blood pressure, shortness of breath, shallow breathing, body swelling, chest pain, and almost lost consciousness.  The EPA nurse administered oxygen, and Ms. Morris was

taken by wheel chair to her cubicle, and then to her car.  She informed Mr. Richards of these events.

29. Mr. Richards took the position on July 18, 2006, that having assigned Ms. Morris to Potomac Yards, which was considered a "green" building, he required more detailed information before he could consider her reactions to have been "workplace induced."  He also said, as he had while she was assigned to the "clean space," that he had no evidence that Ms. Morris' reactions were not caused by her morning commute.  By requiring her in this way to prove a negative proposition, Mr. Richards imposed an unreasonable obstacle to the accommodation of Ms. Morris' disability.

30. In truth, Ms. Morris was assigned to Potomac Yards not as an accommodation, but through a "bargain" struck by Mr. Richards which was designed to require Ms. Morris to be present at that EPA work site to perform her duties.  When the "clean space" was closing, she was given a choice of returning to the main EPA facility where her need for accommodation first arose, or moving to Potomac Yards.  Terri Stowe, a member of the Pesticides Program staff, arranged for Ms. Morris to have space at Potomac Yards in a negotiation with Mr. Richards; the quid pro quo was that the Pesticides Program would have a Federal Register staff member, Ms. Morris, on site.  (Having been moved from Potomac Yards, Ms. Morris is no longer assigned to work with the Pesticides Program.)  It appears that, instead of being granted a reasonable accommodation by her employer, Ms. Morris obtained her cubicle at Potomac Yards through a bargain which would require Ms. Morris to be physically present to serve the Pesticides Program.

31. From July 25-28, 2006, Ms. Morris was ill three out of four days, requiring her to miss work.  On July 28, 2006, Mr. Richards wrote, "at some point you do need to indicate what it is "in the workplace" you believe is causing this "Workplace Allergic Reaction."

32. Ms. Morris was ill from workplace-induced reactions on August 1 and 2, 2006.  On August 2, 2006, Ms. Morris wrote to Mr. Richards, "I am at a loss as to what medical documentation you are requesting.  Previously, medical documentation from two doctors on my medical condition were provided.  Dr. Shamim responded to questions from Bill Haig regarding my request for reasonable accommodation, determination of a disability and my medical condition, as well as several other letters regarding my medical condition.  The EPA doctor spoke with Dr. Shamim regarding my medical condition.  Please clarify, is the information requested related to my leave requests or the determination and accommodation of my disability."  Mr. Richards replied, "A response to your request for clarification on medical documentation is coming."

## H.  EPA Intentionally Ignored Ms. Morris' Disability, Impeding Her Ability to Work and Taking Adverse Actions Against Her on Account of Her Disability

33. Ms. Morris was ill from August 9, 2006 (when she was taken to the emergency room) through August 14, 2006, from a reaction to her Potomac Yards work site.  Ms. Morris attempted to obtain the medical record from her hospitalization to provide them to her physician for his evaluation, which took approximately six weeks.

34. Mr. Richards continued to refuse to consider not only the work-from-home option, either full- or part-time, but also the location of Ms. Morris's cubicle with Potomac Yards, or whether a cubicle was even an appropriate work space for her.

10

35. Ms. Morris had a reaction on August 15, 2006, and again needed time off.  Mr. Richards took this occasion to tell her "As to the determination regarding work-at-home that determination has been made as stated some time ago and working within the EPA building complex is a requirement of your position."  At this time, however, Ms. Morris had been moved between two different locations in the "EPA building complex," neither of which had her working in the same building with the majority of the Federal Register staff.

36. Ms. Morris remained ill on August 16, 2006, because of a workplace reaction, and Mr. Richards responded to her leave request: "I need a clear answer from your doctor when you will be able to return to your workstation."  Ms. Morris then reported that she was ill on August 17 and 18, and on Monday, August 21, submitted a note from her physician stating that she could return to work on August 22, although working other than at home remained against his advice.

37. Throughout July and August, 2006, Ms. Morris was struggling to work, and continually becoming ill because of her workplace environment, while Mr. Richards steadfastly refused to allow her to catch up on her work from home, even temporarily, and continued to harass her, as though EPA had not previously determined that she was disabled, and he did not understand that her disability made her highly susceptible to environmental irritants.  In short, Ms. Richards was turning a blind eye to the very disability that EPA had previously determined to accommodate, under the pretense that Ms. Morris was simply calling in sick and that he had no reason to know the nature of her condition.

38. Mr. Richards conceded that he was not participating in the interactive process, when on August 21, 2006 he wrote, "Since there will be no resolution of your request for "reconsideration" for some months I think it is reasonable for you to explain your plan for

11

returning to work prior to the impending exhaustion of your earned leave balance." Ms. Morris could not have a "plan" for returning to a work environment that was causing her debilitating allergic reactions. It was incumbent on the Agency to explore options to make it possible for Ms. Morris to continue working.

39. Rather than discuss with Ms. Morris how she could accomplish her work, Mr. Richards set about to put Ms. Morris indefinitely into AWOL status.

40. Mr. Richards sent Ms. Morris a memorandum on or about August 24, 2006, in which he ordered her to provide "documentation . . . which supports your alleged allergic reaction to Potomac Yards or report back to work at your designated work site. This required documentation, which must be specific to Potomac Yards, includes information describing the impairment, the nature, severity, and duration of the impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits your ability to perform the activity or activities. Your continued failure to provide this documentation or to report to work may lead to being placed in absence without leave (AWOL) status and/or disciplinary action, up to and including removal from Federal service.

41. This was not related to the interactive process, in which Mr. Richards still steadfastly refused to participate. As he wrote on October 6, 2006, his requests for medical documentation were "in no way related to "Reasonable Accommodation" but based on my role as your supervisor and leave approving official." So even Mr. Richards' August 24, 2006 request for detailed medical information was not for the purpose of engaging in the interactive process, but only for medical leave approval.

42. At no time since she requested a work-at-home accommodation has EPA proposed to Ms. Morris that she again be permitted to work from home temporarily, part-time, or on any other basis.  Instead, Mr. Richards has required that she provide additional medical documentation, and has otherwise insisted that she report for work at EPA facilities.  This has resulted in Ms. Morris missing a great deal of work, and has hindered her performance, efficiency, and deprived her of pay and benefits.

43. Ms. Morris continued to attempt to work at her EPA office, wearing a face mask and taking breaks outside approximately hourly.  On August 28, she began to experience a reaction, and the EPA OSHA clinician took a substantially elevated blood pressure reading 144/84.  She worked the first half of the day August 29, 2006, then had to go an appointment with her cardiologist, who later in the day took an even higher blood pressure reading of 150/82.  During this time period, despite the use of the face mask and regular outdoor breaks, her symptoms—swelling, fatigue, mental clarity, muscle weakness, difficulty breathing—intensified each day.  On most days, by the time she went home in the evening she was exhausted, and experienced difficulty walking, breathing, and functioning generally.

44. At work on August 30, 2006, EPA's OSHA clinician recorded a substantially elevated blood pressure reading of 168/78 and a heart rate of 100, and Ms. Morris was experiencing difficulty walking and breathing, severe congestion, and swelling in her extremities and face.  By mid-afternoon, she was experiencing the onset of trigeminal neuralgia (severe head pain) and chest pain, and left work at 2:30 p.m.

45. As a result of Ms. Morris filing a further EEO informal complaint, on September 5, 2006 an EEO counselor spoke with Mr. Richards, who continued in his refusal to consider a work-from-home resolution, and insisted that he was waiting to hear from Ms. Morris' physician.

46. Mr. Richards began counting Ms. Morris AWOL when she was too ill to report to work, September 8-15, 2006.

47. Ms. Morris provided a detailed opinion letter from her physician, Dr. Shamim, and documentation from her hospitalization, in the second week of October; on October 16, 2006, Mr. Richards wrote, without further elaboration, "the medical documentation that you submitted in response to the August 24, 2006 letter failed to address several of the questions raised in that letter. Based on the insufficient response and inconsistencies with earlier statements made by your doctor you have failed to satisfy the requirements of the August 24, 2006 letter. Therefore, absences will continue to be charged as Absence Without Leave (AWOL) until the information requested on August 24th is furnished."

48. Ms. Morris responded in detail, on October 16, 2006, explaining how Dr. Shamim's letter addressed each of the questions Mr. Richards had asked.

49. On October 20, 2006, Mr. Richards responded to additional requested medical documentation, along with requested emergency room medical documentation for October 13, 2006 (even though Mr. Richards was on the scene when Ms. Morris was transported by ambulance). His one-word description of her documentation: "insufficient." Mr. Richards stated "… I am charging you AWOL for the three hours on 10/13/06 and you are expected to report to your duty station (3379D) for your regular tour of duty.

50. For the purpose of identifying a reasonable accommodation, Ms. Morris'

14

documentation was more than adequate.  Mr. Richards, attempting to discount her doctor's

opinions, alluded to "inconsistencies with earlier statements made by your doctor."  According to

the EPA's own National Reasonable Accommodations Procedures, medical documentation is not

required at all if the disabling condition is obvious (as in this case), and even when required, it

need only "substantiate that the applicant or employee has a qualifying disability, what the

functional limitation is, and/or why a Reasonable Accommodation is needed," and, in appropriate

circumstances, medical documentation from a "social worker" or "counselor" will be accepted.

    51. EPA has refused, in bad faith, to participate in the interactive process required by the

Act by, inter alia:

    (a) asserting that it is not accepted medical practice, or credible, for Ms. Morris'
physicians to evaluate or treat her based in part on her self-reporting of reactions and
symptoms;

    (b) asserting that the opinions of Ms. Morris's three physicians are not credible because
they relied in part on her self-reporting of reactions and symptoms, because they did not
use precisely the same language in their assessments, and for other unspecified reasons;

    (c) asserting that Ms. Morris is required to produce a scientific air quality test to establish
the relationship between her EPA work site and her need for accommodation;

    (d) asserting that Ms. Morris should bring her physician with her to her EPA work site so
that he can determine whether something in the site is causing her reactions, without any
support in medical or disability literature;

    (e) asserting that it was entitled to treat her physician's assessment and recommendation
as "purely hypothetical" and to disregard them, in part, because her physician wrote she
"*would* have no problem" performing her duties from home (instead of "she *will* have no
problem");

    (f) asserting that it was entitled to disregard Ms. Morris' need for accommodation simply
because she had a medical history of disability, i.e., that the onset of her disability was
prior to becoming employed by EPA;

    (g) asserting that, having conducted an air test ("Indoor Mold Assessment") on only *two*
days, August 4 and 5, 2005, but having identified no medical evidence to refute her
physicians' assessments, that Ms. Morris's evidence of disability was not credible;

    (h) asserting that it is necessary for Ms. Morris to be present at an EPA facility to perform

her duties, although she did not have in-person contact on a day-to-day basis with her coworkers or others while working in the "clean space;"

(i)  attempting gradually to add duties which are calculated to require her presence at an EPA worksite.

(j) asserting that the assessment of Dr. Shamim was not credible;

(k) asserting that "note taking" in "a common space controlled by the government" was an essential function of Ms. Morris's job;

(l) unilaterally determining, after Ms. Morris obtained 200 hours of paid leave through EPA's Leave Bank Program, that such leave would be applied "to replace 200 hours of the Advanced Sick Leave that you have taken to reduce the burden of repayment that must take place before you can earn and use sick leave again," the effect of which was to cause Ms. Morris to fall into AWOL status every time she was out sick during the pendency of her complaint seeking an effective accommodation of her disability.

(m) overlooking the possibility that factors other than the physical composition and mechanical components of EPA's work sites were affecting Ms. Morris' health, and that she would be able to perform the essential functions of her job from home.

52. In the meantime, however, Ms. Morris had again been reassigned to a location in EPA East - 3379D, one of the sites at which she had her most severe reactions.  At EPA East, she has no protections against the respiratory irritants which threaten her health.  It was from EPA East that Ms. Morris was moved to the "clean space" in the first place, as EPA's unilateral accommodation of her disability.  Mr. Richards began again requiring "to the extent you are now claiming that your current duty station, #3379D, is unacceptable, you would need to provide me with appropriate documentation for purposes of either granting an accommodation request or granting sick leave.  Your 10/13/06 discharge letter from George Washington University Hospital certainly is insufficient for either of these purposes, as is Dr. Shamin's most recent letter.  As a result, I am charging you AWOL for the three hours on 10/13/06 and you are expected to report to your duty station (3379D) for your regular tour of duty.  To the extent you do not do so, you will be subject to AWOL status.  I would also remind you that thus far, I have

not taken any disciplinary action in response to your continued AWOL, but if your AWOL continues, I may have to take disciplinary action, up to or including removal."

53. Ms. Morris then sought and obtained a consultation and assessment from Richard Niklas, M.D., a clinical professor in the Allergy Clinic at George Washington Medical Center, on November 21, 2006.  His diagnoses, reported to EPA, were (1) perennial allergic rhinitis with seasonal exacerbations; (2) chronic sinusitis; (3) asthma – mild, intermittent; (4) sulfite sensitivity; (5) recurrent anaphylaxis; and (6) hypertension.  Dr. Niklas informed EPA, "because of the severe life-threatening reactions experienced by the patient, it is recommended that she not return to the building which will trigger these symptoms.  The patient should be allowed to work from home in order to prevent these episodes from occurring."

54. With breathtaking circularity, Mr. Richards moved Ms. Morris out of the "clean space," then out of the "green building," and back to the main EPA complex, from which she had originally been moved as an accommodation of her disability, with each move demanding that Ms. Morris again provide medical documentation to support her need for accommodation at each particular location.

55. Ms. Morris continued to become ill, and unable to work, whenever she reported for duty at the EPA work site to which she was assigned.

56. On or about February 5, 2007, Mr. Richards wrote a memo to Ms. Morris proposing to terminate her employment for "insubordination," referring to Ms. Morris' being too disabled to report for work without a reasonable accommodation.

57.  As a result of EPA's intentional and steadfast refusal to accommodate Ms. Morris, her inability to perform her job, and her resulting loss of pay and benefits, Ms. Morris has experienced extreme emotional distress and upset.

### Claims for Relief

### Count 1 - Discrimination - Failure to Accommodate

58. Plaintiff refers to and incorporates the allegations of paragraphs 1 through 57, above, as though fully set forth here.

59.  The Rehabilitation Act provides that "no otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability."  29 U.S.C. §794(a).  The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under certain provisions of the Americans with Disabilities Act ADA.  The relevant provisions of the ADA prohibit discrimination against a "qualified individual with a disability ... in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. §12112(a).  A "qualified individual with a disability" is one who has a disability, and "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id*. §12111(8).  A reasonable accommodation can include job restructuring, and part-time or modified work schedules.  42 U.S.C. §12111(9); 29 C.F.R. §1614.203(c)(2).

60. EEOC Regulations, 29 CFR §1630.2(n), provide that "the term "essential functions" does not include the marginal functions of the position."  Presence at an EPA work site could not be considered an essential function of Ms. Morris' position under any of the factors enumerated

in that regulation.

61. Discrimination under the ADA and the Rehabilitation Act includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. 42 U.S.C. §12112(b)(5)(A); see 29 C.F.R. §1614.203(c)(1). Plaintiff is informed and believes, and based thereon alleges, that accommodating her disability in the manner she and her physicians have requested would not subject EPA to undue hardship.

62. By failing and refusing to provide Ms. Morris with a reasonable accommodation, and by failing and refusing to engage with Ms. Morris in the interactive process to determine whether and what accommodation could be provided her, EPA has discriminated against Ms. Morris in violation of the Rehabilitation Act.

63. The adverse employment actions taken against Ms. Morris would not have occurred in the absence of disability discrimination, in that Ms. Morris would have performed the essential functions of her position in a satisfactory manner at all times had EPA granted her a reasonable accommodation. Therefore, Ms. Morris is entitled to an injunction against all such discrimination and adverse actions, and to restoration of all rights and benefits she would have enjoyed in the absence of such discrimination.

**Count 2 - Retaliation**

64. Plaintiff refers to and incorporates the allegations of paragraphs 1 through 57, above, as though fully set forth here.

65. From the time Ms. Morris requested a reasonable accommodation, in or about

December 2004, and filed her administrative complaint in or about August 2005, EPA began

treating Ms. Morris differently than it had previously, and differently from other similarly

situated employees, and taking adverse employment actions against her, up to and including

proposing to terminate her.

66.  Ms. Morris is informed and believes, and based thereon alleges, that EPA took such

adverse actions intentionally to retaliate against Ms. Morris for engaging in protected activity to

assert her rights under the Rehabilitation Act, and to chill the assertion of such statutory rights by

Ms. Morris and others.

### Prayer for Relief

WHEREFORE, plaintiff prays:

1.  For an injunction reinstating her to her position, requiring that EPA accommodate her

disability by allowing her to work from home, requiring that EPA remove from her employment

record all derogatory information directly or indirectly related to her disability, and prohibiting

EPA from taking any action which would increase or modify her duties with the result that

essential functions be added to her position requiring her to work within an EPA work site;

2.  For back pay and reinstatement of leave and all other benefits of employment,

according to proof at trial;

3.  For front pay;

4.  For compensatory damages according to proof at trial;

5.  For reasonable attorneys' fees;

6.  For such further relief as the Court deems just and proper.

KARR & ALLISON, P.C.

Theodore S. Allison

By: _____ / s / _____
      Theodore S. Allison  (D.C. Bar #441089)
      1920 N Street, N.W., Suite 300
      Washington, D.C.  20036
      Telephone (202) 331-7600
      Facsimile  (202) 293-3999

      Attorneys for Complainant

## Demand for Jury Trial

Plaintiff respectfully requests a trial by jury on all claims stated herein which by law may be tried to a jury, pursuant to the Constitution and Statutes of the United States, including but not limited to 42 U.S.C. §1981a.

Karr & Allison, P.C.

By: _____ / s / _____
      Theodore S. Allison (D.C. Bar #441089)
      1920 N Street, N.W., Suite 300
      Washington, D.C.  20036
      Telephone (202) 331-7600

      Attorneys for Plaintiff

**I (a) PLAINTIFFS**

Connie K. Morris

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _Princ_
(EXCEPT IN U.S. PLAINTIFF CASES)
George
88888    Maryland

**DEFENDANTS**

Stephen L. Johnson (E.P.A)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Theodore S. Allison  1920 "N" St, NW
Washington DC 20036 (202)331-7600

Case: 1:07-cv-00491
Assigned To : Roberts, Richard W.
Assign. Date : 3/14/2007
Description: Morris v. Johnson

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENS**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☐ **E. General Civil (Other) OR ☐ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ G. *Habeas Corpus/ 2255* | ☒ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

| V. ORIGIN | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed<br>from State<br>Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated<br>or Reopened | ☐ 5 Transferred from<br>another district<br>(specify) | ☐ Multi district<br>Litigation | ☐ 7 Appeal to<br>District Judge<br>from Mag.<br>Judge |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

29 USC 794

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS<br>☐ ACTION UNDER F.R.C.P. 23 | **DEMAND $** | Check YES only if demanded in complaint<br>**JURY DEMAND:** ☒ YES ☐ NO |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | ☐ YES ☒ NO | If yes, please complete related case form. |
|---|---|---|---|

**DATE** 3/14/07    **SIGNATURE OF ATTORNEY OF RECORD**

JTC

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.