**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CONNIE K. MORRIS,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 07-0491 (RWR)** |
| ) | |
| **v.** ) | |
| ) | |
| **STEPHEN L. JOHNSON,** ) | |
| **ADMINISTRATOR, UNITED STATES** ) | |
| **ENVIRONMENTAL PROTECTION** ) | |
| **AGENCY,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

## <u>DEFENDANT'S MOTION TO DISMISS THE COMPLAINT</u>

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant, Stephen L. Johnson, Administrator, United States Environmental Protection Agency, hereby seeks an order dismissing Plaintiff's complaint in its entirety because Plaintiff has failed to state claims upon which relief can be granted. In support of this Motion, Defendant respectfully submits the attached memorandum of points and authorities with exhibits, and a proposed order.

Dated: July 23, 2007

Respectfully submitted,

___/s/ Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

___/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

___/s/ Michelle N. Johnson_____
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney

United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT

Of Counsel:

Nancy J. Dunham
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 7454F
Washington, DC 20460

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CONNIE K. MORRIS,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 07-0491 (RWR)** |
| ) | |
| **v.** ) | |
| ) | |
| **STEPHEN L. JOHNSON,** ) | |
| **ADMINISTRATOR, UNITED STATES** ) | |
| **ENVIRONMENTAL PROTECTION** ) | |
| **AGENCY,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant, Stephen L.

Johnson, Administrator, United States Environmental Protection Agency ("EPA"), hereby seeks an

order dismissing Plaintiff's complaint in its entirety because Plaintiff has failed to state claims upon

which relief can be granted. Dismissal of many of the allegations contained in Plaintiff's complaint

is required because Plaintiff has failed to exhaust her administrative remedies regarding such claims.

Furthermore, dismissal of count I of the complaint for failure to accommodate is warranted because

Plaintiff has not invoked the proper statutory basis for her claim; she can not establish that she is

disabled within the meaning of the Rehabilitation Act; and in any event, her request to permanently

work full-time from home was unreasonable as a matter of law. As to her retaliation claim,

dismissal is required because Plaintiff cannot establish a prima facie case of retaliation. For these

reasons, Defendant requests that the complaint be dismissed in its entirety.

## I.    BACKGROUND

This is a case concerning a worker who has become, quite literally, allergic to her workplace. Plaintiff Connie Morris was employed by the EPA from January 12, 2003 through March 10, 2007. See Exhibit 1, Notice of Proposed Removal, dated February 5, 2007; Ex. 2, Complaint of discrimination dated April 13, 2007.[1]    Plaintiff worked for the EPA as a full-time Technical/ Information Liaison Specialist, Federal Register Staff, Office of Program Management Operations ("OPMO"), Office of Prevention, Pollution, and Toxic Substances ("OPPTS"), at EPA headquarters located in Washington, DC, and, at the time of her termination, was earning an annual salary of $100,077.00. Ex. 1, at 1.

At the time Plaintiff began working with the EPA in 2003, she was working in the 6109 Connecting Wing space designated as EPA West. Ex. 1, at 1.  She was able to perform her duties and reported to work regularly at that time without any problems. Id.  Plaintiff was a member of the Federal Register Staff and her first-line supervisor was John Richards.  Compl. ¶ 12.  Federal Register Staff are responsible for preparing documents, such as notices, proposals, final orders, stays, and confirmations of orders, necessary to implement the provisions of federal legislation administered and enforced by OPPTS. Ex. 3, Information Liaison Specialist/Technical Information

---

[1]As discussed further, infra, the Court may consider documents that are referred to in the complaint without converting Defendant's motion to dismiss into one seeking summary judgment.  See Wagener v. SBC Pension Benefit Plan, 407 F.3d 395, 397 (D.C. Cir. 2005) (noting that in reviewing district court's grant of motion to dismiss, the court could refer to "exhibits attached to, and the documents incorporated by reference in, the complaint."); Savage v. Scales, 310 F. Supp. 2d 122, 129 & n.8 (D.D.C. 2004) ("'[T]he Court may take judicial notice of' public documents, 'even if they are not included in, or attached to the complaint.'") (citations omitted).  The Notice of Proposed Removal is specifically referred to in the Complaint.  See Complaint ("Compl.") ¶ 56, whereas Plaintiff's statement that she has "exhausted her administrative remedies" permits the Court to consider her administrative discrimination complaints.

Specialist Position description, at 2. The position Plaintiff held was a senior position that required her to "provide leadership in executing editorial policy and priorities and coordinating document preparation efforts of other information liaison specialists when size, complexity and time constraints require a full team of people to work on a single Federal Register document package." Id. Plaintiff was also responsible for providing any "necessary training and/or assistance to Agency personnel working with regulatory documents, including the development and presentation of specialized training programs, workshops, etc.[,]" as well as providing "specific guidance and leadership to other members of the staff by implementing policy and procedural guidelines . . . ." Id. Among her other responsibilities, Plaintiff also had to "[r]espond[ ] immediately to questions concerning the location and status of all OPPTS documents[ ] being circulated for signature[,]" and "review[ ] work generated by less experienced members of the staff for uniformity and consistency among working groups and policy consistency in Federal Register style." Id. at 3; Compl. ¶ 10.[2] Concerning the "physical demands" of the position, the description provides that "[w]ork in this office is work station oriented with normal movement throughout the office to perform assigned tasks, use of dedicated specialized equipment." Ex. 3, at 10 (emphasis added). The "work environment" is described as consisting of "work . . . performed in an office environment." Id.

Beginning in November 2004, Plaintiff began reporting that she was allergic to the workplace. Ex. 1, at 1. On April 29, 2005, Plaintiff requested a reasonable accommodation in the form of approval to work permanently from home. Ex. 4, Request for Reasonable Accommodation;

---

[2]The excerpt from her position description quoted by Plaintiff similarly indicates that her position "provides leadership in executing editorial policy and priorities and coordinating the document preparation efforts of other information liaison specialists . . . [,]" as well as reviewing the work of less experienced staff and providing assistance when needed. Compl. ¶ 10.

Compl. ¶ 6.  In this request for a reasonable accommodation, Plaintiff requested that she be able to work at home because "[o]ngoing exposure to mold, mildew, and dust mites from work environment [had] triggered numerous allergic reactions . . . ."  Ex. 4.  Plaintiff's workspace location was subsequently changed from a cubicle to an office, however she continued to experience problems. Ex. 1, at 2.  On or about July 7, 2005, the Agency assigned Plaintiff to work at an EPA work site designated as a "clean space" in Crystal City, Virginia.  Id.  Plaintiff contended that she still continued to suffer problems at this location, despite air quality testing that revealed that the "clean space was acceptable by all applicable standards, and in fact was better than ambient air."  Ex. 1, at 3.[3]  On or about June 5, 2006, Plaintiff was moved the EPA's new Potomac Yards facility.  Id.; Compl. ¶¶ 11, 23.  Despite testing that confirmed that the air in the Potomac Yards facility was also better than ambient air, Plaintiff continued to contend that she was experiencing health problems as a result of her "workplace allergy."  Ex. 1, at 3.

Due to her alleged allergic reaction in the workplace, Plaintiff failed to report to work.  Id. at 5; Compl. ¶¶ 33, 35, 37.  Plaintiff was charged with being Absent Without Leave for the periods between August 20, 2006, through September 2, 2006 and October 1, 2006 through January 6, 2007. Ex. 1, at 6-10.  She was also charged with "Insubordination/Failure to Follow Supervisory Instructions" for her refusal to report for work.  Id. at 10-14.  She was terminated on March 10, 2007.  Ex. 2.

---

[3]Plaintiff's prior work space in the EPA building had also been tested for air quality concerns and revealed "no fungal growth, no airborne microbial amplification, no health risk, and confirmed that the air quality in the EPA space was actually superior to ambient (outside) air."  Ex. 1, at 2.

**Plaintiff's Administrative Complaints**

During her four-year tenure with the EPA, Plaintiff has filed two separate administrative

complaints of discrimination.

**1.     Complaint Filed August 10, 2005, EPA File No. 2005-0075-HQ**

On August 10, 2005, Plaintiff filed a complaint of discrimination.  Ex. 5, Complaint of

Discrimination dated 8/10/05; Compl. ¶ 6.  In this complaint, Plaintiff alleged that she had been

discriminated against on the basis of her sex and disability.  Ex. 5.  She described her disability as

"workplace sensitivity which affects life activity of breathing and walking."  Id. (emphasis added).

 In a statement attached to her complaint, Plaintiff stated that she believed she was discriminated

against for the following five reasons:

> 1.     When OPPTS Federal Register Staff become ill, they are allowed to notify
> supervisor and leave the premises.  I was told I had to contact four people and must
> keep a diary, and was still told must remain on the premises which subsequently
> resulted in me being transported by ambulance to the emergency room.
>
> 2.     I notified my supervisor several times indicating I was encountering allergic
> reactions in the clean space which inhibited my breathing and walking.  Supervisor
> still advised me that the clean space was my duty station.  This resulted in my being
> transported by ambulance to the emergency room.
>
> 3.     While under doctor's care and recovering, was harassed by my supervisor by phone,
> fax and Email.
>
> 4.     While under doctor's care and recovering, I was instructed to meet and surrender
> to the Deputy Director all papers, documentation, disks, equipment, including applicable
> passwords, and any other work related materials that I have at home that are the property
> of EPA.  Deputy Director would contact me to make the necessary arrangements as
> soon as possible.
>
> 5.     Received verbal threats my employment could be terminated.

Ex. 5, at 2.  As relief, Plaintiff sought "restoration of sick and annual leave, stop threats of

termination of employment, stop reprisal from filing for reasonable accommodation, and disability,

telework/work from home."[4]  Id.

On December 5, 2006, the Equal Employment Opportunity Commission ("EEOC") issued
its decision regarding Plaintiff's complaint.  Ex. 6, EEOC Decision Without a Hearing dated
12/5/06.  The administrative law judge ("ALJ") determined that the following issue was before him
pending adjudication:

> Whether, in violation of Title VII of the Civil Rights Act of 1964 . . .
> and the Rehabilitation Act of 1973 . . . the U.S. Environmental
> Protection Agency . . . discriminated against Connie K. Morris (Complainant) . . .
> based upon her sex (female) and disability (workplace sensitivity)
> when the Agency provided Complainant with a reasonable accommodation
> that Complainant contends was insufficient.

Id. at 4.  Concerning her Rehabilitation Act claim,[5] the ALJ determined that Plaintiff "fail[ed] to
produce any evidence to demonstrate that she was treated differently than similarly situated
employees who were not disabled."  Id. at 19.  The ALJ determined that the EPA had "engaged in
an interactive process with Complainant to ascertain an effective reasonable accommodation."  Id.
at 7.  This included performing airborne microbial assessment and tests of the EPA's workplace
offices, including Plaintiff's office and assigning Plaintiff to the Agency's "clean space" facility in
Crystal City, VA.  Id.  Furthermore, concerning her request for a reasonable accommodation, the
ALJ found that "[t]he undisputed evidence demonstrate[d] that Complainant requested a reasonable
accommodation and the Agency took steps to identify possible accommodations and made an

---

[4]Although Plaintiff indicated that she was seeking relief for acts of reprisal, she failed to
select the box regarding assertion of a claim of retaliation on her administrative complaint.  Ex.
5, at 1.

[5]As it concerned her Title VII claim, the ALJ determined that Plaintiff failed to establish
"that she was treated differently than similarly situated employees . . . or that other evidence
exists sufficient to create an inference that the agency's actions were motivated by
discrimination."  Ex. 6, at 18.

individualized assessment regarding Complainant, therein comparing Complainant's qualifications and limitations with the job requirements." Id. at 20.  While the Agency provided Plaintiff an accommodation in the form of a transfer to its "clean space" facility, the Agency contended that an accommodation permitting Plaintiff to permanently work from home was unreasonable because Plaintiff "encumbers a senior position on the Federal Register Staff which requires Complainant to perform a leadership role regarding other staff, editorial policy, priorities, coordination of document preparation under strict deadlines, and regular face-to-face meetings with other EPA personnel." Id. at 21.  Significantly, the "clean space" facility provided Plaintiff "with a secure computer network connection within the EPA, which Complainant's job required." Id.  In agreeing that the Agency had satisfied its burden under the law, the ALJ found that:

> [t]he record evidence demonstrates that the Agency engaged in an interactive process to ascertain which reasonable accommodation it could provide Complainant and, given the duties and responsibilities of Complainant's position, provided an accommodation it determined warranted and effective under the particular circumstances of this case, in light of Complainant's medical condition and the essential functions of her position.  There is no evidence to suggest that the Agency failed in its obligations under applicable law and regulation or that it intentionally provided Complainant with an ineffective or unreasonable accommodation because of her membership in any protected class.

Id. at 25.

**Complaint Filed April 13, 2007, EPA File No. 2005-0075**

In her second administrative complaint, filed April 13, 2007, Plaintiff alleged that she had suffered discrimination on the basis of her handicap, which she again described as a "workplace sensitivity which affects life activity of breathing and walking." Ex. 2 (emphasis added).  In describing the ways in which she believed to have been discriminated against, Plaintiff stated the following:

7

I have been terminated from my job, and prior to that, my supervisor threatened me with adverse action, all based on my being ill which was caused by not receiving a reasonable accommodation, and/or having my only accommodation (the "clean space") taken away.

I was determined by EPA to be a person with a disability. My removal letter indicated EPA did not consider me a person with a disability.
The accommodation I received (the "clean space") was taken away and I was assigned to Potomac Yards and back to EPA East, where I had my most severe workplace allergic reactions, without any accommodation or effort to accommodate me.

At or near the time of these events, I had a pending EEO complaint based on refusal to allow me to telework.

My doctor and I requested a reasonable accommodation of teleworking from home because of a disability which EPA recognized. Two doctors provided medical documentation to substantiate my need to work from home. A third doctor initially indicated I was very sensitive to various allergens. My supervisor and his supervisor disregarded my medical documentation, claiming they did not believe it. This was a pattern that continued over most of the past year.

My supervisor and his supervisor appeared to take the position that I had to prove that characteristics of a particular EPA site were causing my reactions. My supervisor and his supervisor appeared to be telling me to establish my right to a reasonable accommodation all over again each time I was moved. I do not believe a new request for a reasonable accommodation should be required for each new work location.

I was not accommodated nor was the interactive process engaged in through the date of my removal from federal service (3-10-07). I was removed both because of my inability to work without a reasonable accommodation, and in retaliation for asserting my rights.

Id.

Notably, Plaintiff's complaint in this Court was filed on March 14, 2007, four days after her termination,[6] and approximately thirty days _before_ she filed her administrative complaint of

---

[6]As set out in detail in the Notice of Proposed Removal, the basis for Plaintiff's termination was her refusal to appear for work. Ex. 1.

8

discrimination with the Agency. Plaintiff does not include allegations regarding her termination in her complaint. Her administrative complaint has been pending with the Agency approximately 90 days at this time.

## II.    STANDARD OF REVIEW

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has recently expounded on the oft-quoted standard for dismissal contained in Conley v. Gibson, 355 U.S. 41 (1957), noting that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted). Thus, in order for a complaint to survive dismissal, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. (citations omitted). This requires a plaintiff seeking to avoid dismissal to state "circumstances, occurrences and events" that support the legal claim presented rather than merely make a "bare averment" that he is entitled to relief. Id. at 1965 n.3. Dismissal is required if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." Id. at 1974.

In assessing the legal sufficiency of the complaint, the Court may consider the facts as alleged in the complaint, as well as documents incorporated into the complaint by reference, and matters of which judicial notice may be taken. See Wagener v. SBC Pension Benefit Plan, 407 F.3d 395, 397 (D.C. Cir. 2005) (noting that in reviewing district court's grant of motion to dismiss, the court could refer to "exhibits attached to, and the documents incorporated by reference in, the

9

complaint."); Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004) (court could consider documents that "are public records subject to judicial notice on a motion to dismiss.") (citing EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997) (other citations omitted). See also Thompson v. District of Columbia, 478 F. Supp. 2d 5, 10 & n.2 (D.D.C. 2007) ("Courts may take judicial notice of 'public documents, even if they are not included in, or attached to the complaint. . . . Consideration of such judicially noticeable documents does not convert this motion to one for summary judgment.") (citations omitted); Howard v. Gutierrez, 474 F. Supp. 2d 41 (D.D.C. 2007) ("Indeed it is a well settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice.") (citation and internal quotation marks omitted).

## III.  PLAINTIFF HAS FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES REGARDING MANY OF THE ALLEGATIONS IN HER COMPLAINT.

Prior to seeking relief in federal court pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq., a federal employee must timely exhaust all available administrative remedies. See 42 U.S.C. § 2000e-16(c) (requiring claimants to exhaust their remedies prior to bringing a Title VII lawsuit); 29 U.S.C. § 794a(a)(1) (incorporating Title VII's remedies for Rehabilitation Act claims); 29 C.F.R. § 1614.407; Kizas v. Webster, 707 F.2d 524, 544 & n.99 (D.C. Cir. 1983); see, e.g., Robinson v. Chao, 403 F. Supp. 2d 24, 28 (D.D.C. 2005); Raines v. United States Dep't of Justice, 424 F. Supp. 2d 60, 65 (D.D.C. 2006).[7]  Before a complainant can file a formal discrimination

---

[7] Regulations promulgated by the U.S. Equal Employment Opportunity Commission require federal courts to use the standards applicable to claims brought pursuant to the Americans with Disabilities Act in determining whether section 501 of the Rehabilitation Act has been violated.  29 C.F.R. § 1614.203.

complaint, she must first consult an EEO counselor to try to resolve the matter informally. 29 C.F.R. § 1614.105(a). Contact with an EEO counselor must occur "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). If the matter is not resolved informally, the complainant may then file a formal complaint against the agency within 15 days of receipt of notice from the EEO counselor. 29 C.F.R. § 1614.105(d). After the filing of an administrative complaint, a complainant may not proceed to federal court to file a civil action until 180 days have elapsed since the filing of the administrative complaint, provided no appeal has been filed and no action by the agency has been taken. 29 C.F.R. § 1614.407.

Plaintiff asserts in conclusory fashion that she "has exhausted her administrative remedies." Compl. ¶ 6. Plaintiff then goes on to state that she "filed a formal complaint with the agency EEO office on or about August 10, 2005, and within the past 90 days, on December 19, 2006, received an adverse decision from the agency." Id. ¶ 8. However, a comparison of her administrative complaint filed in 2005 and her complaint filed in this Court readily reveal that Plaintiff has not exhausted many of the claims she has asserted. The subject of Plaintiff's 2005 complaint was the denial of her request to work from home; the fact that she had to remain at work when ill; the fact that she continued to suffer health effects when working in the "clean space"; that she was allegedly harassed by her supervisor; that she was required to meet and surrender all EPA property to the Deputy Director; and that she was threatened with termination. Ex. 5, at 2. However, in her complaint filed in this Court, Plaintiff alleges that she suffered discrimination because of, inter alia, the following actions: her supervisors failed to engage in the interactive process, Compl. ¶ 62; her subsequent assignment to Potomac Yard, id. ¶ 23; her supervisor's request for documentation

11

regarding Plaintiff's alleged disability, id. ¶ 29; her reassignment to EPA East, id. ¶ 52; the various allegations concerning her requests for sick leave and her placement on "absent without leave" ("AWOL") status, id. ¶¶ 33-52, as well as the February 5, 2007 proposal to terminate her, id. ¶ 56. However, these claims were not timely exhausted at the time Plaintiff filed her complaint in this Court  because they have not been pending before the Agency for the requisite 180 days, and therefore dismissal is required.  Cf. Jones v. Ashcroft, 321 F. Supp. 2d 1, 12  (D.D.C. 2004) (dismissing Title VII lawsuit because of plaintiff's "premature filing" of his lawsuit and holding that "plaintiff failed to exhaust his administrative remedies by filing this suit before his administrative appeal had been pending for 180 days."); Jordan v. Evans, 355 F. Supp. 2d 72, 84 (D.D.C. 2004) (dismissing Title VII claims that had been filed "before the 180-day period had expired.").  See also Easton v. Snow, No. Civ.A. 04-2038, 2006 WL 1774552, at *2 (D.D.C. June 26, 2006) ("A complainant may only seek relief in federal court after receiving an adverse final decision from the agency or after a written complaint had been pending for at least 180 days.") (citing to Title VII and ADEA provisions).

Perhaps realizing that all of her claims are not properly before the Court, Plaintiff contends in her complaint that all actions occurring on or about "August 10, 2005  to the present time, were within the scope of and related to the EEOC investigation of Ms. Morris' administrative complaint, and/or constitute retaliation, for which there is no separate requirement of exhaustion of administrative remedies."  Compl. ¶ 8.[8]  Plaintiff's conclusory statement inaccurately reflects the

---

[8]Notably, attached to her 2007 administrative complaint of discrimination, Plaintiff included a statement that she was filing the complaint in the event "it were determined that I was required to exhaust my administrative remedies beyond my prior administrative complaint which is the subject of my federal action."  Ex. 2, at 2.

state of the law. While the D.C. Circuit has held that "[a] Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations[,]'" <u>Park v. Howard Univ.</u>, 71 F.3d 904, 907 (D.C. Cir. 1995), the Supreme Court, in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002), has modified that holding and concluded that "discrete discriminatory acts are not actionable if time-barred, <u>even when they are related to acts alleged in timely filed charges</u>." (Emphasis added). Such "discrete acts" include "termination, failure to promote, denial of transfer, or refusal to hire . . . ." <u>Id.</u> at 114; <u>see also</u> <u>Coleman-Adebayo v. Leavitt</u>, 326 F. Supp. 2d 132, 138 (D.D.C. 2004) (noting that "<u>Park</u> no longer reflects the state of the law[,]" in light of <u>Morgan</u>), <u>amended on reconsideration in part</u>, 400 F. Supp. 2d 257 (D.D.C. 2005). Furthermore, "[i]ndividual acts of retaliation that form the basis of retaliation claims also are included within the Supreme Court's list of discrete discriminatory acts, and therefore any claim stemming from those acts must be administratively exhausted." <u>Coleman-Adebayo</u>, 326 F. Supp. 2d at 138. This prohibition applies to bar Plaintiff's claims for acts stemming from her April 2007 discrimination complaint, and dismissal is required of those allegations that form the basis of Plaintiff's complaint in this court because these claims have not been administratively exhausted. <u>See</u> <u>Dage v. Leavitt</u>, No. Civ.A. 04-0221, 2007 WL 81961, at *5 (D.D.C. Jan. 9, 2007) (refusing to consider claims in plaintiff's complaint that were "expansive [in] scope] compared to allegations made in his administrative complaint); <u>Coleman-Adebayo</u>, 326 F. Supp. 2d at 139 (dismissing plaintiff's retaliation claim regarding her transfer to an EPA office despite the filing of an earlier charge alleging that plaintiff

should be permitted to work at home).[9]

## IV. PLAINTIFF HAS FAILED TO STATE A CLAIM FOR FAILURE TO ACCOMMODATE UNDER THE REHABILITATION ACT.

In count I of her complaint, Plaintiff alleges that she was denied a reasonable accommodation when the Agency denied her request to work full-time from her home. Compl. ¶ 62.[10] Dismissal of this count is required for several reasons. First, Plaintiff has not invoked the proper statutory provision of the Rehabilitation Act upon which to base her claim. Second, because Plaintiff cannot establish that she is disabled within the meaning of the Rehabilitation Act, she cannot establish a claim for failure to accommodate. And third, even if Plaintiff could establish that she is protected under the Rehabilitation Act, Plaintiff's request to permanently work from home was not reasonable as a matter of law. For these reasons, dismissal of count I is required.

### A. Section 504 of the Rehabilitation Act Does Not Apply to Employment Discrimination Claims Against the Federal Government.

In her complaint, Plaintiff cites to section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) in support of her failure to accommodate claim. However, it is well established that "[s]ection 501 is the exclusive remedy for federal employees alleging disability discrimination by a federal agency." Raines v. United States Dep't of Justice, 424 F. Supp. 60, 65 (D.D.C. 2006) (citations omitted). Indeed, the District of Columbia Circuit has clearly held that section 504 provides no such

---

[9]In considering plaintiff's Rule 59(e) motion, the court subsequently reinstated a portion of plaintiff's retaliation claim, namely her 1999 through 2001 claims. Coleman-Adebayo v. Leavitt, 400 F. Supp. 2d 257, 261-62 (D.D.C. 2005). However, the court did not reinstate the claims pertaining to actions that had occurred in 2003 as those claims had not been properly exhausted. Id. at 260-61.

[10]While Plaintiff also contends in count I that the Agency failed to engage in "the interactive process[,]" Compl. ¶ 62, as discussed supra at 11, this is a claim that has not been properly exhausted and should not be considered by the Court.

14

relief to federal employees.  See Taylor v. Small, 350 F.3d 1286, 1291 (D.C. Cir. 2003).  In Taylor, the circuit court acknowledged that "[s]ection 504 does not on its face apply to federal employees; rather it prohibits 'discrimination under any program or activity receiving federal financial assistance or under any program of activity conducted by any Executive agency . . . .'" Id. (quoting 29 U.S.C. § 794).  The court recognized that government employees "are not participants in or beneficiaries of a 'program or activity conducted by any Executive agency[.]" Id.  Accordingly, the court held that "[section] 504 does not provide federal employees an 'alternative route for relief under the Rehabilitation Act.'" Id.  (citations omitted).

Here, Plaintiff has failed to invoke the proper provision of the Rehabilitation Act.  Rather, she has based her claim in count I of her complaint on section 504, 29 U.S.C. § 794.  As a result, she has failed to set forth a claim upon which relief can be granted.  See Taylor, 350 F.3d at 1292 (affirming dismissal of Rehabilitation Act claim by government employee that was based on section 504).

**B.    Plaintiff Cannot Establish a Prima Facie Case of Discrimination Under the Rehabilitation Act.**

The Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 et seq., requires a federal executive agency to provide a reasonable accommodation to an employee with a disability.  To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.  Edwards v. U.S. E.P.A., 456 F. Supp. 2d 72, 97 (D.D.C. 2006); Thompson v. Rice, 422 F. Supp. 2d 158, 165-66 (D.D.C.2006).  Thus, the two-fold threshold

15

question under the Rehabilitation Act is (1) whether a plaintiff is an individual with a disability who (2) is "otherwise qualified" to perform his or her job.  <u>Mack v. Strauss</u>, 134 F. Supp. 2d 103, 109 (D.D.C.), <u>aff'd</u>, 2001 WL 1286263 (D.C. Cir. 2001).

       **1.**        **Plaintiff is Not Disabled Within the Meaning of the Rehabilitation Act.**

Plaintiff cannot establish she is an individual with a disability under the Act.  "A person is disabled under the Rehabilitation Act if she 'has a physical or mental impairment which substantially limits one or more of [her] major life activities; has a record of such an impairment; or is regarded as having such an impairment."  <u>Thompson</u>, 422 F. Supp. 2d at 166 (quoting 29 U.S.C. § 705(20)(B)).  In making a determination of whether Plaintiff is disabled, the Court can refer to the standards utilized by the Americans with Disabilities Act.  <u>See</u> 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111, <u>et</u> <u>seq.</u>)); <u>Thompson</u>, 422 F. Supp. 2d at 166 & n.6 ("The liability standards of the Rehabilitation Act and the ADA are the same in employment discrimination cases, and thus cases interpreting either statute are applicable in defining the terms 'disability' and otherwise determining liability.") (citing 29 U.S.C. § 794(d)).  "It is the plaintiff's burden to prove that [s]he is disabled."  <u>Haynes v. Williams</u>, 392 F.3d 478, 482 (D.C. Cir. 2004).  Plaintiff cannot satisfy the definition of an individual with a disability as defined under the Act.

Plaintiff does not have a physical or mental impairment that significantly limits any of her major life activities.  To qualify as a disability, an impairment's impact must be "permanent or long-term."  <u>Toyota Motor Manufacturing, Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 198 (2002) (citing

29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (2001)).  It is well settled that a transient health condition is not a "disability" for purposes of the Rehabilitation Act or the ADA.  Under ADA regulations pertinent to determining whether an individual is substantially limited in a major life activity, factors to consider are: (1) "[t]he nature and severity of the impairment;" (2) [t]he duration or expected duration of the impairment;" and (3)"[t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment[.]" 29 C.F.R. § 1630.2(j)(2). Plaintiff does not have a physical impairment that meets any of these criteria.

As described in her complaint, Plaintiff 's alleged physical impairment consists of "a yeast sensitivity which in turn causes her to be sensitive to small concentrations of other molds and even chemicals in the workplace and elsewhere."  Compl. ¶ 12. This sensitivity can cause "muscle weakness, breathing problems, problems with walking, thinking, elevated blood pressure, and swelling." Id. Notably, Plaintiff does not allege anywhere in her complaint that she had debilitating symptoms from her "disability" at any location aside from her workplace.[11] Specifically, according to Plaintiff, her doctor, Dr. Christopher Holland, stated that were Plaintiff permitted to work from home "she would not experience these problems." Id. Thus, any alleged debilitating symptoms Plaintiff experienced were only caused by her being in the workplace and cannot be substantially limiting within the meaning of the Rehabilitation Act. See Haynes, 392 F.3d at 483; Coleman-Adebayo, 326 F. Supp. 2d at 143 142-43 (holding that hypertension that was controlled by medicine except when plaintiff was subjected to stress at work was not a disability; "Unfortunately for plaintiff, a person whose daily life activities are not substantially limited, even though her

---

[11]Notably, in both her 2005 and 2007 administrative complaints, Plaintiff described her impairment as a "workplace sensitivity . . . ." Exs. 2 and 5 (emphasis added).

performance at work is subject to physical limitations, is not disabled.") (citing Toyota, 534 U.S. at 201-02).

Indeed, in Haynes, the District of Columbia Circuit specifically rejected the notion that an impairment that manifests itself only in the workplace could render an employee substantially limited in a major life function. Id. The employee there contended that he developed a "severe medical condition" that was exacerbated by his work environment and caused him to itch incessantly, resulting in him being unable to sleep sufficiently. Id. at 480. Because of his difficulties sleeping, the employee failed to timely report to work and was eventually terminated as a result. Id. at 481. The employee filed a lawsuit against his employer pursuant to the ADA and the Rehabilitation Act. Id. & n.1. In concluding that the employee had failed to establish that he was substantially limited in the major life activity of sleeping, the court stated:

> If [the employee] could have avoided the [impairment's impact of] itching that seriously affected his sleep by simply working at a different location, then he was not 'substantially limited' in the major life function of sleeping. Indeed, were we to hold that a plaintiff can recover under the ADA based on a condition that becomes limiting only when he works in a single building, we would transform the ADA into an occupational safety and health statute.

Id. at 483 (footnote omitted). Thus, the D.C. Circuit has made clear that "[i]f the impact of an impairment can be eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term." Id. See also Coleman-Adebayo, 326 F. Supp. 2d at 142-43 (holding that hypertension was not a disability under the Rehabilitation Act where "[t]he only circumstances in which plaintiff's hypertension is not controlled by medication is when she is working in an EPA office."). Because her impairment is only triggered when she is working at EPA facilities, Plaintiff does not have an impairment that significantly limits any of her major life

18

functions.

For these same reasons, Plaintiff cannot show that she has a record of an impairment that significantly limits one or more of her major life activities.[12]  "A record of impairment means that a person 'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." Thompson, 422 F. Supp. 2d at 174 (quoting 29 C.F.R. § 1630.2(k)).  The fact that Plaintiff was diagnosed by her doctors as having an impairment does not make her disabled for purposes of the Rehabilitation Act. In Toyota, the Supreme Court cautioned that "[i]t is insufficient for individuals attempting to prove disability status to merely submit evidence of a medical diagnosis of an impairment.  Instead, the Act requires [Plaintiff] . . . to prove a disability. . . ." 534 U.S. at 198.  Thus, "merely having an impairment does not make [an individual] disabled." Id.  Instead, plaintiffs must "prove a disability by offering

---

[12]Notably, Plaintiff does not contend that her alleged impairment significantly limits her ability to work. Ex. 5 (administrative complaint of discrimination alleging that her "workplace sensitivity . . . affects life activity of breathing and walking."); Compl. ¶ 12 (noting that alleged impairment causes "muscle weakness, breathing problems, problems with walking, thinking, elevated blood pressure and swelling."").  Even if Plaintiff did contend that her alleged impairment significantly impacts the major life activity of working, she could not establish a substantial limitation on that activity because she cannot show that she is precluded from performing a broad range of jobs, rather than working at specific EPA sites. Coleman-Adebayo, 326 F. Supp. 2d at 143 & n.7 ("To establish a substantial limitation on the major life activity of working, plaintiff would have to allege and prove . . . '[her] impairment prevents [her] from performing a 'substantial class' or 'broad range' of jobs otherwise available to [her]' rather than demonstrating that she is unable to do her specific job.") (citations omitted). See also Haynes, 392 F.3d at 483 ("If the impact of an impairment can be eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term."); Thompson, 422 F. Supp. 2d at 171 (holding that plaintiff's Rehabilitation Act claim could not "succeed because she has not shown that she is excluded from a substantial class or broad range of jobs. Her characterization of the broad range of jobs as 'working in the Foreign Service' is inconsistent with the standards articulated [by the Supreme Court and District of Columbia Circuit].").  "This assumes, of course, that working qualifies as a major life activity, a premise that the Supreme court has questioned." Coleman-Adebayo, 326 F. Supp. 2d at 143 & n.7 (citations omitted).

evidence that the extent of the limitation [caused by the impairment] in terms of their own experience is substantial.'" Id. at 201-02.  To qualify as "substantial," "the impairment's impact must also be permanent or long-term."  Id. at 201.  According to Plaintiff's own doctor, were Plaintiff permitted to work at home she would not experience any impact from her impairment. Compl. ¶ 12.  As stated supra, it is clear that an impairment that only manifests itself when Plaintiff reports to work does not qualify under the Rehabilitation Act.

Finally, Plaintiff was not regarded by the EPA as disabled within the meaning of the Rehabilitation Act.  "An individual is 'regarded as' disabled if her employer 'mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities' or 'mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Thompson, 422 F. Supp. 2d at 175 (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)).  Plaintiff alleges that the "EPA concurred, and found on July 7, 2005 that Ms. Morris was an individual with a disability."  Compl. ¶ 13.[13]  However, an employer "considers" an employee as disabled when the Defendant regards the Plaintiff as being unable to perform a class of jobs or a broad range of jobs.  Sutton, 527 U.S. at 483.  Indeed, in continuing to insist that Plaintiff appear for work and reassigning her to different work sites, Compl. ¶¶ 21, 29, 37, 39-40, 52, 54, the EPA evidenced that it did not consider Plaintiff as disabled within the meaning of the Rehabilitation Act.  Furthermore, "'an employer's attempts to accommodate an employee's concerns

---

[13]The EPA's National Reasonable Accommodation Coordinator, William R. Haig, initially denied Plaintiff's request for a reasonable accommodation but, after Plaintiff submitted a request for reconsideration, Mr. Haig issued a Determination of Disability finding that Plaintiff was disabled.  Ex. 7, District of Columbia, Office of Administrative Hearings, Final Order dated June 4, 2007.  Subsequently, Plaintiff sought unemployment benefits, a request that was initially granted by the Claims Examiner, but reversed after the EPA appealed that decision.  Id. at 13.

20

and perceived needs do not establish that the employer regarded the employee as having a disability.'" Thompson, 422 F. Supp. 2d at 175 (citation omitted).

For these reasons, Plaintiff is not an individual with a disability as that term is defined pursuant to the Rehabilitation Act and she is therefore not entitled to any of the Act's protections. See Coleman-Adebayo, 326 F. Supp. 2d at 143 ("Plaintiff is not entitled to an accommodation for an affliction that is not a disability under statute.").

### 2.    Plaintiff Was Not an Otherwise Qualified Individual.

While the Rehabilitation Act requires an agency to approve a request for a reasonable accommodation that is consistent with the Americans with Disabilities Act of 1990, see 29 U.S.C. § 791(g) (incorporating 42 U.S.C. § 12111(8); 29 C.F.R. §§ 1614.203(b) (incorporating 29 C.F.R. § 1630.4), an accommodation is only required to be provided if the employee is a "qualified" individual with a disability, i.e., an individual who can perform the essential functions of her position with or without reasonable accommodation.  See 29 C.F.R. § 1630.2(m); see also Taylor v. Rice, 451 F.3d 898, 905 (D.C. Cir. 2007) ("An 'individual with a disability' under the Rehabilitation Act . . . must be 'qualified' to be protected by the Disabilities Act–that is, he or she, 'with or without reasonable accommodation,' must be able to 'perform the essential functions of the employment position that such individual holds or desires.") (citations omitted).

Attendance at work was an essential function of Plaintiff's position.  As a "senior member" of the Federal Register Staff, Plaintiff was required to "provide leadership in executing editorial policy and priorities . . ." as well as "coordinating the document preparation efforts of other information liaison specialists when size, complexity and time constraints require a full team of people to work on a single Federal Register document package."  Ex. 3, at 2.  Furthermore, the

position description clearly states that Plaintiff's work was "work station oriented" and required "use of dedicated specialized equipment." Id. at 10.[14]  These functions required Plaintiff to physically be in the office.

The District of Columbia Circuit has recognized that attendance is an essential function of a government employee's position.  See Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994) ("an essential function of any government job is an ability to appear for work").  The basis for Plaintiff's termination was her complete failure to report to work for the period of January 4, 2007 through February 2, 2007.  See Ex. 7, at 10-12. Plaintiff was also charged with being AWOL for approximately 412 hours between August 21, 2006 and December 16, 2006. Id. at 6.  This failure to appear for work regularly establishes that Plaintiff could not perform the essential functions of her job. See Sampson v. Citibank, F.S.B., 53 F. Supp. 2d 13, 18 (D.D.C. 1999) (an "employee who cannot meet the attendance requirements of a job is not a 'qualified' individual under the ADA") (citing Tyndall v. National Educ. Centers, 31 F.3d 209, 213 (4th Cir. 1994)).  Because she could not appear regularly to work, Plaintiff was not an otherwise qualified individual under the Rehabilitation Act and was not entitled to an accommodation. See Matzo v. Postmaster General, 685 F. Supp. 260, 263 (D.D.C 1987)  ("[An employee with a] handicap which deprives a worker of an ability to fulfill an essential requirement of his craft can never be 'otherwise qualified' [under the Rehabilitation Act]."), aff'd, 861 F.2d 1290 (D.C. Cir. 1988).

--------

[14]Plaintiff states that even if she were required to have "constant access to EPA's Local Area Network (LAN), it is generally accepted that employees in the federal government can have such access, and EPA has done nothing to explain who gets remote access to the EPA's LAN." Compl. ¶ 20.  However, "[a] handicapped employee cannot dictate the measure of his employer's duty to accommodate . . . ." Matzo, 685 F. Supp. at 264.  Nor does Plaintiff provide any method by which she could effectively coordinate and lead persons on her team from home.

C.    **Plaintiff's Request to Permanently Work from Home was not a Reasonable Request for an Accommodation.**

For failure to accommodate cases under the Rehabilitation Act, the plaintiff "carries the burden of proving by a preponderance of the evidence that she has a disability, but with a <u>reasonable accommodation</u> (which she must describe), she can perform the essential functions of [her] job." <u>Flemmings v. Howard Univ.</u>, 198 F.3d 857, 861 (D.C. Cir.1999) (emphasis added); <u>Pantazes v. Jackson</u>, 366 F. Supp. 2d 57, 66 (D.D.C. 2005).  The only accommodation at issue in this case is whether or not Plaintiff was entitled to permanently work from home.  As discussed more fully <u>supra</u>, this was not a reasonable accommodation because it would have eliminated an essential function of Plaintiff's position, <u>i.e.</u>, office attendance and cooperatively working with and leading members of her team.

Plaintiff has the burden of identifying a reasonable accommodation.  <u>Id.</u> at 191.  However, the only accommodation Plaintiff suggested was one that would have involved permanently working from home, and not requiring her to appear at work at all.  This would have obviated an essential function of her position which required Plaintiff, as the senior member of a team of people, to work collaboratively with others in preparing a single document package for the Federal Register.  Ex. 3, at 2.  "The duty to accommodate does not require an employer to relieve the employee of any essential functions of the job or modify the actual duties." <u>Clayborne v. Potter</u>, 448 F. Supp. 2d 185, 191-92 (D.D.C. 2006) (citations omitted).  Because the accommodation that Plaintiff requested would have eliminated an essential function of her position, the accommodation was not reasonable as a matter of law.  <u>Duncan v. Harvey</u>, 479 F. Supp. 2d 125, 133 (D.D.C. 2007) ("holding that "plaintiff's request that defendant restructure her job to eliminate [an essential function of her position] was not reasonable.") (citations omitted); <u>see also</u> <u>Mulloy v. Acushnet Co.</u>, 460 F.3d 141,

23

153-54 (1st Cir. 2006) (holding that employee's request to work remotely was "per se unreasonable" because his physical presence at work "was an essential function of his job . . . .").

## V.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RETALIATION.[15]

In count two of her complaint, Plaintiff contends that "[f]rom the time [she] requested a reasonable accommodation, in or about December 2004, and filed her administrative complaint in or about August 2005, EPA began treating Ms. Morris differently than it had previously, and differently from other similarly situated employees, and taking adverse employment actions against her, up to and including proposing to terminate her."  Compl. ¶ 65.

As discussed supra, many, if not all, of the allegations that could comprise Plaintiff's retaliation claim are not properly before the Court because Plaintiff has not exhausted her administrative remedies.  Clearly, the proposal to terminate Plaintiff, which occurred in February 2007, would be such a claim.[16]  These claims are not, therefore, properly before the Court. However, even if the Court were to consider Plaintiff's retaliation claim, dismissal is still required.

"Section 501 of the Rehabilitation Act incorporates ADA § 107, which in turn incorporates '[t]he powers, remedies, and procedures set forth in sections 705, 706, 707, 709 and 710 of the Civil Rights Act of 1964,' 42 U.S.C. § 12117."  Woodruff v. Peters, 482 F.3d 521, 528 (D.C. Cir. 2007). Therefore, this Court applies "Title VII's McDonnell Douglas burden-shifting framework to

---

[15]Plaintiff does not cite the precise statutory basis for her claim of retaliation, asserting only that she was retaliated against "for engaging in protected activity to assert her rights under the Rehabilitation Act."  Compl. ¶ 66.

[16]Plaintiff does not delineate the specific actions she contends constitute retaliation, instead incorporating paragraphs 1 through 57 of her complaint into her retaliation count. However, it is apparent many of these allegations have not been exhausted and could not form the basis of her retaliation claim.

retaliation claims under the Rehabilitation Act when employers assert non-retaliatory grounds for adverse employment actions." [17] Id. at 528-29. Thus, to establish a prima facie case of retaliation or reprisal under the Rehabilitation Act, plaintiff has the "initial burden" of establishing that (1) she engaged in protected activity; (2) she was subjected to an adverse employment action and, (3) there was a causal link between the protected activity and the adverse action. Id. at 529. Without conceding that Plaintiff can meet the first of the prima facie elements, it is apparent that she cannot establish the last two elements of her prima facie case of retaliation, and therefore dismissal is required. See Totten v. Norton, 421 F. Supp. 2d 115, 120 (D.D.C. 2006) ("If, based on the allegations in the complaint and drawing all inferences consistent with those allegations in plaintiff's favor, it appears beyond doubt that a Title VII reprisal plaintiff would be unable to satisfy one or more of these prima facie elements, then the Court must grant defendant's motion to dismiss.").

Not every action an employer takes after an employee has engaged in protected activity will be held to constitute retaliation. "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414 (2006). To establish the second prong of her prima facie case, Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co., 126 S. Ct. 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks and

---

[17]Title VII provides, in part, that it is unlawful for an employer to discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

other citation omitted); see also Totten, 421 F. Supp. 2d at 120-21 ("Materially adverse consequences include those 'affecting the terms, conditions or privileges of employment . . . as well as those that fall short of ultimate employment decisions.") (citations omitted).

As to the claims that are properly before the Court, Plaintiff has failed to allege any "materially adverse consequences" that would dissuade a reasonable worker from making or supporting a charge of discrimination. While she fails to identify the precise action forming her claims of retaliation, her 2005 administrative complaint contended that she was required to maintain a diary of the times she was ill and required to remain on the premises; was required to remain at her work station; she was harassed by her supervisor on the phone while sick; and she was told that her employment could be terminated. Ex. 5, at 2. See also Compl. ¶¶ 29 (supervisor required documentation regarding illness); ¶ 37 (supervisor harassed Plaintiff); ¶ 40 (supervisor informed plaintiff that continued absences could lead up to removal from federal service). Plaintiff cannot show that these actions, notably a "threat" to terminate her employment, had material adverse consequences for her employment. See, e.g., Mayers v. Laborers' Health & Safety Fund, 478 F.3d 364, 369 (D.C. Cir. 2007) (holding that retaliation claim "fail[ed] on the merits . . ." because plaintiff failed to allege that the alleged retaliatory project she was assigned "increased her workload above and beyond what ordinarily was expected of her."); Totten, 421 F. Supp. 2d at 121 (holding that "[a] single incidence of non-admittance to a federal facility [did] not rise to the requisite level of 'materiality' . . ." and holding that plaintiff was "unable to meet the requirement that the challenged action by his employer would dissuade a reasonable worker from making or supporting a charge of discrimination.").

Furthermore, even if the Court were to consider claims that have not been properly

26

exhausted, Plaintiff is unable to establish the third prong of her prima facie case of retaliation because there is absolutely no causal connection between Plaintiff's prior protected EEO activity in 2005, her transfer in 2006 to Potomac Yards, Compl. ¶ 23, and her eventual termination in 2007. A gap of one to two years is insufficient to establish the required temporal proximity. See, e.g., Mayers, 478 F.3d at 369 (holding that "the eight or nine-month gap between the final protected activity–either the physician's March 2000 letter or Mayers's April 2000 conversation . . . and the early January 2001 project is far too long.") (citation omitted); Haste v. Henderson, 121 F. Supp. 2d 72, 80 (D.D.C. 2000), aff'd, No. Civ.A. 00-5423, 2001 WL 793715 (D.C. Cir. June 28, 2001) (holding that "the passage of nearly two years between the events prevents the finding of a causal connection.") (citations omitted); Garret v. Lucan, 799 F. Supp. 198, 202 (D.D.C. 1992) (holding that a lapse of one year "between plaintiff's EEO activity and the adverse employment decision is too great to support an inference of reprisal.") (citations omitted). See also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citations omitted) (emphasis added).    Because Plaintiff cannot identify any alleged retaliation that occurred close in time to her protected activity in 2005, dismissal of her retaliation claim is warranted.

## VI.    CONCLUSION

For the foregoing reasons, Defendant requests that Plaintiff's complaint be dismissed in its entirety for failure to state claims upon which relief can be granted.

Dated:  July 23, 2007

Respectfully submitted,

_____/s/ Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


_____/s/ Michelle N. Johnson_____
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT


Of Counsel:

Nancy J. Dunham
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Room 7454F
Washington, DC 20460

# EXHIBIT 1

***MEMORANDUM***

SUBJECT:    Notice of Proposed Removal

TO:    Connie K. Morris, Technical Information Specialist
       Federal Register Staff
       Office of Program Management Operations

FROM:    John A. Richards, Director
         Federal Register Staff
         Office of Program Management Operations

DATE:    February 5, 2007


The purpose of this memorandum is to notify you that I am proposing to remove you from your position of Technical Information Specialist, GS-1001-14, step 3, at an annual salary of $100,077.00, in the Federal Register Staff, Office of Program Management Operations, Office of Prevention, Pesticides, and Toxic Substances ("OPPTS"), at the U.S. Environmental Protection Agency. This action is taken for reasons of multiple acts of significant misconduct. If approved by the deciding official, Marylouise M. Uhlig, Associate Assistant Administrator for OPPTS, your removal will be effective no earlier than thirty (30) calendar days from the date you receive this memorandum. I am proposing this action pursuant to Title 5, United States Code, Chapter 75 and Title 5 of the Code of Federal Regulations, Part 751, for such cause as will promote the efficiency of the Federal service.

I.    **BACKGROUND**

   A.    **Workplace History**

On January 1, 2003, you began working as a member of the OPPTS Federal Register Staff. At that time, the Federal Register Staff was located in the 6109 Connecting Wing space designated as EPA West. You were able to perform your duties and reported to work regularly. Prior to my hiring you as a member of my staff, you performed work for me as a contract employee for approximately one year in 1999.

In November 2004 and thereafter, you began reporting problems related to an "allergy to the EPA workplace." See Attachment 1. I immediately began working with

1

Facilities and others at EPA to address your problem. Id. You first requested a reasonable accommodation of permanently working from home full-time in December 2004. See Attachment 2. I located EPA's Reasonable Accommodation procedures and provided them to you. Id. I denied the request for permanent flexiplace, because your job required a secure network connection within the EPA complex as well as regular face-to-face meetings with EPA personnel. I nevertheless engaged in the interactive process with you in order to address these issues and identify an effective accommodation.[1] I worked with you to find a solution to your health complaints and to assist you in performing the essential functions of your position, including arranging with EPA Facilities to test the air quality on no less than six occasions; approving the installation of and payment for air purification systems; approving extended leave; approving intermittent, temporary work from home; having Facilities lower the temperature in your workspace; and reassigning you repeatedly to new office locations.[2] See Attachments 3. More specifically, during the time period from early 2005 to October 2006, I changed your office location five different times, as follows:

1. Your office space was changed from a cubicle in 6109 to an office in room 6108. We had the workspaces tested for air quality on February 18, 2005.[3] The findings in the scientific testing on February 18, 2005 revealed no fungal growth, no airborne microbial amplification, no health risk, and confirmed that the air quality in the EPA space was actually superior to ambient (outside) air. See Attachment 4. Nevertheless, you continued to report health problems as a result of "a workplace allergy."

2. Thus, your office space was changed for the second time in November 2005, after additional testing had been performed to assess the air quality in several potential office sites. Your office was moved to 1133B EPA East, a conference room on the first floor of EPA East. You continued to report health problems as a result of "a workplace allergy." See Attachment 5.

3. Your office space and work site was changed again in July 2005. At that time, you were relocated to EPA's clean space in the facility at Crystal Station, Virginia. You continued to report health problems as a result of "a workplace allergy." See Attachment

---

[1] Initially we proceeded with the assistance of EPA's Reasonable Accommodation Coordinator, Mr. William Haig. In May 2005, based on the documentation you submitted, Mr. Haig determined that you were not an individual with a disability. Upon reconsideration, Mr. Haig determined in August 2005 that you were a individual with a disability.

[2] You were also permitted to wear a mask and goggles at work, which you did occasionally.

[3] The air quality in the workspace had been tested previously, on January 8, 2004.

2

6. We had this workspace tested for air quality on August 4-5, 2005. Again, all findings in the scientific testing showed that the air quality in the EPA Crystal City clean space was acceptable by all applicable standards, and in fact was better than ambient air. See Attachment 7. You continued to report health problems as a result of "a workplace allergy." See Attachment 8.

4. Again, your office space and work site was changed in June 2006. At that time, your office was located at the brand new Potomac Yards facility in the Registration Division area. You continued to report health problems as a result of "a workplace allergy." See Attachment 9. We had this site tested on August 8 - 9, 2006, and the air quality was acceptable by all applicable standards, and in fact was better than ambient air. See Attachment 10. You continued to report health problems as a result of "a workplace allergy." See Attachment 11.

On multiple occasions in July and August 2006, I requested that you provide additional medical documentation to support your claim that you were allergic to the EPA workplace–at that time, Potomac Yards. None was received. Therefore, on August 24, 2006, I sent you an order to provide the medical documentation by September 7, 2006. I expressly directed you to provide documentation–specific to your current worksite–that demonstrated that you were in fact *allergic to the EPA workplace*. I included the most recent scientific testing for Potomac Yards which showed that the air quality at Potomac Yards was well within required regulatory standards. See Attachment 12. Until the time you left the Potomac Yards location, you failed to provide me with the required documentation.

On August 24, 2006, you requested a grant of leave bank hours. I provided you the instructions and process about applying for leave bank. When EPA's Office of Human Resources approved you as a leave bank recipient in the Fall of 2006, I applied two hundred hours of leave bank hours to your then-existing sick leave deficit. See Attachment 13.

5. In October 2006, your office and work site was changed to the EPA East site in Washington, DC, to cubicle 3379D. See Attachment 14. The entire Federal Register Staff had recently been provided new office space. In September 2006, prior to occupancy, this office space was tested for air quality. It was retested again on October 25, 2006 after you claimed that you had an allergic reaction to the space, and left work for an emergency room visit. The air quality was found to be acceptable by all applicable standards, and in fact was better than ambient air. See Attachment 15. You continued to report health problems as a result of "a workplace allergy." See Attachment 16.

B.    **Medical Documentation**

You have submitted medical letters and other forms of documentation to EPA to justify the existence of a disability, your request for accommodation, your leave requests, your leave bank requests, your request for leave under the Family and Medical Leave Act

3

(FMLA), and your request for extended leave without pay. The relevant documentation is as follows.

- Dr. Jonathan Zucker: Letter dated 8/18/04. See Attachment 17. Dr. Zucker's letter stated that you "presented with a twenty year history of nasal, eye, and sinus symptoms and frontal headaches." Id. Dr. Zucker also reported a history of urticaria, angioedema, hypertension, trigeminal neuralgia. Id. Dr. Zucker indicated that your allergy was to "house dust and molds" and that you had previously taken hyposensitivity injections for house dust and molds, but you discontinued the injections after "less than a month" due to a rash and "body swelling." Id.

- Dr. Ahmad Shamim: Documents dated 11/4/04, 4/19/05, 8/21/06. Letters dated 6/29/05, 10/26/05, and 8/25/06. See Attachment 18. Dr. Shamin's 6/29/05 letter stated that you were being seen for headaches, trigeminal neuralgia, allergies, a sinus condition, environmental sensitivities, hypertension, and other unspecified conditions, and that you were on an unidentified "supportive program to strengthen [your] immune system" as well as "anti-yeast" (candida) medication. In addition, Dr. Shamin opined that when you were "not exposed to these environmental factors and when [you] were at home, you would have no problem functioning and performing [your] job duties properly."

- Dr. Richard Nicklas: Letter dated 1/3/07 See Attachment 19. Dr. Nicklas examined you for the first time on November 21, 2006, and made the following diagnoses: 1) perennial allergic rhinitis with seasonal exacerbations; 2) chronic sinusitis; 3) mild, intermittent asthma; sulfite sensitivity; recurrent anaphylaxis; and hypertension. Dr. Nicklas noted that you reported having an allergic reaction within fifteen minutes of entering "the building in which [you] work," including flushing, increased warmth, difficulty breathing, symptoms of asthma, "near syncope," pruritus, and angioedema. Id. According to Dr. Nicklas, "it is unclear at this time what may be causing these reactions" and "[i]t will probably not be possible to determine the cause." Id.

At EPA's request, in June 2005, Dr. Christopher Holland, M.D., M.P.H. reviewed Dr. Shamin's reports and the scientific testing performed by EPA up until that time. Dr. Holland informed me that the scientific testing established that there was no evidence of a mold problem in the EPA work spaces. See Attachment 20. Dr. Holland also conferred with Dr. Shamin, with your permission, and reported that Dr. Shamin had failed to explain the bases for his findings, and that Dr. Shamin had not done any "specific allergy testing." See id. Dr. Holland's impression was also that Dr. Shamin had not indicated the existence of a serious allergic problem. Id.

I have also reviewed medical records you provided concerning the events of July 19, 2005, August 9, 2006 and October 13, 2006, days on which you suddenly left work claiming the need for emergency paramedic transport and emergency hospital care. See

Attachment 21. The medical records simply do not support the extreme assertions you made at work on those days. Id.

In sum, you have never produced documentation that supports your assertion that you are in fact allergic to EPA workspace (at any of the locations). The medical letters that you have produced are deficient in multiple ways--most patently, because your alleged reaction to the EPA worksite is based exclusively on your own self-reporting. You have never provided any credible proof that any allergic symptoms you experience are caused by the EPA workplace, as opposed to another cause. You have never provided any credible proof that the air quality in your home is superior to that at the EPA workplace  In addition, your self-reporting is contrary to the significant body of actual evidence, including the repeated scientific air quality testing done at multiple sites within EPA; your twenty plus year history of allergies; your reported symptomatology during your history as an EPA contractor, as an EPA probationary employee, and as an EPA employee; and a number of admissions, inconsistent statements, and illogical assertions made by your own physicians or yourself.[4]  Frankly, as the facts have evolved from December 2004 to date, I have developed increasing doubts about the veracity of your claim of a workplace allergy, the need for you to work from home as an accommodation, and the need for you to use leave to avoid the EPA workplace and to recover from these "allergic reactions" to the EPA workplace. Finally, your ongoing absences have had a tremendously negative effect on this office, on the work that we accomplish, and on this office's ability to contribute to the mission of OPPTS and EPA.

## C.    Department of Labor claim

On July 27, 2005 you filed a worker's compensation claim with the Department of Labor, claiming "workplace allergic reaction."  In a decision dated June 1, 2006 the Department of Labor denied your claim, expressly finding that the EPA workplace was *not* the cause of your allergic condition. See Attachment 22.

## D.    EEO complaint

In August 2005, you filed a formal complaint of discrimination against EPA, claiming discrimination based on sex (female) and disability (workplace sensitivity) when you were provided an "insufficient" reasonable accommodation. The complaint was investigated and you requested a hearing before an EEOC administrative judge. The case was assigned to Judge Richard Furcolo, U.S. Equal Employment Opportunity Division, Washington Regional Office, Washington, DC. On December 5, 2005, Judge Furcolo granted summary judgment in EPA's favor, dismissing your complaint on the

---

[4] I find that Dr. Shamin's credibility is severely lacking, as a matter of public record, through the facts underlying the suspension of his medical license by State of Maryland due to professional incompetence and the wilful making of a false report or statement in the practice of medicine.

undisputed material facts, without a hearing.  See Attachment 23.  On December 18, 2006, EPA's Office of Civil Rights issued a Final Agency Order, upholding the summary dismissal by EEOC.  See Attachment 24.

## II.    MISCONDUCT CHARGED

## CHARGE 1: ABSENCE WITHOUT LEAVE

*Specification 1:*  For the pay period beginning Sunday, August 20, 2006, through Saturday, September 2, 2006, you were expected to report to duty.  You did not provide adequate medical justification to support your request for leave and your absence was not approved.  Pay Period total AWOL = 8 hrs.

You were charged 8 hours AWOL on Friday, August 25, 2006, for failure to report.

*Specification 2:*  For the pay period beginning Sunday, September 3, 2006, through Saturday, September 16, 2006, you were expected to report to duty.  You did not provide adequate medical justification to support your request for leave and your absence was not approved.  Pay Period total AWOL = 24 hrs.

You were charged 8 hours AWOL on Friday, September 8, 2006, for failure to report.
You were charged 8 hours AWOL on Thursday, September 14, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, September 15, 2006, for failure to report.

*Specification 3:*  For the pay period beginning Sunday, September 17, 2006, through Saturday, September 30 , 2006, you were expected to report to duty.  You did not provide adequate medical justification to support your request for leave and your absence was not approved.  Pay Period total AWOL = 40 hrs.

You were charged 8 hours AWOL on Thursday, September 21, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, September 22, 2006, for failure to report.
You were charged 8 hours AWOL on Wednesday, September 27, 2006, for failure to report.
You were charged 8 hours AWOL on Thursday, September 28, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, September 29, 2006, for failure to report.

*Specification 4:*  For the pay period beginning Sunday, October 1, 2006, through

Saturday, October 14, 2006, you were expected to report to duty. You did not provide adequate medical justification to support your request for leave and your absence was not approved. Pay Period total AWOL = 22 hrs.

You were charged 8 hours AWOL on Tuesday, October 3, 2006, for failure to report.
You were charged 8 hours AWOL on Wednesday, October 4, 2006, for failure to report.
You were charged 3 hours AWOL on Friday, September 9, 2006, for failure to remain in the office and leaving early.
You were charged 3 hours AWOL on Friday, September 15, 2006, for failure to remain in the office and leaving early.

*Specification 5:* For the pay period beginning Sunday, October 15, 2006, through Saturday, October 27, 2006, you were expected to report to duty. You did not provide adequate medical justification to support your request for leave and your absence was not approved. Pay Period total AWOL = 74 hrs.

You were charged 8 hours AWOL on Monday, October 16, 2006, for failure to report.
You were charged 8 hours AWOL on Tuesday, October 17, 2006, for failure to report.
You were charged 5 hours AWOL on Wednesday, October 18, 2006, for failure remain in the office and leaving early.
You were charged 8 hours AWOL on Thursday, October 19, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, October 20, 2006, for failure to report.
You were charged 5 hours AWOL on Monday, October 23, 2006, for failure remain in the office and leaving early.
You were charged 8 hours AWOL on Tuesday, October 24, 2006, for failure to report.
You were charged 8 hours AWOL on Wednesday, October 25, 2006, for failure to report.
You were charged 8 hours AWOL on Thursday, October 26, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, October 27, 2006, for failure to report.

*Specification 6:* For the pay period beginning Sunday, October 29, 2006, through Saturday, November 11, 2006, you were expected to report to duty. You did not provide adequate medical justification to support your request for leave and your absence was not approved. Pay Period total AWOL = 64 hrs.

You were charged 8 hours AWOL on Monday, October 30, 2006, for failure to

report.

You were charged 4 hours AWOL on Tuesday, October 31, 2006, for failure to remain in the office and leaving early.

You were charged 8 hours AWOL on Wednesday, November 1, 2006, for failure report.

You were charged 8 hours AWOL on Thursday, November 2, 2006, for failure to report.

You were charged 8 hours AWOL on Friday, November 3, 2006, for failure to report.

You were charged 4 hours AWOL on Monday, November 6, 2006, for failure remain in the office and leaving early.

You were charged 8 hours AWOL on Tuesday, November 7, 2006, for failure to report.

You were charged 8 hours AWOL on Wednesday, November 8, 2006, for failure to report.

You were charged 8 hours AWOL on Thursday, November 9, 2006, for failure to report.

*Specification 7:*  For the pay period beginning Sunday, November 12, 2006, through Saturday, November 25, 2006, you were expected to report to duty. You did not provide adequate medical justification to support your request for leave and your absence was not approved. Pay Period total AWOL = 60 hrs.

You were charged 4 hours AWOL on Monday, November 13, 2006, for failure to remain in the office and leaving early.

You were charged 8 hours AWOL on Tuesday, November 14, 2006, for failure to report.

You were charged 8 hours AWOL on Wednesday, November 15, 2006, for failure report.

You were charged 8 hours AWOL on Thursday, November 16, 2006, for failure to report.

You were charged 8 hours AWOL on Friday, November 17, 2006, for failure to report.

You were charged 4 hours AWOL on Monday, November 20, 2006, for failure remain in the office and leaving early.

You were charged 4 hours AWOL on Tuesday, November 21, 2006, for failure to return to the office after your doctor's appointment.

You were charged 8 hours AWOL on Wednesday, November 22, 2006, for failure to report.

You were charged 8 hours AWOL on Friday, November 24, 2006, for failure to report.

*Specification 8:*  For the pay period beginning Sunday, November 26, 2006, through Saturday, December 9, 2006, you were expected to report to duty. You did not provide adequate medical justification to support your request for leave

8

and your absence was not approved.  Pay Period total AWOL = 76 hrs.

You were charged 8 hours AWOL on Monday, November 27, 2006, for failure to report.
You were charged 4 hours AWOL on Tuesday, November 28, 2006, for failure to report for work for the time not taken for your doctor's appointment.
You were charged 8 hours AWOL on Wednesday, November 29, 2006, for failure report.
You were charged 8 hours AWOL on Thursday, November 30, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, December 1, 2006, for failure to report.
You were charged 8 hours AWOL on Monday, December 4, 2006, for failure to report.
You were charged 8 hours AWOL on Tuesday, December 5, 2006, for failure to report.
You were charged 8 hours AWOL on Wednesday, December 6, 2006, for failure to report.
You were charged 8 hours AWOL on Thursday, December 7, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, December 8, 2006, for failure to report.

*Specification 9:*  For the pay period beginning Sunday, December 10, 2006, through Saturday, December 23, 2006, you were expected to report to duty.  You did not provide adequate medical justification to support your request for leave and your absence was not approved.  Pay Period total AWOL = 76 hrs.

You were charged 8 hours AWOL on Monday, December 11, 2006, for failure to report.
You were charged 8 hours AWOL on Tuesday, December 12, 2006, for failure to report.
You were charged 4 hours AWOL on Wednesday, December 13, 2006, for failure remain in the office and leaving early.
You were charged 8 hours AWOL on Thursday, December 14, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, December 15, 2006, for failure to report.
You were charged 8 hours AWOL on Monday, December 18, 2006, for failure to report.
You were charged 8 hours AWOL on Tuesday, December 19, 2006, for failure to report.
You were charged 8 hours AWOL on Wednesday, December 20, 2006, for failure to remain in the office and leaving early.
You were charged 8 hours AWOL on Thursday, December 21, 2006, for failure

9

to report.
You were charged 8 hours AWOL on Friday, December 22, 2006, for failure to report.

*Specification 10:* For the pay period beginning Sunday, December 24, 2006, through Saturday, January 6, 2007, you were expected to report to duty. This pay period also contains days after the effective date of the December 18, 2006 letter. You did not provide adequate medical justification to support your request for leave and your absence was not approved. Pay Period total AWOL = 24 hrs.

You were charged 4 hours AWOL on Tuesday, December 26, 2006, for failure to report for work for the time not taken for your doctor's appointment
You were charged 4 hours AWOL on Wednesday, December 27, 2006, for failure to remain in the office and leaving early.
You were charged 8 hours AWOL on Thursday, December 28, 2006, for failure to report.
You were charged 8 hours AWOL on Friday, December 29, 2006, for failure to report.

See Attachment 25 (AWOL documentation).

## CHARGE 2: INSUBORDINATION/FAILURE TO FOLLOW SUPERVISORY INSTRUCTIONS

On December 18, 2006, I directed you in writing to return to work and to report to your workplace at EPA East on January 2, 2007. See Attachment 26. Because of the presidential funeral on January 2, 2007, I changed your return to work date to January 3, 2007.

*Specification 1:*    On January 3, 2007, you were to report for a full 8 hour tour of duty. After two hours you stated you were sick and needed to leave. At that time I told you it would be AWOL, and that based on the December 18, 2006 letter, it would be considered insubordination. You left the office. Daily total AWOL = 6 hrs.

*Specification 2:*    On January 4, 2007, you were to report for a full 8 hour tour of duty. You called to say you were unable to come to work. At that time I told you it would be AWOL, and that based on the December 18, 2006, letter it would be considered insubordination. I also told you that you were in serious jeopardy of losing your job. Daily total AWOL = 8 hrs.

10

*Specification 3:*    On January 5, 2007, you were to report for a full 8 hour tour of duty. You called to say you were unable to come to work. At that time I told you it would be AWOL, and that based on the December 18, 2006, letter it would be considered insubordination. I also told you that you were in serious jeopardy of losing your job. You indicated that I would be receiving additional material from your doctor. Daily total AWOL = 8 hrs.

*Specification 4:*    On January 8, 2007, you were to report for a full 8 hour tour of duty. You called to say you were unable to come to work. At that time I told you it would be AWOL, and that based on the December 18, 2006, letter it would be considered insubordination. I also told you that you were in serious jeopardy of losing your job. You asked if I had received the additional material from your doctor, and I confirmed that I had received it. Daily total AWOL = 8 hrs.

*Specification 5:*    On January 9, 2007, you were to report for a full 8 hour tour of duty. You called to say you were unable to come to work. At that time I told you it would be AWOL, and that it would be considered insubordination. I also told you that you were in serious jeopardy of losing your job. After our phone conversation I sent you a response to your e-mail that contained your latest medical information.[5] Daily total AWOL = 8 hrs.

*Specification 6:*    On January 10, 2007, you were to report for a full 8 hour tour of duty. You called to say you were unable to come to work. At that time I told you it would be AWOL, and that

---

[5] On January 9, 2007, I responded to your January 5, 2007 e-mail (with the attached 1/3/07 letter from Dr. Richard A. Nicklas). My email stated: "I have reviewed your 1/5/07 email and the attached letter from Dr. Nicklas. Nothing that you have submitted is responsive to my August 24, 2006 request for documentation or is otherwise supportive of your request to work from home full-time. Further, nothing about what you have submitted changes the fact that I cannot approve your continued requests for approved leave due to "workplace allergic reaction." Your continued absences from work and failure to carry out your assigned responsibilities constitutes insubordination/failure to follow supervisory instructions and puts you at risk of incurring disciplinary action, up to and including removal from Federal service." See Attachment 27.

11

based on the December 18, 2006, letter it would be
considered insubordination.   I also told you that you were
in serious jeopardy of losing your job.  You asked if I
had received the additional material from your doctor,
and I confirmed that I had received it.
Daily total AWOL = 8 hrs.

*Specification 13:*      On January 22, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that based on the December 18, 2006, letter it would be
considered insubordination.   I also told you that you were
in serious jeopardy of losing your job.
Daily total AWOL = 8 hrs.

*Specification 14:*      On January 23, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that based on the December 18, 2006, letter it would be
considered insubordination.   I told you that you were
in serious jeopardy of losing your job.  I also reminded
you that I needed a doctor's note for the time you were
out, which you acknowledged.
Daily total AWOL = 8 hrs.

*Specification 15:*      On January 24, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that based on the December 18, 2006, letter it would be
considered insubordination.   I also told you that you were
in serious jeopardy of losing your job.
Daily total AWOL = 8 hrs.

*Specification 16:*      On January 25, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that based on the December 18, 2006, letter it would be
considered insubordination.   I also told you that you were
in serious jeopardy of losing your job.
Daily total AWOL = 8 hrs.

*Specification 17:*      On January 26, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that based on the December 18, 2006, letter it would be

12

considered insubordination.  I also told you that you were
in serious jeopardy of losing your job.
Daily total AWOL = 8 hrs.

*Specification 18:*    On January 29, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that  based on the December 18, 2006, letter it would be
considered insubordination.  I also told you that you were
in serious jeopardy of losing your job.
Daily total AWOL = 8 hrs.

*Specification 19:*    On January 30, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that  based on the December 18, 2006, letter it would be
considered insubordination.  I told you that you were
in serious jeopardy of losing your job. I also reminded you
that I did not have any medical documentation for this
recent absence.
Daily total AWOL = 8 hrs.

*Specification 20:*    On January 31, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to work.  At that time I told you it would be AWOL, and
that  based on the December 18, 2006, letter it would be
considered insubordination.  I told you that you were
in serious jeopardy of losing your job. I also clarified
that the medical documentation I referenced on Tuesday
was the standards doctor care note.  You stated you
thought it was only needed when you returned to work, and
I indicated that when you are out for a long period of time
that it was appropriate to submit one prior to returning to
work.
Daily total AWOL = 8 hrs.

*Specification 21:*    On February 1, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come
to  work.  At that time I told you it would be AWOL, and
that  based on the December 18, 2006, letter it would be
considered insubordination.  I told you that you were
in serious jeopardy of losing your job.
Daily total AWOL = 8 hrs.

*Specification 22:*    On February 2, 2007, you were to report for a full 8 hour
tour of duty.  You called to say you were unable to come

13

to work. At that time I told you it would be AWOL, and
that based on the December 18, 2006, letter it would be
considered insubordination. I told you that you were
in serious jeopardy of losing your job.
Daily total AWOL = 8 hrs.

See Attachment 28 (Insubordination/failure to follow supervisory directives
documentation).

On several occasions in January 2007, you reiterated to me that you were not
acting out of insubordination, but that you were "a disabled person" and that you were
"really too sick to work at EPA East." See Attachment 29. You also made other
requests: to work from home temporarily; or to work somewhere else within EPA, where
you could have an enclosed office with an air filter and a window.[6] Id. I responded to
you, explaining that nothing about what you provided responded to the request for
documentation set forth in my August 24, 2006 letter to you or was otherwise supportive
of your request to work from home full-time. See Attachment 30. I also informed you
that nothing about what you submitted changed the fact that I could not grant leave for
your alleged "workplace allergic reaction." I again warned you that your continued
absence from work constitutes insubordination/failure to follow supervisory instructions
– which constituted misconduct for which you could be disciplined, including being
removed from your federal position.

## III.    DISCUSSION:

I have carefully considered all of the relevant circumstances and required factors in
issuing this Notice of Proposed Removal. Your absence of a past record of discipline has
been considered as a mitigating factor. Aggravating factors include the seriousness of
the offenses and the direct relationship between both types of misconduct and the
efficiency of the Federal service; your very limited tenure as a Federal employee; the
effect of your misconduct on your ability to perform satisfactorily and my confidence in
your ability to carry out your responsibilities; the consistency of this penalty with EPA's
Table of Penalties; the notoriety of your misconduct; the clarity with which you were on
notice that your conduct was actionable misconduct and that this discipline was
forthcoming; your potential for rehabilitation; and the adequacy of alternative sanctions.
On the whole, the great weight of the factors are aggravating factors and support the

---

[6] I have engaged extensively in the interactive process related to reasonable
accommodation under the Rehabilitation Act. Your most recent suggestions about
accommodation have already been attempted, with no positive results. In addition, the
suggestion that you require yet another office within EPA--with a *window*--is not only
unsupported by any credible documentation, but makes absolutely no sense, given the
scientific evidence in this matter.

14

penalty of removal.

## IV.    NOTICE AND STATEMENT OF RIGHTS:

You may reply to this Notice of Proposed Removal in writing, orally, or both within seven (7) calendar days after the date you receive this notice. You should direct your written reply and any request to make an oral reply to Marylouise M. Uhlig, Associate Assistant Administrator for OPPTS, 1200 Pennsylvania Avenue, NW, Mailcode 7101M, Washington, DC 20460-0001. Ms. Uhlig will serve as the deciding official for this proposed action. You may schedule a meeting with Ms. Uhlig through her Assistant, Marilyn Malloy, at 202-564-0545.

You will remain in an active duty status during the thirty (30) day advance notice period. You have the right to be represented by an attorney or other representative of your choice. You have a right to review the material relied upon to support this proposed action, which are included as Attachments 1 to 30. You may submit documentary evidence in support of your reply during the seven day period.

Marylouise Uhlig, Associate Assistant Administrator for OPPTS, will give full consideration to any reply you submit, and will issue a written decision on the proposed action. If you are removed, the effective date of the removal will be no earlier than thirty (30) calendar days from the date you receive notice of this proposed removal.

If you have any questions about this notice or wish to review the regulations relating to this proposed action, you may contact Melissa Hatfield, Labor and Employment Relations, Office of Human Resources, at (202) 564-7953.

It is EPA's policy to offer Employee Counseling and Assistance Program ("ECAP") services to an employee who may be experiencing personal problems that affect job performance, conduct, or attendance. These services are confidential. I am not implying that you have such a problem; however, if you believe these services would be appropriate for your situation, you may contact ECAP staff member Mr. Wayne White at 202-564-7914.

Attachments : 1 to 30

cc:    Marylouise M. Uhlig
       Patricia S. Keitt
       Melissa Hatfield


**By Federal Express Overnight Mail**
   **U.S. Postal Service, Certified Mail, Return Receipt Requested**

# EXHIBIT 2

# COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT
## BECAUSE OF
## RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY, OR REPRISAL
*(Please type or print)*

(FOR AGENCY USE)

| | |
|---|---|
| **1. YOUR (COMPLAINANT=S) FULL NAME:**<br>Connie K. Morris | **2. WHAT IS YOUR TELEPHONE NUMBER INCLUDING AREA CODE?**<br><br>HOME PHONE: 301 805-4350 |
| **STREET ADDRESS (OR POST OFFICE BOX NUMBER)**<br>12300 Hillmeade Station Drive | **WORK PHONE:** |

| CITY | STATE | ZIP CODE | **4. ARE YOU NOW WORKING FOR THE FEDERAL GOVERNMENT?** |
|---|---|---|---|
| Bowie | MD | 20720 | YES (ANSWER A, B, C AND D BELOW)<br>X NO (CONTINUE WITH QUESTION 5) |

| | |
|---|---|
| **3. WHICH FEDERAL OFFICE DO YOU BELIEVE DISCRIMINATED AGAINST YOU?**<br>*(Prepare a separate complaint form for each office.)* | **A. NAME OF AGENCY WHERE YOU WORK:** |
| **A. NAME OF OFFICE WHICH YOU BELIEVE DISCRIMINATED AGAINST YOU:**<br>OPPTS/OPMO/ Federal Register | **B. STREET ADDRESS OF YOUR AGENCY:** |
| **B. STREET ADDRESS OF OFFICE:**<br>1200 Pennsylvania Avenue, N.W. | **C. CITY        STATE        ZIP CODE** |

| C. CITY | STATE | ZIP CODE | **D. WHAT IS THE TITLE, SERIES, AND GRADE OF YOUR JOB?** |
|---|---|---|---|
| Washington | DC | 20460 | |

| 5. DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION TOOK PLACE: | | | 6. NAME AND ADDRESS OF REPRESENTATIVE: Theodore S. Allison, 1920 N Street, N.W., Suite 300, Washington, DC 20036 |
|---|---|---|---|
| MONTH: 03 | DAY: 10 | YEAR: 2007 | |

**7. CHECK BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST. BECAUSE OF YOUR:**

9 RACE, IF SO, STATE YOUR RACE

9 COLOR, IF SO, STATE YOUR COLOR

9 RELIGION, IF SO, STATE YOUR RELIGION

9 NATIONAL ORIGIN, IF SO, STATE YOUR NATIONAL ORIGIN

9 SEX, IF SO, STATE YOUR SEX

X HANDICAP, IF SO, STATE YOUR HANDICAP   workplace sensitivity which affects life activity of breathing and walking

X REPRISAL, IF SO, STATE YOUR CHARGE   Existing EEOC Complaint

9 AGE, IF SO, STATE YOUR DATE OF BIRTH

*(Complaints of discrimination because of age apply only to employees or applicants who are at least 40 years of age at the time of the alleged discriminatory actions.)*

**8. EXPLAIN HOW YOU BELIEVE YOU WERE DISCRIMINATED AGAINST (TREATED DIFFERENTLY FROM OTHER EMPLOYEES OR APPLICANTS) BECAUSE OF YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP, OR REPRISAL.** *(For each allegation, please state to the best of your knowledge, information and belief what incident occurred and when the incident occurred. You may continue your answer on another sheet of paper if you need more space.)*

- I have been removed from my job, and prior to that, my supervisor threatened me with adverse action, all based on my being ill which was caused by not receiving a reasonable accommodation, and/or having my only accommodation (the "clean space") taken away.

- I was determined by EPA to be a person with a disability. My removal letter indicated EPA did not consider me a person with a disability.

- The accommodation I received (the "clean space") was taken away, and I was assigned to Potomac Yards and back to EPA East, where I had my most severe workplace allergic reactions, without any accommodation or effort to accommodate me.

- At or near the time of these events, I had a pending EEO complaint based on refusal to allow me to telework.

- My doctor and I requested a reasonable accommodation of teleworking from home because of a disability which EPA recognized. Two doctors provided medical documentation to substantiate my need to work from home. A third doctor initially indicated I was very sensitive to various allergens. My supervisor and his supervisor disregarded my medical documentation, claiming they did not believe it. This was a pattern that continued over most of the past year.

- My supervisor and his supervisor appeared to take the position that I had to prove that characteristics of a particular EPA site were causing my reactions. My supervisor and his supervisor appeared to be telling me to establish my right to a reasonable accommodation all over again each time I was moved. I do not believe a new request for reasonable accommodation should be required for each new work location.

- I was not accommodated nor was the interactive process engaged in through the date of my removal from federal service (3-10-07). I was removed both because of my inability to work without a reasonable accommodation, and in retaliation for asserting my rights.

| 9(a). I HAVE DISCUSSED MY COMPLAINT WITH AN EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR:<br>X YES        9 NO | 9(b). NAME OF COUNSELOR:<br>Natalie Twyman |
|---|---|

**10. WHAT CORRECTIVE ACTION ARE YOU SEEKING?** *(If additional space is needed, use separate sheet.)* Reinstatement to position; reasonable accommodation of Telework from home; restoration of all leave used because of failure to accommodate; back pay; prevent future reprisal; ability to request sick leave as other employees do; attorneys' fees, and front pay (if appropriate).

| 11. DATE OF THIS COMPLAINT   4-13-07 | 12. SIGN YOUR (COMPLAINANT=S) NAME HERE: Connie K Morris |
|---|---|

Attachment to Complaint of Discrimination in the Federal Government

As a matter of procedure, I will seek to have the issues raised by this complaint decided in the action I filed on or about February 14, 2007, in United States District Court. That case arises out of related facts and circumstances which were raised in an earlier administrative complaint of discrimination. I have filed the present complaint in case it were determined that I was required to exhaust administrative remedies beyond my prior administrative complaint which is the subject of my federal action.

Initial

# EXHIBIT 3

*CMS Code: 005231*
*Dept ID: 2551*

| United States Environmental Protection Agency **POSITION DESCRIPTION COVERSHEET** | **1. DUTY LOCATION** Washington, DC | **2. POSITION NUMBER** 0029828 |
|---|---|---|

**3. CLASSIFICATION ACTION: a.** Reference of Series and Date of Standards Used to Clarify This Position

*GS-1001 Series (def.)*

| Official Allocation | b. Title | c. Service | d. Series | e. Grade | f. CLC |
|---|---|---|---|---|---|
| | *Information Liaison Specialist* | *GS* | *1001* | *14* | *001* |
| **4. SUPERVISOR'S RECOMMENDATION** | Information Liaison Specialist | GS | 1001 | 14 | |

**5. ORGANIZATIONAL TITLE OF POSITION (if any)**

**6. NAME OF EMPLOYEE** *Graves, J / Rickert, D.*

**7. ORGANIZATION (give complete organizational breakdown)**

| a. U. S. ENVIRONMENTAL PROTECTION AGENCY | e. FEDERAL REGISTER STAFF |
|---|---|
| b. AA FOR OPPTS | f. |
| c. IMMEDIATE OFFICE OF THE AA | g. |
| d. OPMO | h. EPAYS Organization Code        71043000 |

**8. SUPERVISORY/MANAGERIAL DESIGNATION**

__ **[S]** First or Second level supervisor: An individual who performs supervisory work and managerial responsibilities that require accomplishment of work through combined technical and administrative direction of others and meets the requirements for coverage as described in the General Schedule Supervisory Guide.

__ **[A]** An individual (as defined in Section 7103(a)(10) of Title V of the U.S. Code) who is authorized to hire, direct, assign, promote, reward, transfer, lay off, suspend, discipline, or remove one or more employees, or effectively recommend such action. The exercise of this responsibility is not routine or clerical in nature, but requires the consistent exercise of independent judgment.

__ **[M]** A manager who directs the work of an organization; is accountable for the success of line or staff programs; monitors, evaluates, and adjusts program activities; and performs the full range of duties outlined in the General Schedule Supervisory Guide. May also include deputies who fully share responsibility for managing the organization or who serve as an alter ego to the manager.

__ **[B]** A management official (as defined in Section 7103(a)(11) of Title V of the U.S. Code) who formulates, determines or influences an organization's policies. This means creating, establishing, or prescribing general principles, plans, or courses of action for an organization; or bringing about a course of action for the organization. Management officials must actively participate in shaping the organization's policies not just interpret laws and regulations, give resource information or recommendations or serve as experts or highly trained professionals who implement or interpret the organization's policies and plans.

__ **[T]** "Team Leader" This position meets the requirements for coverage under Part II of the Work Leader Grade Evaluation Guide.

X **[N]** None of the above applies. This is a non-supervisory/non-managerial position.

**9. SUPERVISORY CERTIFICATION** I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships and that the position is necessary to carry out governmental functions for which I am responsible. The

| a. Typed Name and Title of Immediate Supervisor John Richards, Director/Federal Register Staff | | d. Typed Name and Title of Second-Level Supervisor Marylouise M. Uhlig, AAA for OPPTS (Management) | |
|---|---|---|---|
| b. Signature | c. Date | e. Signature | f. Date |

**10. OFFICIAL CLASSIFICATION CERTIFICATION**

| a. ☑ This position has no promotion potential.        ☐ If position develops as planned and employee progresses satisfactorily, this position has known promotion potential to grade: | | b. Fair Labor Standards Act ☐ Nonexempt  ☑ Exempt | c. Functional Code 00 |
|---|---|---|---|
| d. Bargaining Unit Code 0011 | e. Check, if applicable: ☐ Medical Monitoring Required ☐ Extramural Resources Management Duties (___% of time) ☐ This position is subject to random drug testing (    ) | f. Signature | g. Date 02-05-03 |

**11. REMARKS**        (none)

EPA Form 3150-1 (Rev 1/99) (E–Forms 4.4)        *Moderate Risk*

*184*

Exhibit FS Page _1_ of _5_

Technical Information Specialist
GS-1001-14

## INTRODUCTION:

This position of Technical Information Specialist, is in the Federal Register Staff, Office of Program Management and Operations, Office of Prevention, Pesticides and Toxic Substances (OPPTS). The Federal Register Staff is responsible for the categorization and organization of material within seven digit interlocking classification schemes, editorial preparation, and processing of all OPPTS documents for publication in the **Federal Register**.

Documents prepared by the Federal Register Staff consist of various notices, proposals, final orders, stays, and confirmations of orders required to implement the provisions of Federal legislation administered and enforced by OPPTS. Material must conform to the government-wide policies established by the Office of the Federal Register for publication in the Federal Register; otherwise; the material is not acceptable for publication in the daily issue of the **Federal Register** or annual Code of Federal Regulations. The multiple media release of regulatory information; design of file systems and support materials is the responsibility of the senior staff as part of their support for the Business Process and Enterprise Architecture infrastructure responsibilities. Successful achievement of an interactive document drafting process with a wide variety of program personnel and subject matter experts is a critical element for the success of the OPPTS Federal Register Staff.

## DUTIES AND RESPONSIBILITIES:

● As a senior member of the Federal Register Staff, provides leadership in executing editorial policy and priorities and coordinating the document preparation efforts of other information liaison specialists when size, complexity and time constraints require a full team of people work on a single Federal Register document package. The design and execution of interactive document production processes is a critical element in the efficient implementation of the regulatory objectives of OPPTS. Incumbent is also responsible for implementation of the multiple media public access strategy for the assigned area as follows:

1. Implements policy procedures and directs a program that has control over OPPTS regulatory documents for format, style, and codification structure, and provides any necessary training and/or assistance to Agency personnel working with regulatory documents, including the development and presentation of specialized training programs, workshops, etc.

2. Provides detailed document drafting instruction of a nonscientific nature to scientific personnel writing regulatory issuances throughout OPPTS in an effort to expedite the implementation of important Agency decisions. Such instruction includes the design and creation of specific training programs, and support activities related to categories of documents assigned.

2

3. Provides specific guidance and leadership to other members of the staff by implementing policy and procedural guidelines for the following:

a. content, structure, and maintenance of control reports (e.g., computerized quarterly report of the status of all agency document activity) and supportive regulatory finding aids (e.g., cross-referencing system, subject index, and guide to public records retention requirements) that are an essential part of the Agency's regulatory document system, and

b. maintenance of the only official, current version of Title 40, Chapter I, Subchapters E and R, of the Code of Federal Regulations. This requires monitoring of contract posting of all new regulations, amendments, deletions, corrections, cross-references, etc.; and the checking and re-editing for completeness. Incumbent is also responsible for the accuracy for proposed new editions of the Code volumes for OPPTS, involving consultation with the Code Branch of the Office of the Federal Register, National Archives.

4. Directs maintenance and assembly of the OPPTS **Federal Register** document information control system for documents circulating within EPA prior to publication. Responds immediately to questions concerning the location and status of all OPPTS documents, being circulated for signature. This function requires liaison with the program offices and Docket Control Officer to ensure proper document numbering and tracking relative to receipt of comments after publication.

5. Reviews work generated by less experienced members of the staff for uniformity and consistency among working groups and policy consistency in **Federal Register** style.

6. Takes lead in analyzing and implementing Business Process and IT Enterprise Architecture changes that increase efficiency, streamline program workload and make document production throughout OPPTS more efficient, reduce costs or improve public access to regulatory information/requirements.

● The multiple media public access system includes preparing information in multiple electronic file formats to meet the ever expanding needs of advanced technology, including interfacing with the government-wide electronic docket system and the electronic rule making initiative being lead by EPA. As a senior member of the Federal Register Staff the incumbent has the responsibility to provide leadership in implementing a multiple media public access approach including:

1. Assessment of the information contained in the **Federal Register** document and referenced support materials, for all electronic public access systems.

2. Development of index and structure files to develop a display that is audience sensitive and makes use of all design requirements and options available. *FS*

**Exhibit**

Page _3_ of _10_

3. Liaison activities with material authors to convince them of the benefits of the approach, and overcoming any resistance through persuasion, negotiation, and understanding the perspective of the program's interests.

136

3

4. Develops a coordinated timetable for all forms of electronic public access to be simultaneous with the traditional paper release in an integrated process.

5. Provides support for the Internet posting of environmental regulatory documents from GPO Internet sources when needed to make certain that information flows into the electronic distribution system that makes up the daily workload of the Environmental Documents Service. Monitor and support several of the activities that have been taken over by contractors. These activities include:

a. Identify document by subject matter and program for logging, cost accounting and tracking purposes.

b. Determine the correct address options appropriate for each document related to OPPTS publication activity.

c. Verify list server mass mailing execution.

d. Verify the correct posting to the EPA Public Access Web Site, fixing entries, headings, posting positions where possible or providing detailed instructions to the technical support team when assistance is required.

6. Coordinate document production with the assembly and preparation of support documents, public comments, fact sheets, and links to other Federal Register documents for coordinated support of EPA Public Access activities.

7. Instruct and assist program personnel who are not familiar with the electronic regulatory distribution process and operations in how their material will be processed, and become electronically available, including coordinated support in identifying resources available to them capable of providing assistance.

● Perform other duties as assigned related to the development of an orderly OPPTS-wide regulatory system, including special assignments from the Director, OPPTS Federal Register Staff for development and utilization of effective management systems.

Exhibit
Page 4 of 10

187

## INFORMATION LIAISON SPECIALIST GS-14
## FACTOR LEVEL DESCRIPTIONS

## FACTOR 1.  KNOWLEDGE REQUIRED BY THE POSITION

Level 1-8 - 1550 Points

Mastery of a subject area or of an information specialty to include knowledge of new developments and/or experimental theories in accessing, organizing or disseminating information, is required to:

- Solve highly complex problems within the occupation;

- Make significant recommendations to change, interpret, or develop important or innovative information policies, programs, approaches, or analysis methods; or

- Develop new approaches for other experienced technical information specialists to use in solving a variety of problems or in expanding services.

The level of knowledge involved is that of a technical authority in a specialization, that is, either in the literature of a broad subject area (e.g., seven digit inter-locking codification scheme), or of a very complex and highly specialized subject area (e.g., plant genetics), or in a difficult information specialty (e.g., thesaurus development and management).  Also at this level are assignments that involve developing services and/or products for users (e.g., information locators, specialized data bases, communications interfaces, special reports/ analyses) that serve as agency standards or as models for other information organizations outside of the agency or major component.

In addition to the knowledge factors outlined above, the information specialist knowledge base must include the writing and editing skills necessary for highly technical and scientific documents.

Illustrations:

- The specialist manages the regulatory process that controls a major segment of technical or scientific regulations. The special-

*188*

ist reviews and screens recommendations for additions, changes, and deletions from indexers and users, ensuring the integrity of the hierarchical and relational structure of the thesaurus for each change that is accepted; ensures that terms with possible multiple meanings are clarified; performs frequent updates, corrections, and refinements to the recognition dictionary for a computerized system that identifies key words and phrases from titles and abstracts; and ensures that all other dictionaries and indexing tools are compatible with the basic thesaurus.

• The specialist serves as a project leader for developing new or enhanced systems for the delivery of technical information. For example, the specialist conducts feasibility studies and works with computer specialists to develop gateway systems providing single access paths for authorized users to numerous secure and nonsecure research and development data bases, permitting easy combination and analysis of data from all of the accessed data bases. The specialist conducts pilot studies of new technology applications in areas such as multimedia, expert systems, and information transfer networks between users and specialized libraries.

• The specialist plans, develops, and maintains computer-based files used for storage and retrieval of toxicological and environ-mental information of national and international scope. The specialist identifies. evaluates, and selects information sources; works with computer specialists to develop programs to manage data; identifies and implements mechanisms for identifying, acquiring, and disseminating studies relevant to the cross-disciplinary aspects of toxicology, medicine. and the effects of toxic substances on the environment.

# FACTOR 2. SUPERVISORY CONTROLS

Level 2-5—650 Points

The employee is the organization's expert in writing and editing specific categories of FEDERAL REGISTER documents. The supervisor, therefore, provides only administrative direction in terms of broad policy statements and general objectives to be achieved through the publication program.

Exhibit FS
Page 6 of 10

The specialist conceives, plans, initiates, and adjusts the scope of projects to achieve consistency with the agency's overall objectives, other publishing projects, and audience information needs. The projects typically involve ongoing periodicals for specific purposes or large volumes of interrelated written materials that require overall management. Some assignments involve individual written products of extreme complexity or sensitivity. The specialist carries out the projects, often coordinating the work of teams of writing, editing, design, and production personnel either in the agency or under contract, and keeps the supervisor informed of progress.

Evaluates multiple media public access options for documents and prepares material accordingly.

Completed written products are considered authoritative and are normally accepted without significant change. The supervisor reviews completed work only for its impact on and coordination with the agency's overall initiatives.

## FACTOR 3.  GUIDELINES

Level 3-5 - 650 Points

Many of the controlling guidelines are broadly stated and non-specific, such as agency-level policy issuances and regulations, Federal regulations and legislation, and national or international information standards. These guidelines are very general and require extensive interpretation and augmentation. When more specific guidelines do exist, they contain little direct application to the fundamental decisions the specialist must make.

The specialist uses considerable independent judgment and ingenuity in determining the intent of broad guidance, and in interpreting and revising existing policy and program guidance for use by others. The specialist is recognized as an authority in one or more major functions or program management. As such, the specialist is instrumental in interpreting and adapting general agency objectives into specific plans or programs, and/or in developing new and improved techniques, methods. or approaches.

## FACTOR 4.  COMPLEXITY

Exhibit FS
Page 7 of 10

190

Level 4-5 - 325 Points

Assignments consist of a broad range of technical information activities or require substantial depth of analysis, and typically require solving problems in information access and dissemination in particularly difficult and responsible circumstances.

Decisions regarding what needs to be done are complicated by the novel or obscure nature of the problems (e.g., establishing semantic rules and specialized structure for electronic multiple media public access via Internet and Fax-on-Demand, including machine-aided index-ing) and/or special requirements for organization and coordination (e.g., working with other organizational units to consolidate chemical information dispersed in a variety of files and formats). Decisions also must be made in an environment of continual change, where information and information sources are rapidly expanding, much of the subject-matter content is in flux. and the technology for gaining access to this information is undergoing major change.

Assignments require the specialist to be innovative and adept at modifying precedents, methods and techniques, originating new techniques, and developing and sharing new information sources.

Examples of work at this level are: in depth information searching in a broad subject field such as weapon systems; selecting, developing, and assigning codified structure and indexing terms that accurately portray advanced activity in all forms of human, animal or plant envi-ronmental impact.

## FACTOR 5. SCOPE AND EFFECT

Level 5-5 - 325 Points

The purpose of the work is to analyze main issues in information access and dissemination; to resolve or recommend solutions for development of regulatory documents to resolve critical problems that are central to the mission of the organization; or to develop new approaches, methods, guides, or standards for use by other technical information specialists. The specialist provides expert advice and guidance covering a complex subject-matter area to users and other technical information specialists. or develops thesauri and related dictionaries for a major technical information

Exhibit F5
Page 8 of 10

program, or develops major new services or significant system enhancements.

The work affects the work of other technical information specialists and/or librarians, or the development of major aspects of technical information programs, or the efficiency of specialized regulatory information services rendered to agency scientists, medical professionals, policy strategists, Members of Congress and congressional staffs, or other clientele within or outside the agency or major component.

## FACTOR 6. PERSONAL CONTACTS AND FACTOR 7. PURPOSE OF CONTACTS

360 Points (A. 180 Points   B. 180 Points)

*Persons Contacted*:

Contacts are with high-level managers and administrators within the agency. Contacts outside the agency are with individuals representing other agencies, the press, contractors, public interest groups, congressional committees, the academic community, and the business community.

Individuals or groups from outside the employing agency, such as technical information specialists, librarians and/or subject-matter experts in other agencies and/or in non- Federal libraries, information services or laboratories; users from other agencies, or representatives of professional associations. This level may also include contacts with program officials several managerial levels removed from the specialist when such contacts occur on an ad hoc or other irregular basis.

*Purpose of Contacts*:

Contacts are made to persuade authors to make or accept major revisions in the approach and content of manuscripts, to gain cooperation from program officials in publishing the materials as written and designed, or to discuss with representatives of other agencies or public action groups with differing points of view the impact of the materials under preparation on their areas of responsibility and interest. Tact and persuasion are required in convincing individuals to accept presentations that are not fully in accord with their perceptions or that represent opposing viewpoints as well as their own. Tact is required also in overcoming pride of authorship when negotiating major changes in FEDERAL REGISTER documents, or to arrive at a consensus that expresses an organization's position.

192

Advocates for and practically assembles information for multiple media public access release persuading upper management in other program areas of the benefits of such efforts.

## FACTOR 8. PHYSICAL DEMANDS

Level 8-1--5 Points

Work in this office is work station oriented with normal movement throughout the office to perform assigned tasks, use of dedicated specialized equipment. This function requires significant use of a computer, including the ability to perform all standard operating features. Manual agility and dexterity of hand movement and eye and hand coordination are essential.

## FACTOR 9. WORK ENVIRONMENT

Level 9-1--5 Points

This work is performed in an office environment. Normal safety precautions are required. This environment contains a significant amount of electronic equipment, but normal work precautions guarantee the normal level of safety.

Total Points = 3,870

Exhibit  FS
Page 10 of 10

193

# EXHIBIT 4

*Attachment 5*

APPENDIX B

# EMPLOYEE CONFIRMATION OF REQUEST for RA
*(To be completed by the LORAC or Decision-Maker and forwarded to the NRAC)*

| | |
|---|---|
| 1. Date of submission to RAC and/or Decision-Maker: | 2. Date of Initial Employee Request: April 29, 2005 |

**3. Agency Official Accepting Request:**

**4. Applicant or Employee Making Request:** Connie K. Morris

**5. Employee's Location (AAShip/Program Office/ Division/Branch):** OPPTS/OPMO/FRS

**6. Employee's Supervisor:** John A. Richards, Director, FRS

**7. Designated Agency Decision-Maker:** John A. Richards, Director, FRS

**8. LORAC (if applicable):**

**9. Type of Accommodation Requested:** *(check all that apply)*

| | | |
|---|---|---|
| ✓ No Cost/Low Cost | ○ Repeat/Recurring | ○ Facility Access |
| ○ Higher-Cost | ○ Essential Job Function(s) | ○ Accessing a Benefit or |
| ○ Reassignment | *(if checked, complete #12)* | Privilege of Employment |

**10. Specific Accommodation Requested by Employee:** Work at Home/Telework as a Reasonable Accommodation

**11. Functional Limitation(s) Requiring an Accommodation** Diagnosed with allergy sensitivity to mold, mildew, and dust mites, urticaria, angio edema, trigeminal neuralgia, and bronchitis. Ongoing exposure to mold, mildew, and dust mites from work environment has triggered numerous allergic reactions with episodes of body swelling, breathing difficulties, bronchitis, rashes, rapid heart rate, rise in blood pressure and several other symptoms relating to allergy sensitivity and trigeminal neuralgia. Dr. Shamin on 11-4-04 advised of my extreme sensitivity and should not be exposed to mold, mildew, and dust mites. Dr. Shamin in note 4-19-05 advised should work from home 4/13-22/05 and 4-25-05 advised to remain home for recovery from bronchitis and allergy issues until further notice. I have worked in EPA Connecting Wing & EPA East with same results.

**12. List essential job functions:** *(Consult with the employee's supervisor to identify the essential job functions.)*

| | | | |
|---|---|---|---|
| *Connie K Morris* | 4-29-05 | *John A. Richards* | 4/29/2005 |
| Employee | Date | Agency Official Receiving Request | Date |
| ☒ *I do not want my medical information to be disclosed to any EPA official other than the identified Decision-Maker and NRAC* | | | |
| ☐ *I do not want my medical information to be disclosed to my supervisor or supervisory chain.* | | | |

**NOTE:** Return Form to NRAC

57

# EXHIBIT 5

COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT
BECAUSE OF
RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY, OR RETALIATION
(Please type or print)

(FOR AGENCY USE)

Case 1:06-cv-00491-RWR    Document 6-6    Filed 07/23/2007    Page 2 of 3

received
8-17-05    RW

**1. YOUR (COMPLAINANT'S) FULL NAME:**
Connie K. Morris

**2. WHAT IS YOUR TELEPHONE NUMBER INCLUDING AREA CODE?**
HOME PHONE: 301 805-4350
WORK PHONE: Unknown — newly assigned phone # in clean space

**STREET ADDRESS (OR POST OFFICE BOX NUMBER)**
12300 Hillmeade Station Drive

**CITY** Bowie  **STATE** MD  **ZIP CODE** 20720

**4. ARE YOU NOW WORKING FOR THE FEDERAL GOVERNMENT?**
☐ YES (ANSWER A, B, C AND D BELOW)
☐ NO (CONTINUE WITH QUESTION 5)

**3. WHICH FEDERAL OFFICE DO YOU BELIEVE DISCRIMINATED AGAINST YOU?**
(Prepare a separate complaint form for each office.)

**A. NAME OF AGENCY WHERE YOU WORK:**
EPA

**A. NAME OF OFFICE WHICH YOU BELIEVE DISCRIMINATED AGAINST YOU:**
OPPTS/OPMD/Federal Register

**B. STREET ADDRESS OF YOUR AGENCY:**
1200 Pennsylvania Ave., NW

**B. STREET ADDRESS OF OFFICE:**
1200 Pennsylvania Ave, NW

**C. CITY** Wash  **STATE** DC  **ZIP CODE** 20460

**C. CITY** Wash  **STATE** DC  **ZIP CODE** 20460

**D. WHAT IS THE TITLE, SERIES, AND GRADE OF YOUR JOB?**
Information Liaison Specialist, GS1001, 14

**5. DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION TOOK PLACE:**
MONTH 07  DAY 19  YEAR 2005

**6. NAME AND ADDRESS OF REPRESENTATIVE:** Stephen L. Johnson, Administrator, EPA, 1200 Penn Ave, NW, Wash, DC

**7. CHECK BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST, BECAUSE OF YOUR:**
☐ RACE, IF SO, STATE YOUR RACE _____
☐ COLOR, IF SO, STATE YOUR COLOR _____
☐ RELIGION, IF SO, STATE YOUR RELIGION _____
☑ SEX, IF SO, STATE YOUR SEX _Female_
☐ NATIONAL ORIGIN, IF SO, STATE YOUR NATIONAL ORIGIN _____
☐ AGE, IF SO, STATE YOUR DATE OF BIRTH _____
☑ DISABILITY, IF SO, STATE YOUR DISABILITY _Workplace sensitivity which affects life activity of breathing & walking_
☐ RETALIATION, IF SO, STATE YOUR CHARGE _____
(Complaints of discrimination because of age apply only to employees or applicants who are at least 40 years of age at the time of the alleged discriminatory actions.)

**8. EXPLAIN HOW YOU BELIEVE YOU WERE DISCRIMINATED AGAINST (TREATED DIFFERENTLY FROM OTHER EMPLOYEES OR APPLICANTS) BECAUSE OF YOUR RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, DISABILITY, OR RETALIATION. (For each allegation, please state to the best of your knowledge, information and belief what incident occurred and when the incident occurred. You may continue your answer on another sheet of paper if you need more space.)**

See attached

**9(a). I HAVE DISCUSSED MY COMPLAINT WITH AN EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR:**
☑ YES  ☐ NO

**9(b). NAME OF COUNSELOR:**
Eudora Heath

**10. WHAT CORRECTIVE ACTION ARE YOU SEEKING?** (If additional space is needed, use separate sheet.) – Restoration of sick + annual leave, stop threats of termination of employment, stop Reprisal from filing for reasonable accommodation and disability, telework/work from home!

**11. DATE OF THIS COMPLAINT**
MONTH 08  DAY 10  YEAR 2005

**12. SIGN YOUR (COMPLAINANT'S) NAME HERE:**
Connie K Morris

Exhibit A1
Page 1 of 2

11

Connie K. Morris

Item 8. Explain how you believe you were discriminated against.

Because of my disability and gender, I feel that I was discriminated against based on the following:

1. When OPPTS Federal Register Staff become ill, they are allowed to notify supervisor and leave the premises. I was told I had to contact four people and must keep a diary, and was still told must remain on the premises which subsequently resulted in me being transported by ambulance to the emergency room.

2. I notified my supervisor several times indicating I was encountering allergic reactions in the clean space which inhibited my breathing and walking. Supervisor still advised me that the clean space was my duty station. This resulted in my being transported by ambulance to the emergency room.

3. While under doctor's care and recovering, was harassed by my supervisor by phone, fax and Email.

4. While under doctor's care and recovering, I was instructed to meet and surrender to the Deputy Director all papers, documentation, disks, equipment, including applicable passwords, and any other work related materials that I have at home that are the property of EPA. Deputy Director would contact me to make the necessary arrangements as soon as possible.

5. Received verbal threats my employment could be terminated.

12    1

Exhibit ___A1___
Page _2_ of _2_

# EXHIBIT 6

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON, D.C. FIELD OFFICE
1801 L Street, NW, Suite 100
Washington, D.C. 20507

| | | |
|---|---|---|
| Connie K. Morris, | : | |
| Complainant, | : | |
| | : | EEOC No.     570-2006-00175X |
| v. | : | |
| | : | Agency No.    2005-0075-HQ |
| Stephen L. Johnson, Administrator, | : | |
| U.S. Environmental Protection Agency, | : | <u>December 5, 2006</u> |
| Agency. | : | |
| | : | |

## <u>DECISION WITHOUT A HEARING</u>

This Decision is issued pursuant to 29 C.F.R. § 1614.109 (g) (2006).[1]

## <u>JURISDICTION AND VENUE</u>

The undersigned Administrative Judge has jurisdiction to adjudicate this complaint pursuant to 29 C.F.R. § 1614.109 (a), as a request for a Hearing in this Federal sector employment discrimination complaint was duly submitted by Complainant to, and accepted by, the U.S. Equal Employment Opportunity Commission ("EEOC" or "Commission").

At all times relevant to this complaint, Connie K. Morris ("Complainant") was a Federal employee and the U.S. Environmental Protection Agency ("EPA" or "Agency") is an Executive agency of the Federal government.

---

[1] The Commission's regulations are patterned after the procedures and guidelines for summary judgment set forth in R. 56 of the Federal Rules of Civil Procedure. *Pedersen v. Reno*, Attorney General, EEOC Request No. 05943339 (1995). Fed. R. Civ. P. 56 provides, "When a motion for summary judgment is made and supported as provided in this rule, . . . [t]he adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Venue is appropriate in the EEOC's Washington, D.C. Field Office, Federal sector (Hearings) Unit, as the acts underlying this complaint regard a Federal agency or department within this office's geographic jurisdiction. 29 C.F.R. § 1614.108 (g); EEO Management Directive 110, Appendix J (November 9, 1999) ("EEO MD-110").

## PARTIES

At all relevant times herein, Connie K. Morris (Complainant) was a Federal employee of the Agency and encumbered a permanent, full-time position as a GS-1001-14, Information Liaison Specialist, in the Agency's Federal Register Staff, Office of Program Management Operations ("OPMO"), Office of Prevention, Pollution, and Toxic Substances ("OPPTS"), located at EPA Headquarters in Washington, D.C. Report of Investigation ("ROI"), Tabs F-1; F-4.

The U.S. Environmental Agency is an Executive agency of the Federal government, as defined in 5 U.S.C. 105, and is subject to this tribunal's jurisdiction regarding the underlying Federal sector employment discrimination complaint. 29 C.F.R. § 1614.103 (b)(2).

## PROCEDURAL BACKGROUND

On July 14, 2005, Complainant initiated contact with an EEO Counselor at the Agency regarding the events underlying this complaint. ROI, Tab B-2.

On August 10, 2005, and after the completion of pre-complaint processing, *see* 29 C.F.R. § 1614.105, Complainant filed a formal complaint of discrimination against the Agency. ROI, Tab A-1.

On September 23, 2005, the Agency accepted the bases and issues identified in Complainant's discrimination complaint for investigation. ROI, Tab C-2. Thereafter, in or about December of 2005,[2] the Agency contracted with an EEO Investigation company to develop an impartial and appropriate factual record upon which to make findings on the claims raised by Complainant. *See* 29 C.F.R. § 1614.108 (b).

On February 8, 2006, the Agency informed Complainant that the investigation of this complaint was complete. *See* EPA Compliant file.

On February 17, 2006, Complainant submitted a Request for Hearing form to the Agency and to the EEOC's Washington, D.C. Field Office, requesting the appointment of an EEOC Administrative Judge pursuant to 29 C.F.R. § 1614.108 (g). *See* EPA Compliant file, Request for Hearing Form.

On April 19, 2006, an Acknowledgment and Order was issued by this tribunal that acknowledged receipt of Complainant's request for a Hearing, appointed the undersigned Administrative Judge, established deadlines, and practice and procedures governing the EEOC's processing of this Federal sector complaint. EEO MD-110, Ch. 7, § I, pp. 7-1 to 7-2.

On July 14, 2006, and pursuant to 29 C.F.R. § 1614.109 (g), *see* Acknowledgment and Order, § VII, p. 4, the Agency submitted a Motion to Dismiss and/or for Summary Judgment, with Brief in Support, including appended Exhibits ("Agency's Motion").[3]

---

[2] The applicable dates on the two Investigator Letters of Authorization contained in the Agency's Complaint file are partially obliterated.

[3] The Acknowledgment and Order provides that discovery be completed within seventy (70) calendar days from the date of receipt. The EEOC presumes receipt of the Acknowledgment and Order by the parties five calendar days after issuance. Acknowledgment and Order, § V, p.2; Certificate of Service. Discovery, therefore, closed on July 3, 2006. Neither party contests the timeliness of any pleading herein.

On August 7, 2006, Complainant submitted Complainant's Memorandum of Law in Opposition to Motion to Dismiss, or for Summary Judgment, with Declaration appended thereto ("Complainant's Opposition").[4]

On August 15, 2006, the Agency submitted the Agency's Reply to Complainant's Opposition to its Motion to Dismiss and/or for Summary Judgment ("Agency's Reply").[5]

## ISSUES

The specific issues pending adjudication before this tribunal are as follows:

Whether, in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e-2000e-15 ("Title VII"), and the Rehabilitation Act of 1973, 29 U.S.C. §§706, *et seq.* ("Rehabilitation Act"), the U.S. Environmental Protection Agency (Agency) discriminated against Connie K. Morris (Complainant), based upon her sex (female) and disability (workplace sensitivity) when the Agency provided Complainant with a reasonable accommodation that Complainant contends was insufficient.

ROI, Tab C-2, Notice of Acceptance of Claim, Discrimination Complaint Number 2005-0075-HQ, dated September 23, 2005.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

During the relevant period, Complainant was a Federal employee at the Agency and identified her relevant protected classes as female and disabled (sensitivity to mold and dust mites). Complainant encumbered a permanent, full-time, Federal employee position as a GS-1001-14, Information Liaison

---

[4] No motion contesting any procedural aspect of Complainant's Opposition has been submitted by the Agency.

[5] The timeliness of the Agency's Reply is not contested. *See* Acknowledgment and Order, § VII, p. 4 (moving party has five calendar days from receipt of a response to a Motion for Decision Without a Hearing to file a Reply).

-4-

Specialist, in the Agency's Federal Register Staff, Office of Program Management Operations (OPMO), Office of Prevention, Pollution, and Toxic Substances (OPPTS), located at EPA Headquarters in Washington, DC. ROI, Tab F-1.

Complainant's first-level supervisor was John A. Richards (male, no disability) ("Richards"), Supervisory Technical Information Specialist, GM-1412-15 (Director fo OPPTS Federal Register Staff) located in OPPM, Immediate Office of the Assistant Administrator (OPPTS), at EPA Headquarters in Washington, D.C. ROI, Tab F-3. Richards' fist-level supervisor, and Complainant's second-level supervisor, is Marylouise M. Uhlig (female, disability unknown), Associate Administrator for OPPTS (Management) at the Agency. *Id.*

Pursuant to a Memorandum of Understanding with the American Federation of Government Employees AFL-CIO ("AFGE"), the Agency established and created national reasonable accommodation procedures that outline the rights and responsibilities of AFGE employees and Agency Decision-Makers regarding requests for reasonable accommodations at the Agency. ROI, Tab F-7.

On April 29, 2005, and pursuant to Agency policy and procedure, Complainant filed a formal request with the Agency for a reasonable accommodation for her medical condition. On May 3, 2005, Complainant's request was denied. ROI, Tab F-8.

On May 3, 2005, Complainant submitted medical information to the Agency's National Reasonable Accommodation Coordinator. On July 7, 2005, Complainant submitted additional medical information to the Agency's National Reasonable Accommodation Coordinator, including a medical

report from Complainant's health care provider Ahmad Shamim, M.D.,[6] dated June 29, 2005. *Id. See also*, ROI, Tab F-1, Attachments (containing documents accurately identifying the health care provider).

On July 7, 2005, and pursuant to Agency Order 3110.21, Providing Reasonable Accommodation for EPA Employees and Applicants with Disabilities, *et al.*, and upon Complainant's request for reconsideration and submission of medical information from Complainant's health care provider, the Agency's National Reasonable Accommodation Coordinator confirmed that "a medical condition exists that substantially limits this employee's [Complainant] major life activities of breathing, walking and therefore she is determined to be a person with a disability." ROI, Tab F-8, EPA Determination of Disability. Therein, the Coordinator determined that "the limitations imposed by the medical condition include the substantial negative reaction to exposure to dust mites, gas fumes and mold" and recommended that the Complainant and the Decision-Maker, identified as Richards, "meet to discuss the accommodation/s that will be offered by management." *Id.*

As a "reasonable accommodation," Complainant requested permanent full time "telework/work from home." *Id.*

During the relevant period, both before Complainant's formal request for a reasonable accommodation and after the Agency issued its Determination of Disability, the Agency engaged in an

---

[6] Ahmad Shamim, M.D.'s license to practice medicine in Maryland, which was originally suspended by the State of Maryland in 1984 due to professional incompetence, was ordered reinstated on August 16, 1994, albeit with significant restrictions including a three year probationary period. *See* Order of Reinstatement, In the Matter of Ahmad Shamim, M.D., License No. D10243, Board of Physician Quality Assurance, Case No. 84-0139 (August 16, 1994) (Israel H. Weiner, M.D., Chair, presiding). Presumably, during the relevant period, Ahmad Shamim, M.D. was duly licensed to practice medicine and was qualified to offer a medical diagnosis or opinion, to a reasonable degree of medical certainty, regarding Complainant's medical condition.

interactive process with Complainant to ascertain an effective reasonable accommodation. ROI, Tabs F-1, Attachments 1, 4, 7, 9, 10, 11, 12, 17-20, 25, 27-32, 34-36; F-2, Attachment C.

On January 8, 2004, the Agency performed an airborne microbial assessment and tests of its workplace offices, including Complainant's office, identified as suite 6109 EPA East/West Connecting Wing Building. ROI, Tab F-2, Attachment D. *See* Agency's Motion, pp. 6, 12-13; EPA's Statement of Undisputed Material facts, ¶ 5; Attachment A, ¶ 4; Attachment B.

The Agency maintains a "clean space" facility in Crystal City, VA. *Id.*

Beginning on or about June 22, 2005, Complainant, pursuant to instruction from Richards, obtained a badge for entry into the Agency's clean space building and thereafter reported to work at that location. ROI, Tab F-8. Between June 23, 2005, and July 25, 2005, Complainant requested sick leave encompassing approximately thirteen (13) days, and worked at home on nine (9) days. Complainant also requested to work at home as an alternative to reporting to work at the Agency's clean space location. *Id.*

Effective July 10, 2005, Complainant's Duty Station was changed from the Agency's Washington, D.C. Headquarters' offices to the Agency's clean space location in Crystal City (Arlington), VA. ROI, Tab F-4. The change in Complainant's Duty Station did not affect or change Complainant's pay plan, pay grade level or step, annual salary or duties. *Id. See* ROI, Tab F-5.

On July 19, 2005, in the morning after arriving for work at the Agency's clean space location, Complainant requested immediate medical attention and was taken from the Agency's offices by ambulance to an emergency room at an area hospital. *Id.*

-7-

The Agency's Federal Register Staff is comprised of four (4) males and ten (10) females. ROI, Tab F-6. The Agency is prohibited by the Privacy Act of 1974, 5 U.S.C. 552a, from disclosing personal information about its employees, *i.e.*, disability status, contained within its system of records, absent express authorization from the affected employee(s). *Id.*

## STATEMENT OF APPLICABLE SUBSTANTIVE LAW

As noted above, *see* fn.1, *supra*, the EEOC's regulations regarding a Decision Without a Hearing, *see* 29 C.F.R. § 1614.109 (g) (ofttimes referred to as "summary judgment"), are patterned after Rule 56 of the Federal Rules of Civil Procedure.

### Summary Judgment Standard - Fed.R.Civ.P., R. 56

Under Fed.R.Civ.P., R. 56, summary judgment is appropriate in a pending civil action if there is no genuine[7] issue as to any material fact[8] and, as a result, a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Thus, in a Federal court, for summary judgment to issue the evidence must only be such that a fair-minded fact-finder could not return a verdict for a party on the evidence presented. *Anderson*, 477 U.S. at 252. Therein, the party opposing summary judgment may not rest upon mere allegations or denials in the pleadings or upon conclusory statements in affidavits; rather, that party must go beyond the pleadings and support her/his contentions with proper

---

[7] A factual issue is genuine only if it is manifested by substantial evidence going beyond the allegations in the complaint. *See e.g., Pignons S.A. de Mecanique v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir. 1981).

[8] A material fact must be shown to have a likelihood of impacting the outcome of the issues at trial. *See e.g., Mattoon v. City of Pittsfield*, 980 F.2d 1, 7-8 (1st Cir. 1992).

documentary evidence. *Celotex Corp.*, 477 U.S. at 324. If the evidence produced by the non-movant is merely colorable or not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Summary judgment is also warranted where a party fails to establish an essential element of his/her case, and that party bears the ultimate burden of proof on that matter. *Id.*; Celotex, 477 U.S. at 322-23. *See* EEO MD-110 at 7-15.

To defeat a motion for summary judgment, therefore, a party must show that there is sufficient material evidence supporting the claimed factual dispute to require the fact-finder to resolve the parties' differing versions of the truth at trial. *Anderson*, 477 U.S. at 248-49. Critically, only disputes over facts that might affect the outcome of the suit under governing law will preclude summary judgment. *Anderson*, 477 U.S. at 248. It is well-established that no genuine issue of *material* fact will be found to exist if the relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not return a verdict for the party opposing summary judgment. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). In making this determination, the trier of fact must draw inferences from the record in the light most favorable to the party opposing summary judgment. *Anderson*, 477 U.S. at 255; *Celotex*, 477 U.S. at 317-23, 330 n.2 (Brennan, J., concurring).

Under applicable EEOC Federal sector employment discrimination caselaw, analogous principles apply. *Murphy v. Brownlee, Act. Secy., U.S. Dep't of the Army*, EEOC Appeal No. 01A04099 (2003); *Petty v. Rumsfeld, Secy., U.S. Dep't of Defense*, EEOC Appeal No. 01A24206 (2003).[9]

---

[9] The *Murphy* and *Petty* Decisions are endorsed by the EEOC's Executive Secretary and are, thus, mandatory precedent in this tribunal.

Standard - Decisions Without a Hearing - 29 C.F.R. §1614.109(g)

In *Murphy*, the Commission's Office of Federal Operations, while embracing applicable U.S. Supreme Court precedent,[10] explained that

> the [Federal sector] hearing process is intended to be an extension of the investigative process, designed to ensure that the parties have "a fair and reasonable opportunity to explain and supplement the record and, in appropriate instances, to examine and cross-examine witnesses." *See* Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 7-1 (November 9, 1999); *see also* 29 C.F.R. § 1614.109(e). "Truncation of this process, while material facts are still in dispute and the credibility of witnesses is still ripe for challenge, improperly deprives complainant of a full and fair investigation of her claims." *Mi S. Bang v. United States Postal Service*, EEOC Appeal No. 01961575 (March 26, 1998). *See also Peavley v. United States Postal Service*, EEOC Request No. 05950628 (October 31, 1996); *Chronister v. United States Postal Service*, EEOC Request No. 05940578 (April 23, 1995).

In *Petty*, the Commission's Office of Federal Operations expounded upon applicable protocol regarding dispositive Federal sector proceedings, as follows (with re-paginated footnotes):

---

[10] The appellate author of *Murphy* wrote

The U.S. Supreme Court has held that summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In ruling on a motion for summary judgment, a court's function is not to weigh the evidence but rather to determine whether there are genuine issues for trial. *Id.* at 249. The evidence of the non-moving party must be believed at the summary judgment stage and all justifiable inferences must be drawn in the non-moving party's favor. *Id.* at 255. An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Oliver v. Digital Equip. Corp.*, 846 F.2D 103, 105 (1st Cir. 1988). A fact is "material" if it has the potential to affect the outcome of the case. If a case can only be resolved by weighing conflicting evidence, summary judgment is not appropriate. In the context of an administrative proceeding, an AJ may properly consider summary judgment only upon a determination that the record has been adequately developed for summary disposition. *See Stabler v. Department of the Navy*, EEOC Request No. 05910080 (February 21, 1991); *Simpkins v. United States Postal Service*, EEOC Request No. 05950912 (February 23, 1996). The courts have been clear that summary judgment is not to be used as a "trial by affidavit." *Redmand v. Warrener*, 516 F.2d 766, 768 (1st Cir. 1975). The Commission has noted that when a party submits an affidavit and credibility is at issue, "there is a need for strident cross-examination and summary judgment on such evidence is improper." *Pedersen v. Department of Justice*, EEOC Request No. 05940339 (February 24, 1995). *Murphy*, EEOC Appeal No. 01A04099 at 4.

-10-

In both the federal court system and the administrative process, this dispositive mechanism is designed to facilitate faster adjudication of claims where critical facts are uncontested – that is, where the only task remaining is to apply the relevant law to undisputed facts to determine which party should prevail.[11] However, before an administrative judge can properly issue a decision without a hearing in the federal sector, either on his or her own initiative or after a motion is made by either party, several criteria must be met.

First, the administrative judge must be certain that the investigative record has been adequately developed. Unlike the typical civil employment discrimination trial in federal court, an EEOC hearing is not strictly judicial in nature -- it is a quasi-investigatory exercise, as well. It is specifically designed as "an adjudicatory proceeding *that completes the process of developing a full and appropriate record.*" EEO MD-110, at 7-1 [emphasis added]; *see also* 29 C.F.R. § 1614.109(a) (stating that once a complainant requests a hearing and an EEOC administrative judge is appointed, the administrative judge assumes "full responsibility for the adjudication of the complaint, including overseeing the development of the record"); *cf.* EEO MD-110, at 7-7 (explaining that "[t]he Commission intends that the [a]dministrative [j]udge will take complete control of the case once a hearing is requested").

\*                          \*                          \*

Accordingly, an administrative judge may not issue a decision without a hearing if he or she has concluded that holding an actual hearing would aid in the development of an appropriate factual record (*i.e.*, one which contains all the information necessary to enable an accurate adjudication of the complaint on its merits). *See, e.g., Brown v. United States Postal Service*, EEOC Appeal No. 01992087 (Sept. 13, 2002).

\*                          \*                          \*

Second, the administrative judge cannot issue a decision without a hearing unless there are no *genuine issues* of *material fact.* According to the U.S. Supreme Court, "the substantive law will identify which facts are material," and "only disputes over facts that might affect the outcome of the suit under the governing law [*not* unnecessary or irrelevant factual disputes] will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby Inc.*, 477

---

[11] *See* 64 Fed. Reg. 37650 (July 12, 1999) (where the Commission explained, in the preamble to the existing federal sector regulations, that "the problem of meritless complaints can be addressed through appropriate application of . . . traditional summary judgment," and that these complaints "should be resolved more quickly at earlier stages in the process using [such] existing legal standards . . ."); and *Celotex Corporation v. Catrett,* 477 U.S. 317, 327 (1986) (where the U.S. Supreme Court noted that Rule 56 "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'"); *cf.* Black's Law Dictionary (7th ed. 1999) (explaining that the purpose of summary judgment is to "allow the speedy disposition of a controversy without the need for trial").

U.S. 242, 248 (1986).[12] In the hearing context, in circumstantial disparate treatment cases such as this one, this means that the administrative judge must look to the *McDonnell Douglas* evidentiary scheme to determine which facts may be "material" in this sense. Thus if, for example, "a complainant is unable to set forth facts necessary to establish one essential element of a *prima facie* case, a dispute over facts necessary to prove another element of the case [*i.e.*, whether the agency's legitimate non-discriminatory reason for its actions is true] would not be material to the outcome." EEO MD-110, at 7-15.

Assuming there are material facts in dispute, "summary judgment will not lie if the dispute . . . is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the [party opposing summary judgment]." *Anderson*, 477 U.S. at 248.[13] At summary judgment, the threshold inquiry is "determining whether there is the need for a trial -- whether, in other words, there are any . . . factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. In the federal sector, the critical question is whether there is a need for a *hearing* – whether, in other words, there are issues of material fact that must be resolved by an administrative judge, *acting as a jury would*, because such issues may reasonably be resolved in favor of either the complainant or the agency. Consequently, the administrative judge cannot issue a decision without a hearing if the theoretically "reasonable administrative judge," acting as a fact finder, could find in favor of the party opposing the issuance of a decision without a hearing (typically the complainant).

Third and similarly, the administrative judge may not issue a decision without a hearing if he or she actually has to *find* facts first to do so. According to the Supreme Court, "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. at 255. Therefore, at summary judgment, the "evidence of the [party opposing summary judgment] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*.[14]

---

[12] *Cf. Celotex v. Catrett*, 477 U.S. 317, 233-23 [sic] (1986) [citations omitted] (explaining that "a complete failure of proof concerning an essential element of [an opposing] party's case necessarily renders all other facts immaterial").

[13] *Cf. Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986) [citations omitted] (indicating that if "the record taken as a whole could not lead a rational trier of fact to find for the party [opposing summary judgment], there is no 'genuine issue for trial'").

[14] *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-151 (2000) [citations omitted] (stating that at summary judgment, "the court must draw all reasonable inferences in favor of the [party opposing summary judgment], and it may not make credibility determinations or weigh the evidence . . . . Thus, although the

In the hearing context, of course, the administrative judge is both judge *and* jury – legal arbiter *and* fact finder. In deciding whether to issue a decision without a hearing, the administrative judge must be careful not to conflate these two roles. For purposes of issuing a decision without a hearing, the administrative judge is acting only as legal arbiter and cannot determine the truth of any matter that may only appropriately be decided *after* a hearing has been held (albeit by the administrative judge then properly acting as a fact finder). Therefore, if the administrative judge cannot issue a decision without a hearing without *first* playing the part of jury (*e.g.*, finding facts after assessing credibility, weighing evidence, drawing definitive conclusions, etc.), then the administrative judge must hold a hearing. *See, e.g., Reyes v. United States Postal Service*, EEOC Appeal No. 01A23975 (Nov. 4, 2002) (arguing that the evidence of the party opposing the issuance of a decision without a hearing must be believed); *Miles v. Department of the Army*, EEOC Appeal No. 01A04665 (Oct. 31, 2002) (noting that if a case can only be resolved by weighing conflicting evidence, rendering a decision without first holding a hearing would be inappropriate); *Franklin v. United States Postal Service*, EEOC Appeal No. 07A10101 (Sept. 25, 2002) (asserting that whenever the credibility of witnesses is ripe for challenge, there is a need for the type of "strident cross examination" only available via a hearing); and *Engel v. United States Postal Service*, EEOC Appeal No. 01A13103 (Aug. 29, 2002) (declaring that administrative judges should not conduct "trials by affidavit" in ruling on motions for a decision without a hearing).

Fourth and finally, the administrative judge should not rule in favor of one party without holding a hearing unless he or she ensures that the party opposing the ruling is given (1) ample notice of the proposal to issue a decision without a hearing, (2) a comprehensive statement of the allegedly undisputed material facts, (3) the opportunity to respond to such a statement,[15] and (4) the chance to engage in discovery before responding, if necessary. According to the Supreme Court, Rule 56 itself precludes summary judgment "where the [party opposing summary judgment] has not had the opportunity to discover information that is essential to his opposition." *Anderson*, 477 U.S. at 250.[16] In the hearing context, this means that the

---

court should review the record as a whole, it must disregard all evidence favorable to the [party favoring summary judgment] that the jury is not required to believe . . . . That is, the court should give credence to the evidence favoring the [party opposing summary judgment] as well as that 'evidence supporting the [party favoring summary judgment] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses . . . .'")

[15] If the administrative judge proposes to issue a decision without a hearing on his or her own motion, his or her notice to this effect should list the undisputed material facts and order the parties to respond accordingly. If a party makes a motion for a decision without a hearing, the administrative judge should ensure that the motion is served on the opposing party and contains the same relevant information. *Cf.* EEO MD-110, at 7-14 – 7-15.

[16] *See also Celotex*, 477 U.S. at 326 (similarly acknowledging that any "premature" summary judgment motion "can be adequately dealt with under Rule 56 . . . which allows a summary judgment motion to be denied, or

administrative judge must enable the parties to engage in the amount of discovery necessary to properly respond to any motion for a decision without a hearing. *Cf.* 29 C.F.R. § 1614.109(g)(2) (suggesting that an administrative judge could order discovery, if necessary, after receiving an opposition to a motion for a decision without a hearing).

*Petty*, EEOC Appeal No. 01A24206, pp. 12-16.

Thus, in the EEOC's Federal sector tribunal, an Administrative Judge may issue a Decision Without a Hearing only where the investigative record has been adequately developed, holding an actual hearing would not aid in the development of an appropriate factual record, there are no genuine issues of material fact in dispute that might affect the outcome of the suit under the governing law, weighing of evidence and credibility determinations are not necessary, and the non-movant has had ample notice, discovery, and an opportunity to oppose summary disposition. *Id.*

<u>Burdens of Production and Persuasion - Federal Sector Employment Discrimination Complaint</u>

With respect to the laws enforced in the Federal sector by the EEOC, similar to civil actions in Federal court, the Complainant bears the ultimate burden of persuading the trier of fact that the Agency intentionally engaged in unlawful discrimination against him/her with respect to a term, condition or privilege of employment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Absent direct

---

the hearing on the motion to be continued, if the [party opposing summary judgment] has not had an opportunity to make full discovery"); and Fed. R. Civ. P. 56(f) (indeed stipulating that "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just"); *cf. Anderson*, 477 U.S. at 257 (stating that a "plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment" – "even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery").

-14-

evidence[17] of discrimination, the Complainant in a Title VII or Rehabilitation Act case, as here, must carry the initial burden of production under the statutes of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981).

In this case, the record evidence demonstrates that there is no direct evidence of discrimination. *See* ROI; Agency's Motion; Complainant's Opposition; Agency's Reply. Thus, and in order to prove her claim, Complainant may follow the *McDonnell Douglas* tripartite framework[18] to raise a rebuttable inference of unlawful discrimination, thereby requiring the Agency to articulate legitimate, non-discriminatory reasons for its actions. The burden of establishing a *prima facie* case is not onerous.

Prima Facie Case

Complainant's Initial Burden of Production

Under either Title VII or the Rehabilitation Act, a complaining party may establish a *prima facie* case of disparate treatment discrimination by showing that: (1) he/she is a member of a group protected from discrimination; and (2) he/she was treated differently from similarly situated employees not in Complainant's protected class; or (3) that other evidence exists sufficient to create an inference

---

[17] Direct evidence, if believed by the trier of fact, resolves the ultimate issue of whether discrimination occurred, thereby shifting the burden of proof to the Agency to demonstrate that the adverse action would have occurred even absent discrimination. *See EEOC Policy Guidance on Recent Developments in Disparate Treatment Theory*, No. 915.002, § III (1992); *Privette v. HUD*, EEOC Appeal No. 01832650 (1985); *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990).

[18] Because facts in EEO cases vary, the specific tripartite structure set forth in *McDonnell Douglas* for demonstrating the existence of a *prima facie* case is not necessarily applicable in all respects to every case. *McDonnell Douglas*, 411 U.S. at 802, fn. 13. Thus, a Complainant may establish a *prima facie* case of discrimination absent any factor identified by the Court.

that the agency's actions were motivated by discrimination. *Burdine,* 450 U.S. at 256, n.6; *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576 (1978); *McDonnell Douglas*, 411 U.S. at 802, n.13; EEO MD-110, App. L-1 (November 9, 1999). *See also O'Connor v. Consolidated Coin Caterer's Corp.*, 517 U.S. 308, 311-12 (1996) (must be a logical connection between each element of a *prima facie* case and the illegal discrimination), *citing Burdine*, 450 U.S. at 254.

To demonstrate a *prima facie* case under the Rehabilitation Act, Complainant must first demonstrate that: (1) she has a disability that substantially limits one or more of her major life activities; or (2) has a record of such an impairment, or (3) is regarded as having such an impairment. Rehabilitation Act. *See* 29 C.F.R. Part 1630.2. *See also Toyota Motors Manufacturing, Kentucky, Inc. v. Williams*, 534 U. S. 184 (2002).[19] Significantly, the fact that another entity, *e.g.*, Veteran's Administration, Social Security Administration, Worker's Compensation, *et al.*, has determined an individual to be "disabled," in whole or in part, does not establish that a Complainant is "disabled" as that term is applied under laws enforced by the EEOC. *See Melahn v. U.S. Dept. of Navy*, EEOC Appeal No. 01832380 (1985) (determination that person suffers from service-related disability does not establish Complainant as an individual with a disability under the Rehabilitation Act); *Crevier v. Postmaster General, U.S. Postal Service*, EEOC Appeal No. 01952393 (1997) (evidence of Veterans Administration's determination of disability does not establish individual as person with disability under Act); *Bono v. Postmaster General, U.S. Postal Service*, EEOC Appeal No.

---

[19] Failing to demonstrate a "disability" precludes establishing a *prima facie* case.

-16-

01951113 (1997) (records of service-related disability do not describe condition or any limitation on major life activities).

### Agency's Burden of Production - Articulation

If Complainant establishes a *prima facie* case of discrimination, the burden of production then shifts to the Agency to articulate a legitimate, nondiscriminatory reason for its challenged actions. *McDonnell Douglas*, 411 U.S. at 802. If the Agency does so, the *prima facie* inference drops from the case. *St. Mary's Honor Ctr.*, 509 U.S. at 507, 510-11.

### Complainant's Burden of Production and Persuasion

Upon the Agency's articulation, and the obviation of any *prima facie* inference, Complainant then has to prove by a preponderance of the evidence that the proffered explanation is a pretext for unlawful discrimination, *i.e.*, the articulation is interposed to disguise unlawful discrimination - the true and intended purpose for the adverse action. *St. Mary's Honor Ctr.*, 509 U.S. at 511; *Burdine*, 450 U.S. 252-53; *McDonnell Douglas*, 411 U.S. at 804.

Complainant always retains the ultimate burden of persuading the trier of fact by the preponderance of the evidence that the Agency intentionally, and unlawfully, discriminated against her. *St. Mary's Honor Ctr.*, 509 U.S. at 511; *United States Postal Service v. Aikens*, 460 U.S. 711, 715 (1983).

### FINDINGS AND ANALYSIS

As a preliminary matter, I determine that the record herein is sufficiently developed and contains sufficient evidence to determine whether or not the Agency engaged in unlawful discrimination against

-17-

Complainant. *See Hill v. Postmaster General, U.S. Postal Service*, EEOC Appeal No. 01842640 (1986). Thus, the trier of fact has before him all the evidence needed to decide whether the Agency intentionally discriminated against Complainant based upon her sex or disability when the Agency provided Complainant with a reasonable accommodation that Complainant contends was insufficient and whether a Hearing is required in this complaint.[20]

Title VII

Complainant fails to demonstrate a *prima facie* case of discrimination under Title VII. Complainant is a member of the relevant protected class, female, but fails to demonstrate that she was treated differently than similarly situated employees[21] not in Complainant's protected class or that other evidence exists sufficient to create an inference that the agency's actions were motivated by discrimination.

The undisputed record evidence demonstrates that the Agency processed Complainant's requests for reasonable accommodation and disability assessment pursuant to Agency policy. There is no evidence to indicate that other similarly situated employees not in her relevant Title VII protected

---

[20] The Agency's Motion is fashioned in the disjunctive, *i.e.*, either to dismiss or for summary judgment. Upon review of the entire record herein, I determine that the Agency's procedural arguments to dismiss pursuant to 29 C.F.R. § 1614.107, lack sufficient merit. It has not been established that Complainant's requests to management to work from home were requests for a reasonable accommodation based upon her status as a qualified individual with a disability. The record evidence clearly demonstrates that Agency management did not consider Complainant disabled until the Agency's National Reasonable Accommodation Coordinator's finding.

[21] *See Goodman v. Postmaster General, U.S. Postal Service*, EEOC Appeal No. 01A14992 (2002) (for two or more employees to be considered similarly situated for the purpose of creating an inference of disparate treatment, complainant must show that all of the relevant aspects of her employment situation are nearly identical to those of the other employees who she alleges were treated differently). Complainant's proffered comparators are in a different chain-of-command with different duties. *See* Agency Motion at 15; EPA's Statement of Undisputed Material Facts, ¶ 27, fn.6.

-18-

class, *i.e.*, males, were treated differently. Consequently, the undisputed record evidence demonstrates that Complainant fails to establish a *prima facie* case of unlawful discrimination under Title VII based upon her sex (female). Accordingly, judgment is entered for the Agency on Complainant's Title VII claim.

<u>Rehabilitation Act</u>

<u>Disparate Treatment</u>

With respect to Complainant's other claims, Complainant demonstrates several components of a *prima facie* disparate treatment case under the Rehabilitation Act. For example, the Agency concedes that Complainant is a qualified individual with a disability,[22] *i.e.*, Complainant has a physical impairment that limits Complainant's ability to perform major life activities, the Agency is aware of Complainant's disability, Complainant is qualified to perform the essential functions of her position at the Agency. ROI, Tab F-8. However, Complainant fails to produce any evidence to demonstrate that she was treated differently than similarly situated employees who were not disabled. *See* EEO MD-110, Appendix L-6. Accordingly, judgement is entered for the Agency on Complainant's Rehabilitation Act disparate treatment claim.

<u>Reasonable Accommodation</u>

Remaining for adjudication is Complainant's reasonable accommodation claim under the Rehabilitation Act. Complainant asserts that the Agency subjected her to unlawful discrimination when

---

[22] *See* Agency Reply at 3.

-19-

it failed to provide Complainant with her preferred reasonable accommodation: permanent, full time, work at home schedule.

Again, and as noted above, the Agency's actions concede that Complainant is disabled under the Rehabilitation Act. The undisputed evidence demonstrates that Complainant requested a reasonable accommodation and the Agency took steps to identify possible accommodations and made an individualized assessment regarding Complainant, therein comparing Complainant's qualifications and limitations with the job requirements. ROI, Tab F-2. The Agency identified an accommodation it deemed effective for Complainant, the change of Duty Station to the clean space in Crystal City, VA, which would enable Complainant to perform the essential functions of her position. *Id.* However, Complainant contests the effectiveness of the Agency's reasonable accommodation, including the breadth and extent of the interactive process,[23] and requested instead a permanent, full time, work at home schedule as the only effective accommodation for her medical condition. Thus, and viewing the evidence in a light most favorable to Complainant, I determine that Complainant establishes a *prima facie* case under the Rehabilitation Act with respect to her assertion that the Agency failed to provide a reasonable accommodation.

In its articulation, the Agency contends that it is under no obligation to provide the reasonable accommodation of Complainant's choice, a permanent, work at home full time schedule, and that it

---

[23] The Commission has recognized that an agency's failure to engage in the interactive process does not, in itself, constitute a violation of the Rehabilitation Act. *Doe v. Admin., Social Security Adm.*, EEOC Appeal No. 01A14791 (2003). *See also Wright v. Postmaster General, U.S. Postal Service*, EEOC Appeal No. 01A54237 (2006) ("a factual determination that the agency failed to properly engage in the interactive process, does not, by itself, demand a finding that complainant was denied a reasonable accommodation. Rather, to establish a denial of a reasonable accommodation, complainant must establish that the failure to engage in the interactive process resulted in the agency's failure to provide a reasonable accommodation.").

provided an effective reasonable accommodation by transferring Complainant's Duty Station to an environmentally clean work space, specifically engineered to be free of the contaminants affecting Complainant's health and triggering the disability. *See* ROI, Tab F-2 (public health doctor discussed Complainant's sensitivities with her health care provider; original and alternate work spaces were scientifically tested). Further, the Agency articulates that acquiescing to Complainant's preferred accommodation was, in its business judgment, unworkable and, hence, ineffective.

The Agency explains that Complainant encumbers a senior position on the Federal Register Staff which requires Complainant to perform in a leadership role regarding other staff, editorial policy, priorities, coordination of document preparation under strict time deadlines, and regular face-to-face meetings with other EPA personnel. Agency's Motion at 9-10, *citing* ROI, Tab F-5 (Complainant's position description).[24] *See* ROI, Tab F-2; Agency's Motion, pp. 9-10; Agency's Reply, pp. 3-6. Thus, Agency management determined that moving Complainant's work space to the clean space provided "maximum flexibility that the job function will permit." ROI, Tab F-2 at 5. *See also* Agency's Motion at 10 (no reasonable way Complainant can produce work from outside an EPA worksite on a permanent basis). Critically, the Agency indicates that the clean space provided Complainant with a secure computer network connection within the EPA, which Complainant's job required. *Id.;* Agency's Motion at 10; Agency's Reply, pp. 3-6.

---

[24] The Agency also points out that when Complainant was authorized to perform work at home temporarily, per her request to Richards, which Richards granted, that "collaborative work on a critical development project was 'hampered and delayed.'" Agency Motion at 10.

Under the Rehabilitation Act, where a qualified individual with a disability requests a reasonable accommodation,[25] the Agency is required to engage in an interactive process[26] with the individual and thereafter provide an effective accommodation. The interactive process should identify the precise limitations created by the asserted disability, and potential reasonable accommodations to overcome those limitations. 29 C.F.R. Part 1630 Appendix §§ 1630.2(o)(3), 1630.9.

Relevant here, EEOC regulation defines "reasonable accommodation" as meaning: (i) modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position he or she desires; (ii) modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions[27] of that position; (iii) modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities. 29 C.F.R. § 1630.2(o)(1)(i)-(iii).

The undisputed facts demonstrate that the Agency, pursuant to its obligations under applicable law, policy and collective bargaining agreement, determined Complainant's disability status, engaged in

---

[25] It is axiomatic that an employee claiming a need for a reasonable accommodation must show a nexus between the asserted disabling condition and the requested accommodation. *See Wendt v. Secy., U.S. Dep't of Veterans Affairs*, EEOC Appeal No. 01A14385 (2002); *Wiggins v. Postmaster General, U.S. Postal Serv.*, EEOC Appeal No. 01953715 (1997).

[26] "The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability." 29 C.F.R. Part 1630 Appendix § 1630.9. *See* fn.23, *infra*.

[27] EEOC regulations provide that the term "essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires" and does not include "marginal functions of the position". 29 C.F.R. § 1630.2(n)(1).

-22-

an interactive, individualized assessment with Complainant to identify possible accommodation,

identified an accommodation that would allow Complainant to perform the essential functions of her

job, *i.e.*, change of duty station to the clean space, and effected that particular accommodation. ROI,

Tab F-2. Further, the Agency concluded that it could not authorize Complainant to permanently work

at home full time because of the nature and extent of Complainant's job-related duties. *Id.* The

Agency does not specifically contend that the particular accommodation Complainant requests imposes

an undue hardship[28] upon the Agency, *per se;* only that Complainant's duties are such that if she were

to work from her home full time, she could not perform the essential functions of her position.[29] *See*

*e.g., Smith v. Blue Cross Blue Shield*, 102 F.3d 1075, 1076 (10th Cir.1996) (accommodation that

eliminates the essential function of the job is not reasonable).[30]

---

[28] Undue hardship means "significant difficulty or expense incurred by a covered entity," 29 C.F.R. § 1630.2(p)(1), based on the factors set forth in § 1630.2(p)(2), including: (i) nature and net cost of the accommodation, taking into consideration the availability of tax credits, deductions, and/or outside funding; (ii) overall financial resources of facility or facilities involved in providing the accommodation, number of persons employed, and effect on expenses and resources; (iii) overall financial resources of the covered entity, overall size of the business of covered entity with respect to number of employees, and type and location of facilities; (iv) type of operation(s) of covered entity, including composition, structure, and functions of workforce, and the geographic separateness and administrative or fiscal relationship of facility in question to covered entity; and (v) impact of the accommodation upon operation of the facility, including impact on ability of other employees to perform their duties and on facility's ability to conduct business.

[29] The Agency may also assert a defense to a claim of denial of a reasonable accommodation that the "requested or necessary accommodation would impose an undue hardship on the operation of the covered entity's business." 29 C.F.R. § 1630.15(d).

[30] *See Comerford v. Secy., U.S. Dep't of the Navy*, EEOC Appeal No. 01A44524 (2006), *citing* 29 C.F.R. 1630.2(p)(v); EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act (revised October 17, 2002) ("free to choose among reasonable accommodations as long as the chosen accommodation is effective, and states that, while the preference of the individual with a disability should be given primary consideration... [the agency] has the ultimate discretion to choose between effective accommodations.").

I note that the Agency is correct in that it is not obligated to provide an employee with the accommodation of the employee's choice. Rather, if an individual is a qualified individual with a disability, the Agency's obligation is to provide an effective accommodation. *See Polen v. Secy., U.S. Department of Defense*, EEOC Appeal No. 01970984 (2001), *quoting* 29 C.F.R. Part 1630 Appendix § 1630.9 (employer providing the accommodation has discretion to choose between effective accommodations). Here, the Agency contends that it has done so.

Where the Agency articulates a rationale for its contested actions, any inference generated by the establishment of a *prima facie* case drops. Complainant then has to prove by a preponderance of the evidence that the proffered explanation is a pretext for unlawful discrimination, *i.e.,* the articulation is interposed to disguise unlawful discrimination, the true and intended purpose for the adverse action. *St. Mary's Honor Ctr.*, 509 U.S. at 511; *Burdine*, 450 U.S. 252-53; *McDonnell Douglas*, 411 U.S. at 804.

<u>Pretext</u>

In her Opposition, Complainant asserts that she suffers from a disability and requested a reasonable accommodation, a permanent work at home full time schedule, which Complainant notes, in certain cases, has been found to be an appropriate reasonable accommodation. *See* Complainant's Opposition, pp. 3-6 (citations omitted). In addition, Complainant asserts that she has previously worked at home, without incident, and that "it defies credulity" that Agency "communication and collaboration cannot take place by telephone and e-mail." *Id.* at 7.

-24-

Critically, however, nothing in the Complainant's Opposition, the ROI, or the entire record herein, evidences that the Agency's reasons for the contested employment decision, *i.e.*, the Agency's determination that changing the Complainant's duty station to the clean space as a reasonable accommodation, was pretextual to mask unlawful discrimination against Complainant on the basis of her membership in any protected class. The Agency concedes that Complainant is disabled. The record evidence demonstrates that the Agency engaged in an interactive process to ascertain which reasonable accommodation it could provide Complainant and, given the duties and responsibilities of Complainant's position, provided an accommodation it determined warranted and effective under the particular circumstances of this case, in light of Complainant's medical condition and the essential functions of her position. There is no evidence to suggest that the Agency failed in its obligations under applicable law and regulation or that it intentionally provided Complainant with an ineffective or unreasonable accommodation because of her membership in any protected class.

I note that Complainant cannot establish the existence of discriminatory *animus* merely by showing that the Agency's action was unsound from a business standpoint, unfair, or motivated by arbitrariness or ill will. *Patterson v. Department of the Treasury*, EEOC Request No. 05950156 (1996). *See Burdine*, 450 U.S. at 259. *See e.g.*, *Hovey v. Department of Housing and Urban Development*, EEOC Appeal No. 01973965 (2000) (agency has broad discretion to set policies and carry out personnel decisions and will not be second-guessed by the reviewing authority absent evidence of unlawful motivation). *See also Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996) ("the question is not whether the employer made the best, or even a sound, business decision: it is whether the real reason [was discriminatory]"). Also, and to the extent argued by

-25-

Complainant, *see* Complainant's Opposition at 11, Complainant's mere contentions that management is somehow biased against her protected classes is insufficient to establish that the Agency's reasons for its actions were pretextual. *See Plummer v. U.S. Dep't of the Army*, EEOC Appeal No. 01A23495 (2003). *See also Gleason v. Treasury*, EEOC No. 01900965 (1990); *Page v. EEOC*, EEOC Appeal No. 01932456 (1994), *affd* Request No. 05940531 (1994). The Agency articulated legitimate reasons for its reasonable accommodation decision and Complainant has not produced sufficient evidence to show that these reasons are pretextual.

Having thoroughly reviewed and, exercising strict scrutiny, considered all of the evidence of record, including the Report of Investigation and the submissions of the Agency in the light most favorable to the Complainant; and, having found that the record evidence contains an accurate and appropriate development of the undisputed material facts and there appear to be no genuine issues of material fact in dispute, I hereby determine that the explanations provided by the Agency are legally sufficient to justify a judgment for the Agency. The Complainant has not demonstrated or proffered evidence from which I could conclude that she was subject to disparate treatment by the Agency because of her membership in the enumerated protected classes. As noted above, the record does not contain evidence of pretext. *See McDonnell Douglas; Furnco; Burdine; St. Mary's Honor Center; Consolidated Coin.*

Consequently, on the basis of the undisputed facts and the record evidence, I determine that conducting a Hearing would not aid in the development of an appropriate factual record in this Federal sector employment discrimination complaint and that no credibility determinations are necessary. *See Petty*, pp. 12-16. Complainant has not shown the existence of any discrimination against her by the

-26-

Agency based upon her membership in her protected classes and the Agency is therefore entitled to summary disposition.  Accordingly, judgment is entered for the Agency.


SO ORDERED


Date: December 5, 2006

Richard W. Furcolo
Administrative Judge
Telephone No. (202) 419-0712
Facsimile No. (202) 419-0739


Encl.


Copies to: Parties of Record (by First Class mail only)


-27-

Theodore S. Allison, Esq. (w/o Encl.)

Karr & Allison, P.C.

1920 N Street, NW, Suite 300

Washington, D.C. 20036

Complainant's Designated Representatives


Nancy J. Dunham, Esq. (w/o Encl.)

U.S. Environmental Protection Agency

Office of the General Counsel

Finance and Operations Law Office

Employment Law Division (Mail Code 2377)

1200 Pennsylvania Avenue, NW, Rm. 7454F

Washington, D.C. 20460

Agency's Designated Representative


Director (w/Encl.)

Office of Civil Rights

U.S. Environmental Protection Agency

Ariel Rios Bldg., Rm. 1201

1200 Pennsylvania Avenue, NW

Washington, D.C. 20460

## NOTICE

This is a decision by an Equal Employment Opportunity Commission Administrative Judge issued pursuant to 29 C.F.R. § 1614.109. **With the exception detailed below, the complainant may not appeal to the Commission directly from this decision.** EEOC regulations require the Agency to take final action on the complaint by issuing a final order notifying the complainant whether or not the Agency will fully implement this decision within forty (40) calendar days of receipt of the hearing file and this decision. The complainant may appeal to the Commission within thirty (30) calendar days of receipt of the Agency's final order. The complainant may file an appeal whether the Agency decides to fully implement this decision or not.

The Agency's final order shall also contain notice of the complainant's right to appeal to the Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for such appeal or lawsuit. If the final order does not fully implement this decision, the Agency must also simultaneously file an appeal to the Commission in accordance with 29 C.F.R. § 1614.403, and append a copy of the appeal to the final order. A copy of EEOC Form 573 must be attached. A copy of the final order shall also be provided by the Agency to the Administrative Judge.

If the Agency has not issued its final order within forty (40) calendar days of its receipt of the hearing file and this decision, the complainant may file an appeal to the Commission directly from this decision. In this event, a copy of the Administrative Judge's decision should be attached to the appeal. The complainant should furnish a copy of the appeal to the Agency at the same time it is filed with the Commission, and should certify to the Commission the date and method by which such service was made on the Agency.

All appeals to the Commission must be filed by mail, personal delivery or facsimile to the following address:

> Director
> Office of Federal Operations
> Equal Employment Opportunity Commission
> P.O. Box 19848
> Washington, D.C. 20036
> Fax No. (202) 663-7022

Facsimile transmissions over 10 pages will not be accepted.

## COMPLIANCE WITH AN AGENCY FINAL ACTION

An Agency's final action that has not been the subject of an appeal to the Commission or civil action is binding on the Agency. See 29 C.F.R. § 1614.504. If the complainant believes that the Agency has failed to comply with the terms of its final action, the complainant shall notify the Agency's EEO Director, in writing, of the alleged noncompliance within thirty (30) calendar days of when the complainant knew or should have known of the alleged noncompliance. The Agency shall resolve the matter and respond to the complainant in writing. If the complainant is not satisfied with the Agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the Agency has complied with the terms of its final action. The complainant may file such an appeal within thirty (30) calendar days of receipt of the Agency's determination or, in the event that the Agency fails to respond, at least thirty-five (35) calendar days after complainant has served the Agency with the allegations of noncompliance. A copy of the appeal must be served on the Agency, and the Agency may submit a response to the Commission within thirty (30) calendar days of receiving the notice of appeal.

# EXHIBIT 7

DISTRICT OF COLUMBIA
OFFICE OF
ADMINISTRATIVE HEARINGS

2007 JUN -4  A 11: 36

**DISTRICT OF COLUMBIA**
**OFFICE OF ADMINISTRATIVE HEARINGS**
941 North Capitol Street, NE, Suite 9100
Washington, DC 20002
TEL: (202) 442-8167
FAX: (202) 442-9451

| | |
|---|---|
| U.S. ENVIRONMENTAL PROTECTION AGENCY<br>        Appellant/Employer<br><br>    v.<br><br>CONNIE K. MORRIS<br>        Appellee/Claimant | Case No.: ES-P-07-107084 |

**FINAL ORDER**

## I.  INTRODUCTION

On April 13, 2007, Appellant/Employer U.S. Environmental Protection Agency ("EPA"), by its agent TALX UC eXpress ("TALX"), filed an appeal and hearing request to challenge a Determination by the Claims Examiner, served April 3, 2007, holding Appellee/Claimant Connie K. Morris eligible for unemployment benefits. This appeal raises the issue whether Employer discharged Claimant from her employment for cause constituting "misconduct" as defined in 7 District of Columbia Municipal Regulations ("DCMR") 312, pursuant to the District of Columbia Unemployment Compensation Act, D.C. Official Code § 51-110(b).

This administrative court issued a Scheduling Order and Notice of In-Person Hearing on April 24, 2007, scheduling the hearing for May 8, 2007, at 11:30 a.m. Nancy J. Dunham, Esq., represented Employer, and John A. Richards, Director of the Federal Register Staff, Office of

Prevention, Pollution, and Toxic Substances, EPA Headquarters, testified on its behalf. Claimant represented herself at the hearing, and testified on her own behalf.[1]

## II.    FINDINGS OF FACT

On April 13, 2007, Employer filed an appeal of the Claims Examiner's Determination, certified as served on April 3, 2007, holding Claimant eligible for benefits.[2]

Claimant worked for Employer from January 12, 2003, to March 19, 2007. Her last position was a full-time position as an Information Liaison Specialist, Federal Register Staff, Office of Program Management Operations ("OPMO"), Office of Prevention, Pollution, and Toxic Substances ("OPPTS"), at EPA Headquarters in Washington, D.C. The Federal Register Staff is responsible for preparing, categorizing, and organizing all OPPTS documents for publication in the Federal Register. Its documents are in multimedia form, and include both public information and confidential information. John A. Richards, Director of the Federal Register Staff, was Claimant's immediate supervisor.

At all times relevant to this matter, Claimant suffered from a medical condition of severe allergy to mold, mildew and dust mites. *See e.g.* Exhibits 201 and 203.[3] Beginning in December 2004, Claimant informed Employer that ongoing exposure to mold, mildew and dust mites from her work environment triggered numerous allergic reactions with episodes of body swelling, breathing difficulties, bronchitis, rashes, rapid heart rate, rise in blood pressure, and several other

---

[1] Both parties submitted post-hearing briefs.

[2] Nothing in the record below indicates any issue has been raised or preserved concerning actors under D.C. Official Code § 51-109; *e.g.*, base period eligibility, availability for work.

[3] During the hearing, Claimant's Exhibits 201-212, 214-241 and 243-253, as well as Employer's Exhibits 100, 101, 108, 113, 116, 122, 123, 125, 126 and 128 were admitted into evidence.

symptoms relating to allergy sensitivity. She told Employer that her allergies were so severe that she required "reasonable accommodation" in the form of being permitted to work at home.

In December 2004, Claimant's work location was 1200 Pennsylvania Avenue, N.W., Washington, D.C., EPA East-West Connecting Wing. In an effort to find a solution to Claimant's health problems, Mr. Richards changed the location of Claimant's office within the East-West Connecting Wing, from Suite 6109 to 6108, and approved intermittent, temporary work from home. Both Suites 6109 and 6108 were tested for air quality in January 2005, and the testing revealed no fungal growth, no airborne microbial amplification, and confirmed that the air quality in the EPA space was actually superior to ambient (outside) air. *See* Exhibit 122.

In April 2005, Claimant filed with EPA's National Reasonable Accommodation Coordinator, William R. Haig, a formal request for reasonable accommodation to work at home, which request was denied on May 3, 2005. Claimant requested reconsideration and on July 7, 2005, Mr. Haig issued a Determination of Disability which states, in part, that "it is confirmed that a medical condition exists that substantially limits [Claimant's] major life activities of breathing and walking and therefore she is determined to be a person with a disability .... The limitations imposed by the medical condition include the substantial negative reaction to exposure to dust mites, gas fumes, and mold." *See* Exhibit 209. Thereafter, beginning on or about July 10, 2005, Claimant's work location was changed from the Washington, D.C. site to EPA's "clean space" facility located in Crystal City (Arlington), Virginia. When Claimant reported for work at the clean space in Crystal City on July 19, 2005, she requested medical attention and was taken to the Virginia Hospital Center and treated for "Allergic reaction – inhalant." *See* Exhibit 211. Thereafter, Claimant remained off from work until on or about August 11, 2005. *See* Exhibits 212 and 214.

Employer had Claimant's workspace at Crystal City tested for air quality during the period August 4-5, 2005, and the testing revealed no amplification of non-viable fungi in the space, no viable fungal spores detected indoors, and no evidence to indicate an identifiable health risk to building occupants. *See* Exhibit 108. Based on these air quality test results, Employer denied Claimant's request to work from home pending decisions from complaints that Claimant had filed with the U. S. Equal Employment Opportunity Commission ("EEOC"), and with the U.S. Department of Labor Employees' Compensation Appeals Board ("ECAB") regarding her claims of injury as a result of Employer's refusal to provide reasonable accommodation by permitting Claimant to work from home permanently. In June 2006, the ECAB rejected Claimant's claim of injury due to exposure to allergens in her work environment at the EPA. The Notice of Decision stated, *inter alia*, that "there is no medical evidence that provides a diagnosis which could be connected to the claimed exposure. There is nothing to relate your claimed medical condition to your work environment in any of the factual or medical evidence received in your case." *See* Exhibit 122.

Also in June 2006, Claimant's work location was changed from Crystal City, Virginia to the then new EPA facility at Potomac Yards (Virginia). In response to Claimant's continued complaints of health problems because of workplace allergy, Employer had Claimant's workspace at Potomac Yards tested for air quality during the period August 8-9, 2006, and the testing revealed that the air quality was acceptable by all applicable standards. *See* Exhibit 113.

As of August 2006, Claimant had used all of her available sick leave, leave bank leave, and advanced leave, and had been granted significant leave without pay. On August 24, 2006, Employer issued Claimant a memorandum which explained her leave situation, and directed her to provide medical documentation, specific to her current worksite, that Claimant was allergic to

the EPA workplace. The memorandum also stated that "[y]our continued failure to provide this documentation or to report to work may lead to being placed in absence without leave (AWOL) status and/or disciplinary action, up to and including removal from Federal service." *See* Exhibit 113.

On or about August 25, 2006, Claimant provided Employer a letter from her physician, Ahmad Shamim, M.D., who stated that Claimant had been under Dr. Shamim's care since October 2005. The letter further stated:

> [Claimant] suffers from a related condition of severe allergy to mold, dust and dust mites. In basic terms, there is an over concentration of candida yeast in her system, which produces severe reactions to other irritants, most commonly molds and dust. These conditions make her highly sensitive to other environmental pollutants and allergens, such as chemicals and fumes of various kinds. [U]pon exposure to molds, dust, and dust mites, and other irritants, [Claimant] suffers from migraine headaches, hypertension and increased pulse rate, aggravated trigeminal neuralgia, sinus, congestion and breathing impairments, foggy-headedness and inability to think clearly, muscle weakness, edema in her lower extremities and eyes, and other symptoms.
>
> . . . .
>
> I have received information about a number of reactions [Claimant] has had while at her current and past two work sites at EPA. I have received sufficient information about [Claimant's] reactions in her home environment and elsewhere, and the nature and timing of [Claimant's] reactions to her office environment, to determine, to a reasonable degree of medical certainty, that [Claimant's] reactions during the work day are more likely to be caused by her office environment than by her morning commute to work, or other activities.
>
> . . . .
>
> It is necessary to maintaining [Claimant's] health, and I recommend, that she work from home until such time as there is a significant improvement in available modes of treatment for her condition.

*See* Exhibit 201. However, during the period April 2005, through December 2006, Dr. Shamim prepared medical documentation that effectively released Claimant to return to work at EPA work locations after excusing her absences for medical reasons. *See e.g.*, Exhibits 206, 214, 219,

220,221, 228, 229, 245, 246 and 247. Dr. Shamin never identified the specific allergens that Claimant was exposed to in her several work locations which caused Claimant's severe allergic reactions.

In October 2006, Claimant's work location was changed from Potomac Yards to the EPA East site on Pennsylvania Avenue, N.W. in Washington, D.C. When Claimant reported for work on October 13, 2006, she requested medical attention and was taken to the George Washington Hospital and treated for "Seasonal (Allergic) Rhinitis." *See* Exhibit 238. The air quality in Claimant's work space was again tested on October 25, 2006, and found to be acceptable by all applicable standards and better than ambient air. *See* Exhibit 116.

During the period August 21, 2006, through December 18, 2006, Claimant was charged 412 hours of AWOL. *See* Exhibits 125 and 101. On December 5, 2006, the EEOC dismissed Claimant's discrimination complaint. The EEOC ruled that Employer's position that it could not authorize Claimant to permanently work at home full time because of the nature and extent of her job-related duties "constituted legitimate reasons for its reasonable accommodation decision and [Claimant] has not produced sufficient evidence to show that these reasons are pretextual." *See* Exhibit 123.

On December 18, 2006, Employer ordered Claimant to report for work at her designated work location beginning on January 2, 2007. *See* Exhibit 126. On or about January 3, 2007, Claimant submitted to Employer a letter from Richard A. Nicklas, M.D., regarding Claimant's medical condition. The letter stated that Claimant was seen for the first time at the Allergy Clinic at The George Washington University Medical Center on November 21, 2006. Dr. Nicklas's diagnosis was: (1) perennial allergic rhinitis with seasonal exacerbations; (2) chronic

sinusitis; (3) asthma, mild intermittent; (4) sulfite sensitivity; (5) recurrent anaphylaxix; and (6) hypertension, and that Claimant had had repeated episodes of flushing, increased warmth, difficulty breathing, symptoms of asthma, near syncope, pruritus, and angioedema. "These episodes, which are consistent with a severe allergic reaction to airborne allergens, occur within 15 minutes each time she enters the building in which she works. It is unclear at this time what may be causing these reactions. It will probably not be possible to determine the cause." Finally, Dr. Nicklas stated that "[b]ecause of the severe life-threatening reactions experienced by [Claimant], it is recommended that she not return to the building which will trigger these symptoms." *See* Exhibit 248. Dr. Nicklas did not link Claimant's problems to mold, mildew, and dust mites, nor did he identify any substance in Claimant's several EPA work locations which caused Claimant's severe allergic reactions.

January 2, 2007, was a Federal government holiday due to a Presidential funeral, and Claimant reported for work on January 3, 2007, but only remained at work for two hours before stating that she was sick and needed to leave. During the 12 work days from January 3, 2007, through January 16, 2007, Claimant failed to report for work, and Mr. Richards advised Claimant that she was both AWOL and insubordinate for failing to report for a full day of work each day. Claimant responded that she was not able to report for work because she was sick from workplace allergies. Claimant failed to report for work during the period January 4, 2007, through February 2, 2007.

On February 5, 2007, Mr. Richards issued Claimant a Notice of Proposed Removal for AWOL and insubordination for not reporting to work as ordered. *See* Exhibit 101. On March 9, 2007, Marylouise M. Uhlig, Associate Assistant Administrator, issued a decision to remove Claimant from the Federal Service, effective March 10, 2007, based on the reasoning and

evidentiary support contained in the February 5, 2007, Notice of Proposed Removal.  *See* Exhibit 100.

## III.   CONCLUSIONS OF LAW AND DISCUSSION

Employer timely filed this appeal because it filed within the 10-day statutory period. D.C. Official Code § 51-111(b).  Generally, any unemployed individual who meets certain statutory eligibility requirements is qualified to receive benefits.  D.C. Official Code § 51-109. The law, however, creates disqualification exceptions to the general rule of eligibility.  The burden is upon the employer to establish an exception for an employee who would otherwise be eligible for unemployment insurance benefits under D.C. Official Code § 51-109.   If an employee is discharged for misconduct, the employee is disqualified from receiving benefits. D.C. Official Code § 51-110.  The burden is upon the employer to show that the employee was discharged for misconduct.   OAH Rule 2820.3 (burden of production on party arguing an exception to a statutory requirement).  *McCaskill v. D.C. Dep't of Employment Servs.*, 572 A.2d 443, 446 (D.C. 1990).  Before unemployment benefits may be denied in misconduct cases, there must be a finding of misconduct "based fundamentally on the reasons specified by the employer for the discharge."  *See Chase v. D.C. Dep't. of Employment Servs.*, 804 A. 2d 1119, 1123 (D.C. 2002) (internal citation omitted).

In the instant case, Employer asserts that it terminated Claimant's employment for repeated absences after warning and insubordination during the period January 4, 2007, through February 2, 2007.   The governing regulations (7 DCMR 312) define the terms "gross misconduct" and "misconduct, other than gross misconduct" as follows:

312.3 For purposes of § 10(b) (1) of the Act, the term "gross misconduct" shall mean an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee.

312.4 Gross misconduct may include, but is not limited to the following:

    a.  Sabotage;
    b.  Unprovoked assault or threats;
    c.  Arson;
    d.  Theft or attempted theft;
    e.  Dishonesty;
    f.  Insubordination;
    g.  Repeated disregard of reasonable orders;
    h.  Intoxication, the use of or impairment by an alcoholic beverage, controlled substance, or other intoxicant;
    i.  Use or possession of a controlled substance;
    j.  Willful destruction of property;
    k.  Repeated absence or tardiness following warning.

312.5 For purposes of § 10(b) (2) of the Act, the term "[misconduct] other than gross misconduct" shall mean an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest. The term "[misconduct] other than gross misconduct" shall include those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct.

312.6 [Misconduct] [o]ther than gross misconduct may include, but is not limited to the following:

    a.  Minor violations of employer rules;
    b.  Conducting unauthorized personal activities during business hours;
    c.  Absence or tardiness where the number of instances or their proximity in time does not rise to the level of gross misconduct;
    d.  Inappropriate use of profane or abusive language.

If the basis for disqualification from benefits under D.C. Official Code § 51-110(b) is a violation of the employer's rules, the following criteria must be met to uphold the disqualification:

    (a)  That the existence of the employer's rule was known to the employee;

    (b)  That the employer's rule is reasonable; and

    (c)  That the employer's rule is consistently enforced by the employer.

7 DCMR 312.7; *Jones v. D.C. Dep't of Employment Servs.*, 558 A. 2d 341, 342-43 (D.C. 1989).

Employer presented the testimony of John A. Richards, Director of the Federal Register Staff, OPPTS, EPA Headquarters, who testified consistently with the above-stated findings of fact. Claimant also testified consistently with the above-stated facts. However, Claimant argued that she was not insubordinate for not coming to work during the period January 4, 2007, through February 2, 2007, because she was disabled and sick due to allergies to something(s) at her work place.

In the instant case, there is no dispute that Claimant failed to come to work at any time during the period January 4, 2007, through February 2, 2007. There is also no dispute that Claimant's immediate supervisor ordered Claimant to report for work beginning on January 3, 2007, and advised her that if she failed to do so she would likely lose her job. These undisputed facts prove that Claimant refused to obey a supervisor's direct order and had repeated unauthorized absences after warning, which constitutes gross misconduct under the governing regulations. *See* 7 DCMR 312.4f & k. However, the governing regulations provide for the consideration of mitigating circumstances when determining whether a claimant was discharged from her employment for misconduct. See 7 DCMR 312.5.

There is little guidance in the statutory or case law addressing the situation where, as here, an employee is discharged from employment for not complying with express orders from her employer to return to work, but asserts that had she returned to work, her health would have been seriously compromised. The District of Columbia Court of Appeals has addressed the somewhat analogous issue of whether, and under what circumstances, working conditions

detrimental to an ordinary worker's health constitute good cause for an employee voluntarily quitting her job. In *Hockaday v. D.C. Dep't of Employment Servs*, 443 A.2d 8, 10 (D.C. 1982), the Court stated that it is not unreasonable to "find that an employee, leaving a job for health reasons, does not have good cause connected with the work 'in the absence of medical advice to leave her work for job connected reasons of health.'" (citation omitted). In *Bublis v. D.C. Dep't of Employment Servs*, 575 A.2d 301, 303-04 (D.C. 1990), the Court stated that the governing regulations "require an employee to give the employer ... 'objective, professional, verification' of the disabling illness and to permit the employer to take steps, if any, to accommodate the employee and avoid a job-necessitated resignation." The court then held that under certain circumstances "the information possessed by the employer [is] enough to require it to assume the duty of inquiring further of [employee] about these [health] matters." *Id.* at 304.

In the instant case, however, under the Unemployment Compensation Act, the situation is *not* that of an employee who voluntary quit her job for health-related reasons connected with the work. When Claimant's supervisor ordered her to return to work beginning on January 3, 2007, she had the options to: (1) return to work against a doctor's advice that "she not return to the building which will trigger these symptoms;" (2) refuse to return to work in violation of Employer's direct order; or (3) quit, and assert that she quit for good cause connected with the work. Claimant made an intentional decision to choose the second option over the other options.

However, assuming *arguendo* that Claimant elected to quit, it is questionable whether the evidence supports a claim that she quit for good cause in the form of illness or disability caused or aggravated by the work for the following reasons: (1) there is no evidence in the record to establish that in her several EPA work locations Claimant was exposed to specifically-identified allergens which caused Claimant's severe allergic reactions; (2) Employer attempted to

accommodate Claimant's medical complaints by moving her to three different buildings, all of which were tested and found to have air quality within acceptable standards; (3) the complaints that Claimant filed with the EEOC, and with the ECAB regarding her claims of injury as a result of Employer's refusal to provide reasonable accommodation by permitting Claimant to work from home permanently were rejected as unfounded; and (4) none of Claimant's doctors advised her to stop working at any EPA location because of the existence at the location of specifically identified allergens that caused Claimant's severe allergic reactions. Thus, even in the voluntary quit context, the evidence to support a claim of good cause due to illness or disability caused or aggravated by the work is mixed and would not carry Claimant's burden of proof.

Mitigating circumstances, as noted, reduce "gross" to "simple" misconduct. Circumstances that might be shown, in the misconduct context, as mitigating Claimant's intentional disregard of orders and intentional refusal to appear for work, such as frequency of the action, or a lesser degree of severity, are not present here. *See* 7 DCMR 312.5 & 312.6. Having chosen not to quit her job, Claimant has not demonstrated circumstances that mitigate her refusal to comply with Employer's direct order that she report for work during the period January 4, 2007, through February 2, 2007. Therefore, I conclude that Claimant has failed to prove mitigating circumstances relating to her failure to report for work during the period January 4, 2007, through February 2, 2007.

The evidence of record is sufficient to find that Claimant's refusal to report for work during the period during the period January 4, 2007, through February 2, 2007, after being expressly ordered to do so, constituted gross misconduct in the form of repeated absences after warning and insubordination. *See* 7 DCMR 312.4f & k. Moreover, the D.C. Court of Appeals has opined that:

> Attendance at work is an obligation, which every employee owes to his or
> her employer, and poor attendance, especially after one or more warnings,
> constitutes misconduct sufficient to justify the denial of a claim for
> unemployment benefits. D.C. Code § 46-111(b) (1986 Supp.); *see, e.g.*
> *Gardiner v. Arizona Department of Compensation Board of Review*, 127
> Ariz. 603, 623 P.2d 33, 36 (1980) (repeated instances of tardiness without
> good cause constitute willful misconduct); ....

*Shepherd v. D.C. Dep't of Employment Servs.*, 514 A.2d 1184, 1186 (D.C. 1986). I conclude

that Claimant's conduct as described above constituted misconduct. Employer has proven gross

misconduct by a preponderance of the evidence. *Jadallah v. D.C. Dep't of Employment Servs.*,

476 A.2d 671, 675 (D.C. 1984). The Determination of the Claims Examiner shall be reversed.

D.C. Official Code §§ 51-110(b); 51-111(e); OAH Rule 2820.3. Claimant is ineligible for

benefits.

## IV.    ORDER

Based upon the foregoing findings of fact and conclusions of law and the entire record in

this matter, it is, this 4th day of June 2007:

ORDERED, that the Determination of the Claims Examiner is **REVERSED**, and it is

further

ORDERED, that Appellee/Claimant Connie K. Morris is **INELIGIBLE** for benefits

pursuant to D.C. Official Code § 51-110, and it is further

ORDERED, that the appeal rights of any person aggrieved by this Order are stated

below.

William L. England, Jr.
Administrative Law Judge

# PETITION FOR REVIEW
# (APPEAL RIGHTS)

**THIS ORDER IS A FINAL ORDER. IF YOU WISH TO APPEAL THIS ORDER, YOU HAVE 30 CALENDAR DAYS FROM THE DATE IT IS MAILED TO YOU TO FILE A PETITION FOR REVIEW WITH THE D.C. COURT OF APPEALS.**

Pursuant to D.C. Official Code § 2-1831.16(c)-(e), any party suffering a legal wrong or adversely affected or aggrieved by this Order may obtain judicial review by filing an original and six copies of a petition for review with the District of Columbia Court of Appeals at the following address:

Clerk
District of Columbia Court of Appeals
H. Carl Moultrie I Courthouse
500 Indiana Avenue NW
Sixth Floor
Washington, DC 20001

The petition for review (and required copies) may be mailed or delivered in person to the Clerk of the Court of Appeals, and must be received by the Clerk of the Court of Appeals within 30 calendar days of the mailing date of this Order, pursuant to D.C. App. R. 15(a)(2). There is a fee of $100 for filing a petition for review. Persons who are unable to pay the filing fee may file a Motion and Affidavit to proceed without the payment of the filing fee. Such motion and affidavit should be filed with the petition for review. Information on petitions for review to the Court of Appeals can be found in Title III of the Rules of the District of Columbia Court of Appeals, which are available in the Office of the Clerk of the Court of Appeals or online at www.dcappeals.gov .

If you are a member of the United States Armed Forces on active duty, you may have certain rights under the Servicemembers Civil Relief Act 50 U.S.C.S. Appx. §501 *et seq*. If you qualify for these rights and you have **LOST** this case because you were not present, you **MAY** be able to have this case reopened. If you think you may qualify under this law, you must notify this court promptly to ensure that your rights are protected.

## Certificate of Service:

**By First Class Mail (Postage Paid):**

Environmental Protection Agency
c/o TALX
P.O. Box 66945
Saint Louis, MO 63166

Nancy J. Dunham, Esq.
Office of General Counsel
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Mail Code 2377A
Washington, DC 20460

Connie Morris
12300 Hilmeade Station Drive
Bowie, MD 20720

**By Interagency Mail:**

Dorothy Jones
Department of Employment Services
609 H Street, NE
Washington, DC 20002

I hereby certify that on $\underline{\text{JUNE} \quad 4}$ , 2007, this document was caused to be served upon the above-named parties and upon DOES at the addresses listed and by the means stated.

Clerk/ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CONNIE K. MORRIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.: 07-0491 (RWR)** |
| ) | |
| **STEPHEN L. JOHNSON,** ) | |
| **ADMINISTRATOR, UNITED STATES** ) | |
| **ENVIRONMENTAL PROTECTION** ) | |
| **AGENCY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>ORDER</u>

This matter having come before this Court on Defendant's Motion to Dismiss the

Complaint, it is hereby

**ORDERED** that Defendant's motion is **GRANTED**.  It is further

**ORDERED** that the complaint is hereby dismissed with prejudice.

**SO ORDERED** this _____ day of _____, 2007.

_____
RICHARD W. ROBERTS
United States District Court Judge