**United States District Court for the District of Columbia**

Connie K. Morris, an individual,           )
                                           )
            Plaintiff,                     )
                                           )        Case No. 07-00491 (RWR)
                v.                         )
                                           )
Stephen L. Johnson, Administrator,         )
    United States Environmental            )
    Protection Agency                      )
                                           )
            Defendant.                     )
_____   )

     Plaintiff Connie K. Morris, by counsel undersigned, opposes defendant's motion to dismiss.

## I. Summary of Facts and Procedural Background

### A. Factual Background

     This is an action for failure to accommodate a severe and life threatening disability, determined by defendant to be a qualifying disability. Although plaintiff's position involves mainly computer-based work, which plaintiff has performed for long periods of time in a location remote from her work group, defendant has steadfastly refused to consider extending to plaintiff a recognized accommodation, working from home either on a full-time, part-time, or periodic basis. At no time did defendant engage in good faith in an interactive process to identify an accommodation that would enable plaintiff to do her job. After plaintiff's administrative case was resolved against her, defendant terminated her.

### B. Procedural Background

     Plaintiff filed an administrative charge of discrimination with her employer's Office of Civil Rights on August 10, 2005, within 45 days of receiving an unreasonable and inadequate

accommodation in response to her application for a reasonable accommodation under the Rehabilitation Act.  Her administrative case was resolved against her on or about December 19, 2006, and she filed this action within 90 days thereafter.  Shortly before this action was filed, defendant terminated plaintiff's employment.  In her complaint, plaintiff alleged that her employment was terminated because of her disability, but also sought counseling with the defendant's Office of Civil Rights within 45 days following her termination, and filed a further administrative charge, as a precautionary measure.  Defendant, by its Office of Civil Rights, has dismissed that charge on the ground that it is the subject of this action.

## II.  Standard on a Motion to Dismiss

On a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes the truth of the material facts as alleged in the complaint, *see Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325, 111 S. Ct. 1842, 114 L. Ed. 2d 366 (1991), and the "complaint should not be dismissed unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1276, 305 U.S. App. D.C. 60  (D.C. Cir. 1994); *see also Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); *Browning v. Clinton*, 292 F.3d 235, 242, 352 U.S. App. D.C. 4, 352 U.S. App. D.C. 4 (D.C. Cir. 2002). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'n Corp.*, 16 F.3d at 1276; *see also Browning v. Clinton*, 292 F.3d at 242; *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1113, 342 U.S. App. D.C. 268  (D.C. Cir. 2000); *Harris v. Ladner*, 127 F.3d 1121, 1123, 326 U.S. App. D.C. 446  (D.C. Cir.1997).

Defendant appears to suggest that the decision of the EEOC Administrative Judge,

adopted by defendant as its final decision, has some relevance.  It does not, for the Court, in an action following an adverse decision at the agency level, considers the case *de novo*.  *Scott v. Johanns*, 409 F.3d 466, 469, 366 U.S. App. D.C. 196 (D.C. Cir. 2005) ("in a Title VII suit brought after a final administrative disposition finding no discrimination, the district court considers the discrimination claim *de novo*").

### III. Plaintiff has exhausted her administrative remedies

Far from conclusory allegations of exhaustion of administrative remedies, plaintiff has alleged that "she applied to receive a reasonable accommodation of her disability on April 29, 2005," that "EPA on or about July 7, 2005, determined that she had a disability requiring a reasonable accommodation," that EPA "assigned Ms. Morris to an EPA work site designated the "clean space," in Crystal City, Virginia, on or about July 13, 2005, not consistent with the reasonable accommodation she sought," and that she "initiated the EEO informal and formal complaint process in a timely manner within 45 days thereafter, alleging that she was entitled to a reasonable accommodation that included the ability to work from home." (Compl. ¶ 6.)  She alleged, further, that she "submitted to and cooperated fully with the Equal Employment Opportunity counseling procedure; filed a formal complaint with the agency EEO office on or about August 10, 2005; and . . . on or about December 19, 2006, received an adverse decision from the agency," within the 90 days preceding the filing of this action.  (Compl. ¶ 7.)  Finally, plaintiff has alleged that "all other actions and omissions by EPA, from on or about August 10, 2005 to the present time, were within the scope of and related to the EEOC investigation of Ms. Morris' administrative complaint, and/or constitute retaliation, for which there is no separate requirement of exhaustion of administrative remedies." (Compl. ¶ 8.)

Defendant suggests that many facts alleged in the complaint required plaintiff to take some additional action to exhaust administrative remedies.  As plaintiff has alleged, defendant

failed to engage in the interactive process to accommodate her disability, failed to accommodate

her, and ultimately discharged her.  An employee who is not being accommodated is not

required to seek EEO counseling each day that she is not accommodated, or each time she

receives a piece of evidence of her employer's violation, motive, or other relevant fact.  On the

contrary, plaintiff's administrative charge was pending from August 10, 2005 through December

19, 2006.

        It is elementary that the facts alleged in a complaint in this Court, or in the prior

administrative complaints, need not be alleged in evidentiary detail.  The fact that plaintiff has

included such detail in her complaint in no way suggests a failure to exhaust administrative

remedies.  More importantly, the law is clear that an administrative charge is deemed to include

any matter that could be investigated during pendency of the charge that is reasonably related to

it.  It is well established that a Title VII lawsuit may include "any kind of discrimination like or

related to allegations contained in the charge and growing out of such allegations during the

pendency of the case before the Commission."  *See, e.g., Nealon v. Stone*, 958 F.2d 584 (4th Cir.

1992); *Hill v. Western Electric Co.*, 672 F.2d 381, 390 n.6 (4th Cir.), *cert. denied*, 459 U.S. 981

(1982); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970); *EEOC v. General

Electric Co.*, 532 F.2d 359, 373 (4th Cir. 1976); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312

(7th Cir. 1989).  A discrimination action may be based on "the administrative investigation that

can reasonably be expected to follow the charge of discrimination."  *Park v. Howard Univ.*, 71

F.3d 904, 907 (D.C. Cir. 1995), citing *Chisholm v. United States Postal Service*, 665 F.2d 482,

491 (4th Cir. 1981).  The administrative charge requirement should not be construed to place a

heavy technical burden on "individuals untrained in negotiating procedural labyrinths."  Park,

supra, citing *Loe v. Heckler*, 768 F.2d 409, 417, 247 U.S. App. D.C. 292 (D.C. Cir. 1985).

Moreover, it is not necessary to exhaust administrative remedies with respect to retaliation. *Hayes v. Shalala*, 902 F. Supp. 259, 266 (D.D.C. 1995) (a plaintiff may raise a retaliation claim, although not a claim of discrimination, for the first time in federal court and need not exhaust his or her administrative claims). As the Fourth Circuit held in *Nealon v. Stone*, 958 F.2d 584 (4th Cir. 1992), all circuits that have considered the matter agree that plaintiff need not exhaust administrative remedies for a retaliation claim. *Nealon,* 958 F.2d at 590, cited with approval in *Baker v. Library of Congress*, 260 F. Supp. 59, 66 n.4 (D.D.C. 2003), *Hayes v. Shalala*, 902 F. Supp. 259, 266 (D.D.C. 1995); *see also Brown v. Hartshorne Public School District No. 1*, 864 F.2d 680, 682 (10th Cir. 1988); *Kirkland v. Buffalo Bd. of Educ.*, 622 F.2d 1066, 1068 (2d Cir. 1980); *Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1154-55 (8th Cir. 1989); *Gottlieb v. Tulane Univ. of Louisiana*, 809 F.2d 278, 284 (5th Cir. 1987).

The case *AMTRAK v. Morgan*, 536 U.S. 101, 115 (U.S. 2002), and its progeny, are not to the contrary. That case dealt only with the "continuing violation" or "pattern of discrimination" doctrine, not the retaliation after the filing of an administrative charge. Reasoning that "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," the Supreme Court held that a claim based on discrete acts which occurred long before the filing of the first administrative charge could be barred.

In *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132 (D.D.C. 2004), this Court distinguished *AMTRAK*, recognizing that a claimant is not required to file successive administrative charges when the basis for the alleged discrimination is the subject of a pending administrative action:

> "One of course can conceive of circumstances in which multiple acts of discrimination or retaliation occur after the act giving rise to the initial administrative charge, each of which is tied to the same discriminatory decision.

For example, suppose a religious employee complained of discrimination when his employer refused to permit him time off to attend weekly religious services, and in response the employee filed a claim with the EEOC. Thereafter the employer denied him leave to attend services every week. Each refusal could be viewed as a new act of discrimination or as retaliation for filing the complaint. The alleged discrimination or retaliation would manifest itself each week, and yet there would be a single discriminatory decision. *To require the employee to exhaust administrative remedies as to each weekly denial of time off would seem to put an excessive burden on plaintiffs.* Instead, the employee can file a charge when the initial, final decision is made, or after the other, later acts, so long as those acts are independently discriminatory."

326 F. Supp. 2d 132, 139 n.3 (Emphasis added.)

This reasoning leaves no room for doubt that the Court was not addressing the issue of retaliation subsequent to the filing of a timely administrative charge. Retaliation claims have universally been held properly to be raised for the first time in federal court, not because of any theory of pattern of discrimination or continuing violation, and not because it is difficult to identify retaliatory acts, but because a discrimination claimant should not be required to make a separate administrative charge where the retaliation grew out of her earlier timely administrative charge, or where requiring her to pursue additional administrative remedies would serve only to delay a remedy or result in piecemeal litigation of her claims, or where she might be dissuaded from further complaints because of the very retaliation of which she complains.

The concept of discrete acts— those "easy to identify"—is related not to subsequent retaliation, but to the "continuing violation" doctrine, under which courts have observed that a discrimination plaintiff who is subjected to regular, recurring, discrimination not involving discrete discriminatory acts *might not realize* at first that she is the victim of unlawful discrimination. *See, e.g., Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997) ("The core idea [of the continuing violations theory] is that equitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated. . . . Thus, a plaintiff

can avoid a limitations bar for an event that fails to fall within the statutory period where there is "[a] persisting and continuing system of discriminatory practices in promotion or transfer [that] produces effects that may not manifest themselves as individually discriminatory except in cumulation over a period of time").[1]  Thus, plaintiff was not required to file successive administrative charges relating to her quest for a reasonable accommodation while her August, 2005 administrative case was pending.

## IV.  Plaintiff has stated a claim for failure to accommodate under the Rehabilitation Act

The right of a federal employee to seek relief in federal court under the Rehabilitation Act is well established.  *Breen v. DOT*, 282 F.3d 839, 841, 350 U.S. App. D.C. 212 (D.C. Cir. 2002); *Langon v. HHS*, 959 F.2d 1053, 295 U.S. App. D.C. 49 (D.C. Cir. 1992) ("wholly apart from whether an agency's plan satisfied section 501, the courts have recognized private actions challenging individual employment decisions").  The Court explained that the phrase "reasonable accommodation" does not appear in section 501 of the Rehabilitation Act, but is derived from an EEOC regulation, 29 C.F.R. § 1613.704(a), which provides that "an agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program."  *See also, Carter v. Bennett*, 268 App. D.C. 183, 840 F.2d 63 (D.C. Cir. 1988); *Redd v. Rubin*, 34 F. Supp. 2d 1, 5 (D.D.C. 1998).

---

[1]  To the extent *Coleman-Adebayo v. Leavitt* purports to extend the *AMTRAK* holding to acts of alleged discrimination occurring after the filing of a charge, it applies only "to earlier, *exhausted* complaints."  To the extent defendant here appears to suggest that *AMTRAK* also requires new administrative complaints based on continued refusals to accommodate, while an administrative complaint is pending (and thus *not* "exhausted"), plaintiff respectfully disagrees and urges the Court to reject this unwarranted extension of the principle.

Claims for discrimination under the Rehabilitation Act follow the statutory formulation of the ADA, which prohibits discrimination against a "qualified individual with a disability ... in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). A "qualified individual with a disability" is one who has a disability, and "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. §12111(8); *see* 29 C.F.R. §1614.203(a)(6) (EEOC Rehabilitation Act regulation). Thus, an individual with a disability is "qualified" if she can perform the essential functions of the position with a reasonable accommodation. *Carr v. Reno*, 23 F.3d 525, 529, 306 U.S. App. D.C. 217 (D.C. Cir. 1994). Pursuant to the ADA, a "reasonable accommodation" can include "job restructuring [and] part-time or modified work schedules." 42 U.S.C. §12111(9); 29 C.F.R. §1614.203(c)(2); *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007).

In *Woodruff v. Peters*, the Court of Appeals for the District of Columbia Circuit held that a plaintiff who, in a second amended complaint "implicitly averred that he was a qualified individual with a disability" had satisfied the pleading requirement of the Rehabilitation Act, characterizing the government's motion to dismiss on that issue as "ill-founded." 482 F.3d at 526. The Court held that the mere allegations that the plaintiff was a "qualified individual with a disability," and that his employer "failed to grant him the 'reasonable accommodations' his disability necessitated," sufficed to establish a *prima facie* case of discrimination under 42 U.S.C. §12112(b)(5)(A). *Woodruff*, 482 F.3d at 527.

"[W]hen the defendant denies its actions were motivated by the plaintiff's disability, the plaintiff may employ the *McDonnell Douglas* burden-shifting framework to bring her Rehabilitation Act claim before a jury." *McGill v. Munoz*, 203 F.3d 843, 845, 340 U.S. App. D.C. 185 (D.C. Cir. 2000), citing *Aka v. Washington Hosp. Ctr.*, 332 U.S. App. D.C. 256, 156

F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); *Barth v. Gelb*, 303 U.S. App. D.C. 211, 2 F.3d 1180, 1186 (D.C. Cir. 1993);  *Marshall v. Federal Express Corp*., 327 U.S. App. D.C. 302, 130 F.3d 1095, 1099-1100 (D.C. Cir. 1997).  This framework applies equally to claims of disability discrimination under the Rehabilitation Act.  *McGill v. Munoz*, 203 F.3d at 845 n.2.  In *Barth*, the Court of Appeals held that the disabled employee bears the burden of proof to show a reasonable accommodation, while the employer bears a similar burden to establish the existence of an undue hardship.  2 F.3d at 1186; *see also Monette v. Elec. Data Sys. Corp*., 90 F.3d 1173, 1183, 1186 (6th Cir. 1996).  However, unlike the traditional application of the *McDonnell Douglas* mechanism, in a disability case the employer bears the ultimate burden of persuasion on the issue of reasonableness, which "merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).  It is the position of the EEOC that the only burden that an employee should bear is to show that the suggested accommodation would effectively enable the employee to perform the essential functions of the job.  *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 258-59 (1st Cir. 2001).

As in *Woodruff*, plaintiff here has alleged that the accommodation she sought was available, and was reasonable.  In *Woodruff*, the government employer had a policy allowing employees to telecommute "as frequently as five days a week."  That fact, together with evidence that another employee of the defendant had been allowed to lead a work team from a remote location, and the plaintiff's own testimony that his team was "mostly . . . self-directed," led the Court of Appeals to hold that the plaintiff could make out a claim that he should have been allowed to telecommute, and that summary judgment on the Rehabilitation Act claim thus had been improperly granted.  In the instant case, plaintiff alleges that a work-at-home accommodation would be reasonable, supported by extensive factual allegations concerning her

experience working from home (Compl. ¶¶ 11, 14, 16, 18, 20), her position description (Compl.

¶¶ 9, 10), defendant's sponsorship of telecommuting from home (Compl. ¶¶ 15).  Plaintiff alleges

that the accommodation she sought would not impose a hardship of any degree upon defendant.

(Compl. ¶¶ 14, 15, 18.)

By failing to provide Ms. Morris with a reasonable accommodation, the Agency has

discriminated against her as a qualified individual with a disability.  "The ADA defines the term

'discriminate' to include 'not making reasonable accommodations to the known physical or

mental limitations of an otherwise qualified individual with a disability who is an applicant or

employee, unless such covered entity can demonstrate that the accommodation would impose an

undue hardship on the operation of the business of such covered entity.' 42 U.S.C.

§12112(b)(5)(A); see 29 C.F.R. §1614.203(c)(1)."  *Breen v. DOT*, 282 F.3d at 841 n.3.

Defendant seeks to capitalize on the confusion inherent in the provisions for private

rights of action under the Rehabilitation Act by urging that plaintiff cited the wrong code section

in her complaint.[2]  As explained above (at 7), the private cause of action for a federal employee

is a creature of EEOC regulation and decisional law.  If there is a code section which,

notwithstanding Fed.R.Civ.P. 8, must be pleaded in order to state a claim for relief under the

Rehabilitation Act, plaintiff will seek leave to amend her complaint in that respect.

As demonstrated in the following sections, plaintiff has alleged the necessary elements of

a claim under the Rehabilitation Act: that she is a qualified individual with a disability (Compl.

---

[2]  This phenomenon is not uncommon.  *See, e.g., Breen v. Dept. of
Transportation*, 282 F.3d 839, 350 U.S. App. D.C. 212 (D.C. Cir. 2002), citing 29 U.S.C.
§ 794(a) for the proposition that "the Rehabilitation Act provides that 'no otherwise
qualified individual with a disability' may be discriminated against by a federal agency
'solely by reason of her or his disability,' " in the case of a terminated employee of the
Federal Highway Administration, "a major agency of the U.S. Department of
Transportation" according to the U.S. D.O.T. website (www. fhwa. dot. gov).

¶¶ 12, 13 ), employed by an agency of the federal government (Compl. ¶ 9), that reasonable accommodations existed which would not pose an undue hardship for her employer (Compl. ¶¶ 11, 14-16, 18, 20), and that her employer failed not only to accommodate her (Compl. ¶¶ 21-23), but to engage in the interactive process in an effort to identify a reasonable accommodation at all (Compl. ¶¶ 21-56).

## V.  Plaintiff Is an Individual with a Disability

Plaintiff has alleged that she suffers from a disability for purposes of the Rehabilitation Act.  (Compl. ¶12.)  She alleged that she suffered from "a yeast sensitivity which in turn causes her to be sensitive to small concentrations of other molds and even chemicals in the workplace and elsewhere;"  that her "physician reported to EPA that Ms. Morris has sensitivities to mold and dust mites, causing muscle weakness, breathing problems, problems with walking, thinking, elevated blood pressure, and swelling;" that an EPA physician confirmed these details with Ms. Morris' physician; and that her condition was "well known to Ms. Morris' supervisor, John Richards, and others within the Agency."  (Compl. ¶12.)  In fact, "EPA . . . found on July 7, 2005 that Ms. Morris was an individual with a disability."  (Compl. ¶13.)

Ms. Morris "suffered numerous severe allergic reactions in her workplace, many witnessed by Mr. Richards, and has provided extensive OSHA documentation and numerous physician's notes to Mr. Richards."  (Compl. ¶24.)

Courts have recognized as a matter of law that breathing difficulties and chemical sensitivity may constitute disabilities.  *Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587 (D.Md. 2000), *aff'd* 230 F.3d 1354 (4th Cir. 2000).  Plaintiff has alleged that she has a life-threatening condition that defendant expressly recognized as a disability. (Compl., ¶¶ 6, 53.) Contrary to defendant's argument (Motion, p. 17, n. 11 and accompanying text), plaintiff has indeed alleged that she experiences her disabling condition in the workplace "*and elsewhere*."

(Compl. ¶12.)  The simplistic suggestion that plaintiff is not disabled because she does not experience symptoms of her condition in her residence (Motion, at 17), where she obviously has sufficient control over her environment and activities to eliminate the causes of her symptoms, establishes nothing.  Having alleged that she is disabled—an allegation supported by detailed facts—and having alleged that the disability indeed affects her life outside the workplace as well as within, nothing more should be required.  It can scarcely be questioned that the condition alleged in the complaint, by reasonable inference, limits plaintiff in a broad range of activities such as travel and indoor recreation—indeed, any activity that requires plaintiff to be indoors for extended periods in an atmosphere where common allergens might be present.  Notwithstanding the allegations just enumerated, and the allegation that her employer *recognized* her condition as a qualifying disability, if a more explicit allegation of limitation of a major life activity were deemed necessary, this can be readily provided by amendment.

Defendant's assertion that Plaintiff is "allergic to her workplace" (Motion, at 2) is an absurdity.  As alleged in paragraph 53 of the complaint, "Ms. Morris . . . obtained a consultation and assessment from Richard Niklas, M.D., a clinical professor in the Allergy Clinic at George Washington Medical Center, on November 21, 2006," who reported the following diagnosis: "(1) perennial allergic rhinitis with seasonal exacerbations; (2) chronic sinusitis; (3) asthma mild, intermittent; (4) sulfite sensitivity; (5) recurrent anaphylaxis; and (6) hypertension," some of which, Dr. Niklas explained to EPA, were "severe life-threatening reactions."  (Compl., ¶ 53.)

Defendant suggests that plaintiff's request for reasonable accommodation (Deft. Ex. 4), somehow indicates that plaintiff's disability does not affect aspects of her life other than at work, and that this inference is supported by the use of the words "workplace sensitivity" in Exhibit 5, plaintiff's formal complaint of discrimination.  This is not merely a strained reading of these exhibits—it is taken from whole cloth.  It is sufficient for purposes of plaintiff's complaint that

12

she requested a reasonable accommodation (Compl. ¶6), was found to be a person with a disability (*id.*), made a timely administrative charge based on disability which reasonably notified her employer of the nature of her complaint (*id.*), and the full nature and scope of her disability and her complaint were investigated by the agency's Office of Civil Rights. Similarly, while plaintiff asked to be assigned to work at home, she did not specify that the accommodation be full-time, or permanent. Defendant, however, never pursued the possibility of allowing plaintiff to work from home as needed, and/or within other government facilities, such as might have enabled her to perform her job. (Compl. ¶¶ 38-42.)

Over the course of the summer and fall of 2006, Ms. Morris suffered repeated severe reactions in the Potomac Yards space to which she was then assigned, reporting to her supervisor that EPA's Federal Occupational Health (OSHA) clinician advised her to seek immediate medical attention, and that "after I arrive in the workplace building, I am continuing to encounter all the previously mentioned allergic reactions (elevated blood pressure and heart rate, body swelling, congestion, muscle weakness, difficulty breathing, etc.) I am also encountering chest pain." (Compl., ¶ 25-26.) In one episode, documented by the OSHA clinician, on July 17, 2006, in the Potomac Yard Building, plaintiff "experienced another reaction, of which she notified Mr. Richards, including elevating blood pressure, shortness of breath, shallow breathing, body swelling, chest pain, and a near loss of consciousness. (Compl. ¶ 28.)

In contrast, although her assignment to EPA's "clean space" was not adequate as an accommodation, plaintiff has alleged, "wearing a face mask and sometimes goggles, and taking frequent outdoor breaks, Ms. Morris was generally able to work in the 'clean space.' " (Compl., ¶ 21.) Thus, defendant possessed ample evidence that plaintiff could perform her job with a reasonable and adequate accommodation, defendant's argument that plaintiff is not disabled, but simply "allergic to her workplace," must fail.

13

**VI. Plaintiff was and is a qualified individual**

The inquiry whether plaintiff is a qualified individual has as its focus whether plaintiff, with a reasonable accommodation, can perform the essential functions of her position.

Plaintiff has alleged in considerable detail that she was qualified to perform her job with a reasonable accommodation. First, she performed her job in the "clean space" with less than a reasonable accommodation. (Compl., ¶ 21.) She alleged the essential functions of her position, as set forth in the Position Description, and that they require neither physical presence nor face-to-face contact with others, either explicitly or implicitly. (Compl., ¶ 10.) The Position Description was excerpted at length in the complaint. The complaint further describes how plaintiff was "allowed to work from home temporarily in 2004 and 2005," with reasonable success (Compl., ¶ 11), and that while assigned to work in the "clean space" for a number of months, "she did not have in-person contact on a day-to-day basis with her coworkers or others," nor did she in her subsequent duty station, Potomac Yards. (*Id.*)

Further, plaintiff alleges that "all essential functions of [her] job can be performed remotely," and that working at home, she "had complete access to all necessary persons and materials." (Compl., ¶ 14.) Further, plaintiff "has worked from home on many occasions using EPA's Lotus Notes e-mail system to transmit documents back and forth, and e-mail or telephone to communicate effectively with coworkers," and that she has had no assignments for at least two years that could not have been worked on in this manner. (Compl., ¶ 18.) Plaintiff has alleged that remote access to the defendant's Local Area Network (LAN) is possible, and that "it is generally accepted that employees in the federal government can have such access." (Compl., ¶ 20.) During periods when she was working primarily from home, plaintiff's supervisor worked closely with her, directing her work, and commending her progress. (Compl., ¶ 16.) In

sum, plaintiff has alleged that, "if allowed to work at home, [she would be] able to perform the essential functions of her position." (*Id.*)

Addressing the issue of hardship, and reasonableness of her work-at-home accommodation, plaintiff has alleged that "EPA has offered to accommodate other disabled employees with permanent work-at-home arrangements, and has permitted employees to work from home, either on a full time or part time basis, and either temporarily or permanently, including members of Mr. Richards' own Federal Register staff," and that "the first type of 'no cost/low cost accommodation' listed in EPA's Reasonable Accommodation Procedures, is 'Allowing employees to work from home, telecommuting centers or alternate EPA work locations.' " (Compl., ¶ 15.)

As the Court of Appeals held in *Breen*, evidence that an employer offers some employees accommodations under circumstances similar to the plaintiff's creates a genuine issue of material fact, in the context of a Rule 56 motion, and prevents judgment for the employer. *Breen*, *supra*, 282 F.3d at 842, citing *Walsh v. United Parcel Serv.*, 201 F.3d 718, 726 (6th Cir. 2000) (employer's allowance of medical leave to other employees created genuine issue of fact as to whether granting of leave to plaintiff would have constituted reasonable accommodation); *Swanks v. WMATA*, 179 F.3d 929, 934, 336 U.S. App. D.C. 319 (D.C. Cir. 1999) (an employer may not obtain summary judgment by declaring it has a policy when the employee may have evidence that the employer follows the policy selectively); *see Woodman v. Runyon*, 132 F.3d 1330, 1346 (10th Cir. 1997).

Defendant cannot establish, either at the pleading stage or, plaintiff contends, at trial, that essential functions of her position prevent her from working with the accommodation she requested or some variant of it. Essential functions are "the fundamental job duties of the employment position." 29 C.F.R. §1630.2(n)(1). *Taylor v. Rice*, 371 U.S. App. D.C. 383 (D.C.

Cir. 2006). The "essential functions" of a job "do[] not include the marginal functions of the position." *Baker v. Potter*, 294 F. Supp. 2d 33, 43 (D.D.C. 2003); 29 C.F.R. §1630.2(n)(1). EEOC Regulations at 29 CFR §1630.2(n) govern the determination of what constitutes an essential function of a position. *Taylor*, 451 F.3d 898, 906. In addition to the employer's "judgment as to what functions of a job are essential," 42 U.S.C. §12111(8), a court must consider "[t]he work experience of past incumbents in the job," 29 C.F.R. §1630.2(n)(3)(vi), and "[t]he current work experience of incumbents in similar jobs," *id*. §1630.2(n)(3)(vii). (*Id.*)

According to the regulations, "the term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." The regulation continues, "the term 'essential functions' does not include the marginal functions of the position." The regulation then provides a non-exclusive list of factors to be considered in determining whether a particular function is essential:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

None of these factors would support presence at any EPA controlled worksite as an essential function of Ms. Morris' position. The regulation further specifies the types of evidence which may establish that a function is essential, again a non-exclusive list:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

These factors weigh heavily against a finding that presence at an EPA controlled worksite is an essential function of Ms. Morris' position.

While courts must consider and give deference to "the employer's judgment as to what functions of a job are essential," *id.*, "the court's deference to the employer's judgment regarding a job's essential functions . . does not end the inquiry. *Baker, supra,* 294 F. Supp. 2d, at 44. Further, "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job," and "the court also may consider other evidence of a job's essential functions, including 'the amount of time spent on the job performing the function; . . . the consequences of not requiring the incumbent to perform the function; . . . the terms of a collective bargaining agreement; . . . the work experience of past incumbents in the job; and/or . . . the current work experience of incumbents in similar jobs. 29 C.F.R. §1630.2(n)(3).' " *Id.*

The court in *Smith v. District of Columbia*, 271 F. Supp. 2d 165, 171 (D.D.C. 2003) made the following analogy, which is particularly apt in the present case:

> All would agree that being able to read is an essential function of being a judge, lawyer or law professor. Yet, there are many persons who have ennobled those professions even though they were blind and, therefore, could perform their jobs only by being accommodated by books in braille, computer software, or the hiring of a reader at their employer's expense. Thus, they were disabled but capable of every essential function of their jobs because of an accommodation. Their situation is to be distinguished from an illiterate person who cannot perform these jobs, irrespective of either a physical disability or an accommodation.

A brief enumeration of the positions taken by plaintiff's supervisor on the subject of essential function, as alleged in the complaint, demonstrates that defendant's position on this issue is spurious. At various times he has claimed, *ipse dixit*, "that it is necessary for Ms. Morris to be present at an EPA facility to perform her duties" (Compl., ¶ 51), that "we really need Connie inside the complex to be most effective in the work she is doing," (Compl., ¶ 21), and that "working within the EPA building complex is a requirement of your position," although plaintiff had had two different cubicles in EPA buildings, neither of which had her working in the same building with most of her fellow staff members. (Compl., ¶ 35.) Plaintiff's supervisor has said on another occasion that "note taking" in a "common space controlled by the government" was an essential function of her job. (Compl., ¶ 51.) However, her supervisor has also allowed that he arranged for Ms. Morris to have space at Potomac Yards in a negotiation in which he had to agree to give defendant's Pesticides Program its own Federal Register staff member on site, thus requiring plaintiff to work in an EPA facility in order (with more than minimal circularity) to secure for plaintiff a cubicle in an EPA facility that was "green," but not "clean." (Compl., ¶ 30.)

The essential function of Ms. Morris' position that Mr. Richards is trying to identify is communication, and perhaps interaction with coworkers. As with a blind person who, technically speaking, cannot "read," technology provides many ways for Ms. Morris to perform these functions. Presence at an EPA worksite is merely one such means.

Further, Mr. Richards has conceded that there are many persons on the Federal Register staff, making the granting of a work-at-home accommodation for one such person all the more reasonable under factor 29 CFR §1630.2(n)(ii). Mr. Richards has also acknowledged that members of his staff have been allowed to work from home on a case-by-case basis for limited or time-specific periods. The very fact that work-at-home arrangements have been allowed at

all, for any duration, completely undermines defendant's refusal to consider such an accommodation for Ms. Morris.  Had defendant cooperated in the interactive process, Ms. Morris would have learned how this was accomplished in the case of other employees, including how they kept in contact with others on the staff and throughout the Agency, and an appropriate accommodation might have been fashioned for her.

"Determining whether a particular function is essential is a factual inquiry." *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 915 (10th Cir. 2004), citing *Davidson v. America Online, Inc.*, 337 F.3d 1179, 1190, 1191 (10th Cir. 2003).  It is thus an inquiry ill-suited to disposition on a motion under Fed.R.Civ.P. 12(b)(6).  While the trier of fact must "give consideration to the employer's judgment regarding the functions of a job that are essential," "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Id.*  Some of the factors that courts evaluate in determining whether a job function is "essential" include the amount of time that is required to perform the function; the consequences of not requiring that such function be performed; and whether current and former employees holding the same position performed the function.  See *Baker v. Potter*, 294 F. Supp. 2d 33, 43 (D.D.C. 2003); 29 C.F.R. §1630.2(n)(3).  *Clayborne v. Potter*, 448 F. Supp. 2d 185 (D.D.C. 2006).  Even those courts that have held that an employer's judgment regarding what functions are essential is entitled to some deference must conclude, ultimately, that "the question whether a task constitutes an essential function depends on the totality of the circumstances." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113 (2d Cir.  2004) (district court erred in finding a physician's night and weekend duty constituted essential functions even though those shifts required coverage and all members of group were expected to assist).

19

Inexplicably, defendant seems to have mislaid an important part of the salient quote from *Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994), in which the Court of Appeals, in the earliest days of telecommuting (more than 13 years ago) agreed with the proposition that "an essential function of any government job is an ability to appear for work (whether in the workplace *or*, in the unusual case, *at home*)." 23 F.3d at 530 (emphasis added). Of course, defendant today can hardly characterize working from home or another remote location as "unusual" when the top of the list of no cost or low cost accommodations in defendant's own Reasonable Accommodation Procedures is "Allowing employees to work from home, telecommuting centers or alternate EPA work locations." (Compl. ¶15.)

## VII.  Defendant never accommodated plaintiff

Defendant has never provided a reasonable accommodation to plaintiff. As plaintiff has alleged, in her one and only accommodation, the "clean space" cubicle, she had to wear a breathing mask and goggles, and take frequent outdoor breaks, in order to work without endangering her health. (Compl., ¶ 21.) It is undisputed that defendant then withdrew this accommodation, and moved plaintiff to a so-called "green building." (Compl., ¶ 23.) Plaintiff's allegations in paragraphs 38-42 plainly establish that defendant had withdrawn from the interactive process and offered her no further accommodation after removing her from the "clean space." (Compl. ¶23.) Just over a month after her only accommodation had been withdrawn, plaintiff's supervisor told her "Since there will be no resolution of your request for 'reconsideration' for some months I think it is reasonable for you to explain your plan for returning to work prior to the impending exhaustion of your earned leave balance." (Compl. ¶38.) Nothing further was done to accommodate plaintiff. (Compl. ¶¶38-42.)

**VIII.  Defendant failed to engage in the interactive process**

The interactive process is mandatory.  *Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999).  Failure of an employer to engage in the interactive process subjects the employer to liability for violation of the ADA, and per force, the Rehabilitation Act.  *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 700, 8 AD Cas. (BNA) 875, 887 (7th Cir. 1998).

Employers who fail to engage in the interactive process in good faith face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible. *Barnett*, 228 F.3d at 1116.

The interactive process requires communication and good faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process. *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1114-15 (9th Cir. 2001); *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.").

Although the interactive process "is not an end in itself," "the absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation." *Id.*, citing *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 514 (N.D.N.Y. 2004).  Moreover, courts have held that the duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.' " *McAlindin*, 192 F.3d at 1237. The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "if a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." (Citing EEOC Enforcement Guidance on Reasonable Accommodation, at 7625.)  "Thus, the

employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work, and by avoiding the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective." *Humphrey v. Memorial Hosps. Ass'n,* 239 F.3d 1128, 1138 (9th Cir. 2001).

Defendant had a duty to engage in an interactive process with Ms. Morris, in good faith. *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005) ("absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation"); *see also Battle v. UPS*, 438 F.3d 856, 862-863 (8th Cir. 2006) (an employer hinders this process when the employer knows about the employee's disability, the employee requests accommodations or assistance, the employer does not in good faith assist the employee in seeking accommodations, and the employee could have been reasonably accommodated but for the employer's lack of good faith); *accord Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005); *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002); *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001); *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 677 (1st Cir. 1995).

Defendant has failed to engage in the interactive process in good faith, because it has not reviewed or disclosed to plaintiff options for full-time or part-time work from home, has not

identified any other potential work sites in which breathing conditions could be improved and/or modified, has not explained how working from a remote site under EPA control is different from working from home, or that less-than-perfect efficiency in plaintiff's performance of her duties from a remote location imposes a hardship on defendant (given that employees with other types of disabilities may be entitled to readers, special communications software, etc.)  (*See* Complaint, ¶42.)

Defendant's only "interaction" with plaintiff has been to dog her unceasingly for more and more medical information, expecting her to develop and provide it at her own expense. (Compl., ¶¶39-41.)  Defendant has never suggested the nature or quality of medical information it would be willing to accept in order to come back to the table and discuss accommodation alternatives in an interactive process, nor has it ever acknowledged that working in an office environment with a high level of traffic, of people, files, equipment, could itself be the cause of Ms. Morris' reactions, the condition requiring modification in order to accommodate Ms. Morris' disability.  Defendant has taken the position, in short, that unless plaintiff can demonstrate scientifically that conditions inherent in defendant's buildings themselves cause her reactions, plaintiff is not entitled to accommodation.

The failure to engage in some meaningful dialogue constitutes unlawful discrimination by reason of Ms. Morris' disability.  "In order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296 (3d Cir. 1999), citing *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir. 1998), Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)).  "[A]n employer

discriminates against a qualified individual with a disability when the employer does "not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. §12112(b)(5)(A); *Taylor*, 184 F.3d 296, 306.

In *Taylor*, the Court of Appeals held:

> "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability"

(citing the EEOC's interpretive guideline, 29 C.F.R. Pt. 1630, App. §1630.9 at 359).

"A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). "An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer... Both parties bear responsibility for determining what accommodation is necessary... 'Neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996), citing *Beck*, 75 F.3d at 1135-37; cited with approval in *Taylor*, 184 F.3d at 312.

Nor does Ms. Morris' desire for a work-at-home accommodation, whether reasonable or not, relieve EPA of its duty. The court in *Taylor* continued, citing EEOC regulations: "it would make little sense to insist that the employee must have arrived at the end product of the interactive process before the employer has a duty to participate in that process. The EEOC's interpretive guidelines squarely place some of the burden on the employer by stating that "the employer must make a reasonable effort to determine the appropriate accommodation." 29 C.F.R. Pt. 1630, App. §1630.9 at 359. *Taylor*, 184 F.3d at 311. Of course, it has long been the law of this circuit that an employer must consider a work-at-home arrangement as a possible accommodation under the Rehabilitation Act. *Langon v. Department of Health and Human Servs.*, 295 U.S. App. D.C. 49, 959 F.2d 1053, 1060-61 (D.C. Cir. 1992). Other circuits are in accord, e.g. *Humphrey v. Memorial Hosps. Ass'n*, *supra*, 239 F.3d at 1136-37 (holding that "physical attendance" was "not an essential job duty" for a medical transcriptionist, despite the need for short turn-around times, punctuality and diligent completion of assignments).

The court in *Taylor* continued, "In short, an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." Id. Likewise, the duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.' " *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999), cited in *Taylor,* 451 F.3d 898 at 1237. The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "if a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." EEOC Enforcement Guidance on Reasonable Accommodation, at 7625. Thus, the employer's obligation to engage in the interactive process extends beyond the

first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed.

It is arbitrary for defendant to reject the opinion and recommendation of Ms. Morris' physician, without determining, disclosing and discussing an alternative medical opinion or viewpoint.  It is unreasonable for EPA to insist that Ms. Morris deliver a medical opinion addressing the specific features of an EPA worksite when her condition plainly requires, at a minimum, that she not be required to work regularly in a large, open office area, exposed to a variety of potential respiratory irritants.  Defendant appears to have ruled out the possibility that Ms. Morris' condition could be aggravated by prolonged exposure to small concentrations of irritants.  Suggesting that plaintiff's diagnoses were flawed because based in part on patient reporting, a recognized basis for medical diagnosis and treatment, is similarly flawed.  *Bunnell v. Sullivan*, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc) (In a case of chronic pain, a claimant need not produce medical evidence supporting the severity of the pain, only its likely existence).

Mr. Richards sent Ms. Morris a memorandum on or about August 24, 2006, in which he ordered her to provide "documentation . . . which supports your alleged allergic reaction to Potomac Yards or report back to work at your designated work site.  (Compl., ¶ 40.)  This required documentation, which must be specific to Potomac Yards, includes information describing the impairment, the nature, severity, and duration of the impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits your ability to perform the activity or activities.  (*Id.*)  Your continued failure to provide this documentation or to report to work may lead to being placed in absence without leave (AWOL) status and/or disciplinary action, up to and including removal from Federal service.  (*Id.*)

Mr. Richards' memo was not related to the interactive process, in which Mr. Richards still steadfastly refused to participate.  (Compl., ¶ 41.)  As he wrote on October 6, 2006, his requests for medical documentation were "in no way related to "Reasonable Accommodation" but based on my role as your supervisor and leave approving official."  So even Mr. Richards' August 24, 2006 request for detailed medical information was not for the purpose of engaging in the interactive process, but only for medical leave approval.  (*Id.*)

When he asserted that Ms. Morris' "issues" must be specific to her work environment, Ms. Richards was in essence refusing to give fair consideration to the nature of Ms. Morris' disability.  For example, if Ms. Morris required an enclosed office space with air filtration to protect her from incidental irritants that might enter the office space periodically from sources such as people, files, or equipment, that would relate to Ms. Morris' "general health issues," and would not be "specific" to a given building or office.  *Cf. Service v. Union Pac. R.R. Co.*, 153 F. Supp. 2d 1187, 1193 (E.D. Cal. 2001) (summary judgment denied to employer on issue of reasonable accommodation involving preventing on-the-job exposure to cigarette smoke).

Mr. Richards did not attempt in good faith to find a solution to accommodate Ms. Morris. From the beginning, he delayed initiation of the reasonable accommodation process.  (Compl., ¶ 21.)  He admitted that having Ms. Morris work within an EPA worksite was his preference.  (*Id.*) Nonetheless, defendant purported to accommodate Ms. Morris by moving her to the "clean space," a desolate office space in Crystal City, Virginia, which was operated by EPA with various environmental limitations.  (Compl., ¶ 22.)  There, wearing a face mask and sometimes goggles, and taking frequent outdoor breaks, Ms. Morris was generally able to work in the "clean space."  (*Id.*)  But in early June, 2006, Ms. Morris was moved from the "clean space," which EPA had proffered as her "reasonable accommodation," into Potomac Yard, a so-called "green building."  (Compl., ¶ 23.)   Defendant having withdrawn her only accommodation, no further

effort was made to identify or negotiate a substitute accommodation.  Nowhere in defendant's motion is there any argument, evidence, or authority purporting to justify the relocation of plaintiff from office to office, beginning with the withdrawal of the "clean space" as plaintiff's reasonable accommodation, the refusal to assist plaintiff in finding an office space within Potomac Yards which would minimize her exposure to irritants, or her third relocation back to the very building, EPA East, in which EPA had determined she was entitled to a change of work site as an accommodation (Compl. ¶ 52).

At Potomac Yards, Ms. Morris was stationed in one of the smallest cubicles in contractor space, across from the men's room, a service elevator, a stairwell, and the entrance/exit doors which lead to/from the main elevator.  (Compl., ¶ 23.)   Indeed, shortly after the move, on June 19, 2006, the AFGE Union (representing a number of EPA employees) circulated a memorandum noting that it was beginning to receive complaints of health issues apparently relating to the environment within Potomac Yards.  (*Id*.)

Mr. Richards took the position on July 18, 2006, that having assigned Ms. Morris to Potomac Yards, which was considered a "green" building, he required more detailed information before he could consider her reactions to have been "workplace induced."   (Compl., ¶ 29.)  He also said, as he had while she was assigned to the "clean space," that he had no evidence that Ms. Morris' reactions were not caused by her morning commute.  By requiring her in this way to prove a negative proposition, Mr. Richards imposed an unreasonable obstacle to the accommodation of Ms. Morris' disability.

In truth, Ms. Morris was assigned to Potomac Yards not as an accommodation, but through a "bargain" struck by Mr. Richards which was designed to require Ms. Morris to be present at that EPA work site to perform her duties.  (Compl., ¶ 30.)  Before being moved from the "clean space," Ms. Morris was given a choice of returning to the main EPA facility where her

need for accommodation first arose, or moving to Potomac Yards; faced with this choice, Ms.

Morris chose Potomac Yards.  Mr. Richards negotiated for a space for Ms. Morris at Potomac

Yards, and agreed that in exchange the E.P.A. Pesticides Program (which was based at Potomac

Yards) would have a Federal Register staff member, namely Ms. Morris, on site.  Instead of

being granted a reasonable accommodation by her employer, Ms. Morris obtained her cubicle at

Potomac Yards through a bargain which would require Ms. Morris to be physically present to

serve the Pesticides Program.  But there was no imperative that Ms. Morris be assigned to the

Pesticide Program, because once she was moved from Potomac Yards back to E.P.A.

headquarters, that assignment ended.

Throughout July and August, 2006, Ms. Morris was struggling to work, and continually

becoming ill because of her workplace environment.  (Compl., ¶ 37.)  Mr. Richards steadfastly

refused to allow her to catch up on her work from home, even temporarily, and continued to

harass her.  (*Id.*)

Ultimately, Mr. Richards conceded that he was not participating in the interactive

process, when on August 21, 2006 he wrote, "Since there will be no resolution of your request

for "reconsideration" for some months I think it is reasonable for you to explain your plan for

returning to work prior to the impending exhaustion of your earned leave balance."  (Compl., ¶

38.)  Ms. Morris could not have a "plan" for returning to a work environment that was causing

her debilitating allergic reactions.  It was incumbent on the Agency to explore options to make it

possible for Ms. Morris to continue working.  Rather than discuss with Ms. Morris how she

could accomplish her work, Mr. Richards set about to put Ms. Morris indefinitely into AWOL

status.  (Compl., ¶ 39.)

At no time since she requested a work-at-home accommodation has EPA proposed to Ms.

Morris that she again be permitted to work from home temporarily, part-time, or on any other

basis. (Compl., ¶ 42.)   Periodic changes in schedule can be a reasonable accommodation in an appropriate case.  <u>Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act</u>, 29 C.F.R. Pt. 1630, App. ("other accommodations could include . . . providing additional unpaid leave for necessary treatment"); *see Fogleman v. Greater Hazleton Health Alliance,* 122 Fed. Appx. 581, 585 (3d Cir. 2004).  Instead, Mr. Richards has required that she provide additional medical documentation, and has otherwise insisted that she report for work at EPA facilities.  This has resulted in Ms. Morris missing a great deal of work, and has hindered her performance, efficiency, and deprived her of pay and benefits.  (Compl., ¶ 42.)

Mr. Richards began counting Ms. Morris AWOL when she was too ill to report to work, September 8-15, 2006.  (Compl., ¶ 46.)  When Ms. Morris provided a detailed opinion letter from her physician, Dr. Shamim, and documentation from her hospitalization, in the second week of October; on October 16, 2006, Mr. Richards wrote, without further elaboration, "the medical documentation that you submitted in response to the August 24, 2006 letter failed to address several of the questions raised in that letter.  Based on the insufficient response and inconsistencies with earlier statements made by your doctor you have failed to satisfy the requirements of the August 24, 2006 letter.  Therefore, absences will continue to be charged as Absence Without Leave (AWOL) until the information requested on August 24th is furnished." (Compl., ¶ 47.)  Ms. Morris then responded to Mr. Richards in detail, on October 16, 2006, explaining how Dr. Shamim's letter addressed each of the questions Mr. Richards had asked (Compl., ¶48), but Mr. Richards responded with one word: "insufficient." (Compl., ¶ 49.)

For the purpose of identifying a reasonable accommodation, Ms. Morris' documentation was more than adequate.  (Compl., ¶ 50.)  According to the EPA's own National Reasonable Accommodations Procedures, medical documentation is not required at all if the disabling condition is obvious (as in this case), and even when required, it need only "substantiate that the

applicant or employee has a qualifying disability, what the functional limitation is, and/or why a Reasonable Accommodation is needed," and, in appropriate circumstances, medical documentation from a "social worker" or "counselor" will be accepted. (*Id.*) Rather than work with Ms. Morris on an accommodation of her disability, Mr. Richards deflected the opinions of Ms. Morris' physician, alluding to "inconsistencies with earlier statements made by your doctor." (*Id.*)

In sum, apart from assigning Ms. Morris to the "clean space," the employment action which was the subject of her first administrative charge, defendant has concentrated its efforts toward creating stumbling blocks for plaintiff, withholding accommodation and preventing her from performing her duties. It has done nothing to attempt, through a cooperative process, to enable Ms. Morris to work. The actions of Ms. Morris' supervisor and her agency did not constitute the reasonable effort which every employer must make to determine, through a flexible, interactive process, an appropriate accommodation for her. 29 C.F.R. pt. 1630, app.; *see also Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 677 (1st Cir. 1995).

## IX. Plaintiff's request to work from home was reasonable

Work from home is not per se an unreasonable accommodation, and plaintiff was entitled to make the request, and to benefit from the interactive process until her employer determined that it would pose an unreasonable hardship. No employer, especially one as large and wide-ranging as the EPA, can refuse to consider a work-at-home accommodation out of hand. *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1136-37 (9th Cir. 2001), citing *Langon v. Department of Health and Human Servs.*, 295 U.S. App. D.C. 49, 959 F.2d 1053, 1060 61 (D.C. Cir. 1992) (holding that an employer must consider requested accommodation of working at home); *see Carr v. Reno*, 23 F.3d 525 (D.C. Cir. 1994) (recognizing, even at the dawn of

telecommuting, that an employee might report to work, in the unusual case, at home).  As the

court observed in *Humphrey*:

> "There is another reasonable accommodation that could also serve to render
> Humphrey a "qualified individual." There is at least a triable issue of fact as to
> whether Humphrey would have been able to perform the essential duties of her
> job with the accommodation of a work at home position. Working at home is a
> reasonable accommodation when the essential functions of the position can be
> performed at home and a work at home arrangement would not cause undue
> hardship for the employer. EEOC Enforcement Guidance: Reasonable
> Accommodation and Undue Hardship Under the Americans with Disabilities Act,
> FEP (BNA) 405:7601, at 7626 (March 1, 1999) [hereinafter EEOC Enforcement
> Guidance on Reasonable Accommodation]. n15 Humphrey does not dispute that
> regular and predictable performance of the job is an essential part of the
> transcriptionist position because many of the medical records must be transcribed
> within twenty four hours, and frequent and unscheduled absences would prevent
> the department from meeting its deadlines. However, physical attendance at the
> MHA offices is not an essential job duty; in fact, the record makes it clear that
> MHA permits some of its medical transcriptionists to work at home. "

At a minimum, at the pleading stage, plaintiff's case cannot be decided based on her

request for a work-at-home accommodation.

## X.  Plaintiff has stated a claim for retaliation

The Rehabilitation Act incorporates ADA §107, which in turn incorporates "[t]he

powers, remedies, and procedures set forth in sections 705, 706, 707, 709, and 710 of the Civil

Rights Act of 1964," 42 U.S.C. §12117.  Thus, courts apply Title VII's *McDonnell Douglas*

burden-shifting framework to retaliation claims under the Rehabilitation Act when employers

assert non-retaliatory grounds for adverse employment actions.  *Woodruff v. Peters*, 482 F.3d

521, 529 (D.C. Cir. 2007); *Smith v. District of Columbia*, 368 U.S. App. D.C. 361, 430 F.3d 450,

455 (D.C. Cir. 2005); *Barth v. Gelb*, 303 U.S. App. D.C. 211, 2 F.3d 1180, 1186 (D.C. Cir.

1993).

The plaintiff in a claim for retaliation need only allege (1) she engaged in protected

activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link

between the protected activity and the adverse action. *Smith*, 430 F.3d at 455; *see also*

*McDonnell Douglas*, 411 U.S. at 802.

In *Woodruff*, one instance of the plaintiff's protected activity took place in August, 1998,

and the employer in September, 1998, revoked some of the accommodations the plaintiff had

previously enjoyed.  This, without more, was held to be sufficient to establish a prima facie

claim of retaliation.  The Court explained:

> "Lacking a smoking gun from the FAA that would establish causation, Woodruff
> asks us to infer a causal link from the temporal proximity between the protected
> events and the adverse actions. Temporal proximity can indeed support an
> inference of causation, *e.g., Mitchell v. Baldrige*, 245 U.S. App. D.C. 60, 759
> F.2d 80, 86 (D.C. Cir. 1985), but only where the two events are "very close" in
> time, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct.
> 1508, 149 L. Ed. 2d 509 (2001)."

*Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007).

Defendant's retaliatory motive may be proved by circumstantial evidence, including

evidence that the defendant's stated reason for adverse action was pretextual, combined with

evidence of the prima facie case:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly
> if the disbelief is accompanied by a suspicion of mendacity) may, together with
> the elements of the *prima facie* case, suffice to show intentional discrimination.
> Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to
> infer the ultimate fact of intentional discrimination, and the Court of Appeals was
> correct when it noted that, upon such rejection, >no additional proof of
> discrimination is required."

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 512, 113 S. Ct. 2742, 125 L. Ed. 2d 407

(1993).

No court has established the maximum time lapse between protected Title VII activity

and alleged retaliatory actions for the purpose of establishing a causal connection.  *See Hayes v.*

*Shalala,* 902 F. Supp. 259, 264 (D.D.C. 1995) (adverse action taken at the first time the plaintiff

was vulnerable to such action could account for a lapse of two years or more); *cf. Davis v.*

33

*Ashcroft,* 355 F. Supp. 2d 330 (D.D.C. 2005) (a year and a half considered too great a lapse *in the absence of other evidence*).  A lapse of five months between the activity and the adverse action has been held to support an inference of causation, without other extenuating facts.  *Castle v. Bentsen*, 867 F. Supp. 1 (D.D.C. 1994) (Ritchey, J.)   In  *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996) the court observed that "additional circumstances" may extend the amount of time between protected activity and adverse action from which retaliation may be inferred, citing  *Moss v. Southern Ry. Co.*, 41 Fair Empl. Prac. Cas. (BNA) 553 (N.D. Ga. 1986) (one year time span between expression and retaliation did not defeat plaintiff's claim where termination was disproportionately severe punishment for minor error); *Ross v. Kansas Comm'n on Civil Rights*, 45 Fair Empl. Prac. Cas. (BNA) 1476 (D. Kan. 1985) (one year time span did not defeat plaintiff's claim in light of plaintiff's prior outstanding job performance); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992) (plaintiff's verdict affirmed, despite fourteen month time span between expression and retaliation, where retaliation occurred two months after the EEOC dismissed the complaint).

In the instant case, plaintiff is entitled to all reasonable inferences not only from the timing of adverse actions taken against her in relation to her complaints of disability discrimination, but also from the words and conduct of her supervisor who obstructed her efforts to do her job with a reasonable accommodation at every turn.  Plaintiff's retaliation claim should not be dismissed on the basis of the pleadings.

**Conclusion**

On the basis of the foregoing arguments and authorities, defendant's Motion to Dismiss should be denied.  If the Court is inclined to grant defendant's motion in any respect, plaintiff respectfully requests a hearing, and leave to amend her complaint, and represents that any deficiency which the Court may find can be cured by an amendment with ample basis in fact

and existing law, and without prejudice to defendant.  Plaintiff submits, however, that her

complaint satisfies the requirements of Fed.R.Civ.P. 8, and any specific pleading requirements

under the Rehabilitation Act, the A.D.A., and Title VII, and that defendant's motion should be

denied.


                                           Respectfully submitted,

                                           KARR & ALLISON, P.C.
                                           Theodore S. Allison


                                         By: _____/s/   **Theodore S. Allison** _____
                                             Theodore S. Allison  (D.C.Bar #441089)
                                             1300 19th Street, N.W., Suite 402
                                             Washington, D.C.  20036
                                             Telephone (202) 331-7600
                                             Facsimile  (202) 293-3999

                                             Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on August 10, 2006, I served a copy of the foregoing opposition on the interested parties by placing the same in the United States mail, first class postage prepaid, addressed to:

Michelle Johnson, Esq.
Assistant U.S. Attorney
555 4th Street, N.W. - Civil Division #E4212
Washington, DC  20530

Nancy J. Dunham, Esq.
U.S. Environmental Protection Agency
Office of General Counsel (2377A)
Ariel Rios Building North, Rm 7454D
1200 Pennsylvania Avenue, N.W.
Washington, D.C.  20460

_____/s/__Theodore S. Allison_____