UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              )
CONNIE K. MORRIS,             )
                              )
          Plaintiff,          )
                              )
          v.                  )       Civil Action No. 07-491 (RWR)
                              )
LISA P. JACKSON,              )
                              )
          Defendant.          )
                              )
```

## MEMORANDUM OPINION

Plaintiff Connie Morris brings this action under the Rehabilitation Act, 29 U.S.C. § 701 et seq. against her former employer, the Environmental Protection Agency ("EPA"), alleging that the EPA discriminated against her based on disability, failed to accommodate her disability, and retaliated against her for complaining about it. The EPA has moved for summary judgment. Because no material facts are in dispute and the EPA has shown that it is entitled to judgment as a matter of law on Morris' complaint, the motion for summary judgment will be granted.

## BACKGROUND

Morris suffers from a disability she describes as a "yeast sensitivity" that has caused her to have allergic reactions after being exposed to small concentrations of yeast or other molds. Am. Compl. ¶¶ 12-13. From January 2003 through March 2007, Morris was employed by the EPA as a Technical Information

Specialist for the Federal Register Staff of the EPA's Office of
Program Management Operations.  Def.'s Stmt. of Mat. Facts
("Def.'s Stmt.") ¶¶ 1-2; Pl.'s Stmt. of Mat. Facts ("Pl.'s
Stmt.") ¶¶ 1-2.  Morris's position description set forth her
duties and placement.  She was required to "provide leadership in
executing editorial policy and priorities" by coordinating
document preparation efforts that were necessary to implement the
provisions of federal legislation that the EPA's Office of
Prevention, Pollution, and Toxic Substances ("OPPTS") administers
and enforces.  Def.'s Mot. for Summ. J. ("Def.'s Mot."), Ex. F
("Position Description") at 1; Am. Compl. ¶ 10.  Morris was
expected to provide training, assistance and guidance to EPA
personnel who were working with regulatory documents, and to
respond immediately to questions about the location and status of
OPPTS documents that were being circulated for signature.
Position Description at 1; Def.'s Stmt. ¶¶ 6-9; Am. Compl. ¶ 10.
Morris' work was "work station oriented," and she was assigned to
the 6109 Connecting Wing Space known as "EPA West," an area where
18 other EPA employees worked.  Position Description at 1; Def.'s
Stmt. ¶¶ 5, 10.

Morris was directly supervised by the Director of the
Federal Register Staff, John Richards, and indirectly supervised
by the Associate Assistant Administrator of the OPPTS, Marylouise

Uhlig. Def.'s Stmt. ¶¶ 3-4. According to Richards, it was

"necessary" for Morris to work at an EPA work site.

> [Morris] was part of a team. In that role, she was
> critical to the development of the authoring tools that
> we were preparing for the entire program. She had to
> interface with other people. She was critical in the
> recruitment of C-programmers, because we didn't have
> any other programmers on staff, and these people were
> supposed to assist [Morris] in the programming work she
> was doing. In addition to that, there was a need for
> her to help bring people along in the process and help
> support the staff. I mean, she would help people when
> they had computer problems; she did a lot of different
> things within the office. In keeping her within the
> EPA transportation system, it allowed me to send people
> to wherever [Morris] was, if necessary, to work with
> her. Once she was outside the EPA transportation
> system, there was no way I could make that connection.
> I personally decided it would be inappropriate for me
> to be authorizing people to travel to her home or even
> to an alternative telecommunications site run by GSA,
> where we had no transportation for these people. So
> keeping her inside the EPA transportation system was
> the key element, and what we tried to do is find her a
> place within the EPA transportation system where she
> could be reached that worked for her. . . . [The EPA
> transportation system is a] series of shuttle buses,
> time-consuming, fixed schedule buses to transport EPA
> people from one site to another. But the key element
> is they're free. I didn't have to reimburse people for
> Metro, I didn't have to do anything as far as paying
> for taxicabs, and I didn't - - I couldn't require other
> people to walk to wherever she was.

Def.'s Mot., Ex. D ("Richards' Dep.") at 35-37.

In November 2004, Morris reported to Richards that she was

experiencing an "allergy to the EPA workplace." Def.'s Stmt.

¶ 12, Ex. C at 1. Richards allowed Morris to test various areas

to determine whether she thought she could work comfortably in a

different location. Richards allowed Morris temporarily to work

from home.  Morris eventually decided to work in a conference
room located in the "EPA East" building.  Def.'s Stmt. ¶¶ 14-16.
However, in December 2004, Morris complained to Richards that she
was again experiencing allergic reactions in the EPA East
conference room, and she asked to work from home permanently.
Id. ¶ 17.  Richards purchased air purifiers and air filters and
tested the air quality in the areas where Morris worked.[1]  The
air quality testing indicated that the air in Morris' workspace
was actually superior to outside air, and that it contained no
fungal growth, no airborne microbial amplification, and did not
increase the risk to Morris' health.  Id. ¶¶ 18-19.[2]

On April 29, 2005, Morris asked to permanently work from her
home, as a reasonable accommodation for her "extreme sensitivity"
to "[o]ngoing exposure to mold, mildew, and dust mites from the
work environment," which caused "numerous allergic reactions with
episodes of body swelling, breathing difficulties, bronchitis,
rashes, rapid heart rate, rise in blood pressure and several
other symptoms relating to allergy sensitivity."  Am. Compl. ¶ 6;
Def.'s Stmt. ¶¶ 23-24.  In July 2005, the EPA's National
Reasonable Accommodation Coordinator issued a "Determination of

---

[1] According to Richards, Morris "did the research, found the
filters," and then the EPA put them over the vents which
"improved the situation at times."  Richards' Dep. at 26-27.

[2] Morris does not dispute that the testing occurred, but
disputes that some of the testing was done for her benefit and
disputes the relevance of the testing.  Pl.'s Stmt. ¶¶ 18-19.

Disability" regarding Morris' request, stating that "after careful review" of the medical information provided by Morris, which included reports from her primary doctor and from Dr. Ahmad Shamin, "it is confirmed that a medical condition exists that substantially limits [Morris'] major life activities of breathing and walking and therefore she is determined to be a person with a disability" under the Rehabilitation Act, giving EPA management the authority to provide Morris with a reasonable accommodation. Pl.'s Opp'n, Ex. 5. Afterwards, the EPA assigned Morris to a building which was designated as a "clean space" facility, located in Crystal Station, Virginia. Morris was the only member of Federal Register Staff who worked at the Crystal Station building, and when contractors or other members of the Federal Register Staff had to interact with Morris in person, they had to travel to the building in Crystal Station. Am. Compl. ¶ 13; Def.'s Stmt. ¶¶ 25-27.

Morris informed the EPA that she continued to suffer allergic reactions at the Crystal Station building. The EPA tested the air quality in the EPA building at Potomac Yards, and found that the air quality there was cleaner than ambient air. In June 2006, the EPA relocated Morris to the EPA's building in Potomac Yards. Am. Compl. ¶ 23; Def.'s Stmt. ¶ 29. Morris asserted, though, that she was experiencing allergic reactions that were triggered by that building. Am. Compl. ¶ 26. Richards

asked Morris to provide medical documentation to support her assertion that the air in the building at Potomac Yards triggered her allergic reactions. Morris did not provide any, and in October 2006, Richards reassigned Morris back to the EPA East building. Am. Compl. ¶ 30; Def.'s Stmt. ¶ 30; Def.'s Mem., Ex. C. at 2. In December 2006, a separate Equal Employment Opportunity Commission ("EEOC") complaint[3] that Morris filed against the EPA was dismissed, and Morris was ordered to report to work at EPA-East on January 2, 2007. Morris did report for work on January 2, 2007, but she left two hours after she arrived. In February 2007, Morris was charged with being absent without leave for 412 hours between August 2006 and December 2006, and her employment was terminated effective March 10, 2007. Am. Compl. ¶¶ 8; Def.'s Stmt. ¶¶ 31-34.

In March 2007, Morris filed this action. Her amended two-count complaint alleges that the EPA failed to accommodate her disability (Count 1) and retaliated against her (Count 2). Am. Compl. ¶¶ 58-66. The EPA has moved for summary judgment on both counts, arguing that Morris is not disabled within the meaning of

---

[3] In August 2005, Morris filed a complaint with the EEOC alleging sex and disability discrimination against the EPA, in which she sought a restoration of sick and annual leave that she allegedly used as a result of her "workplace sensitivity," and an elimination of management's "threats of termination of employment[.]" Am. Compl. ¶ 7; Def.'s Mem. Ex. I. Morris received an adverse decision from the EEOC's Administrative Law Judge on that complaint in December 2006. Am. Compl. ¶ 7; Def.'s Mem. Ex. J.

the Rehabilitation Act, that even if she were disabled she was not a qualified person with a disability, that her desired accommodation (working at home) was not a reasonable one, and that the failure to acquiesce to Morris' request was not a materially adverse employment action that can form the basis of a retaliation claim.  Morris opposes.

DISCUSSION

"'Summary judgment may be appropriately granted when the moving party demonstrates that there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law.'"  Modis v. Infotran Sys., Inc., 893 F. Supp. 2d 237, 240 (D.D.C. 2012) (quoting Pueschel v. Nat'l Air Traffic Controllers Ass'n, 772 F. Supp. 2d 181, 183 (D.D.C. 2011) (internal quotation omitted)).  "'In considering a motion for summary judgment, [a court is to draw] all 'justifiable inferences' from the evidence . . . in favor of the nonmovant.'"  Modis, 893 F. Supp. 2d at 240 (quoting Pueschel, 772 F. Supp. 2d at 183 (quoting Cruz-Packer v. Dist. of Columbia, 539 F. Supp. 2d 181, 189 (D.D.C. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986))); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "The relevant inquiry 'is the threshold inquiry of determining whether there is a need for a trial - - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either party.'" <u>Single Stick, Inc. v. Johanns</u>, 601 F. Supp. 2d 307, 312 (D.D.C. 2009) (quoting <u>Anderson</u>, 477 U.S. at 250) (overruled on other grounds by <u>Prime Time Int'l Co. v. Vilsack</u>, 599 F.3d 678 (D.C. Cir. 2010)).  "A genuine issue is present in a case where the 'evidence is such that a reasonable jury could return a verdict for the non-moving party,' a situation separate and distinct from a case where the evidence is 'so one-sided that one party must prevail as a matter of law.'" <u>Modis</u>, 893 F. Supp. 2d at 239-40 (quoting <u>Anderson</u>, 477 U.S. at 248, 252).

I.  DISCRIMINATION UNDER THE REHABILITATION ACT

"Section 501 of the Rehabilitation Act, codified at 29 U.S.C. § 791, is the exclusive remedy for federal employees alleging that federal agencies engaged in disability discrimination." <u>Graffius v. Shinseki</u>, 672 F. Supp. 2d 119, 125 (D.D.C. 2009).  Section 501(b) requires federal agencies to take affirmative steps to make accommodations for qualified people with disabilities.  29 U.S.C. § 791(b); <u>see also</u> <u>Carr v. Reno</u>, 23 F.3d 525, 528 (D.C. Cir. 1994); 29 C.F.R. § 1630.9(a).  "The Rehabilitation Act requires that an agency must make reasonable accommodation to the 'known physical and mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship.'" <u>Koch v.</u>

Schapiro, 759 F. Supp. 2d 67, 76 (D.D.C. 2011) (quoting 42 U.S.C.
§ 12112(b)(5)(A); citing Barth v. Gelb, 2 F.3d 1180, 1183 (D.C.
Cir. 1993)).  To determine what an appropriate, reasonable
accommodation would be, an agency should "initiate an informal,
interactive process with the qualified individual with a
disability in need of accommodation."  29 C.F.R. § 1630.2(o)(3).
To survive a motion for summary judgment, a plaintiff alleging
that an agency failed to make a reasonable accommodation must
submit evidence showing that (1) she had a qualifying disability,
(2) her employer had notice of the disability, (3) with
reasonable accommodation she could perform the essential
functions of the position, and (4) she requested a reasonable
accommodation but the employer denied her request.  See Schmidt
v. Solis, 891 F. Supp. 2d 72, 87 (D.D.C. 2012) (citing Graffius,
672 F. Supp. 2d at 125).

The EPA first argues that Morris was not disabled.  (Def.'s
Mem. at 12.)  "Disability" is a term defined by the
Rehabilitation Act to carry a specific meaning.  "An individual
is disabled under the Rehabilitation Act only if she can show
that she (1) 'has a physical or mental impairment which
substantially limits one or more . . . major life activities,'
(2) 'has a record of such an impairment,' or (3) 'is regarded as
having such an impairment.'"  Adams v. Rice, 531 F.3d 936, 943
(D.C. Cir. 2008) (quoting 29 U.S.C. § 705(20)(B)).  "'Major life

activities' are defined by regulation as 'functions, such as
caring for oneself, performing manual tasks, walking, seeing,
hearing, speaking, breathing, learning, and working.'" Brown v.
Paulson, 541 F. Supp. 2d 379, 385 (D.D.C. 2008) (quoting 29
C.F.R. § 1630.2(i)). These terms are "interpreted strictly to
create a demanding standard for qualifying as disabled." Toyota
Motor Mfg. Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002).
"'A disability exists only where an impairment substantially
limits a major life activity, not where it might, could, or would
be substantially limiting if mitigating measures were not
taken[.]'" Coleman-Adebayo v. Leavitt, 326 F. Supp. 2d 132, 142
(D.D.C. 2004) (quoting Sutton v. United Air Lines, Inc., 527 U.S.
471, 482-83 (1999) (internal quotation omitted)). In addition,
"if the symptoms of an impairment are brought on by a single
workplace, such an impairment is not substantially limiting[.]"
Haynes v. Williams, 392 F.3d 478, 482-483 (D.C. Cir. 2004). "If
the impact of an impairment can be eliminated by changing the
address at which an individual works, that impairment is neither
permanent nor long term." Id. at 483. To satisfy the
requirement of "substantial limitation," courts "require that an
individual be '[u]nable to perform a major life activity that the
average person in the general population can perform' or [be]
'[s]ignificantly restricted as to the condition, manner or
duration under which an individual can perform a major life

activity' as compared to the average person in the general
population." Green v. Am. Univ., 647 F. Supp. 2d 21, 30 (D.D.C.
2009) (quoting Heasley v. D.C. Gen. Hosp., 180 F. Supp. 2d 158,
166 (D.D.C. 2002) (internal quotation omitted)).

According to the EPA, Morris was not disabled because the
symptoms of her allergies and sensitivities could be overcome by
taking over-the-counter medication or by wearing a paper mask;
because "traveling, visiting friends and family, entertaining,
dining out, and shopping are not major life activities"; and
because Morris' allergic reactions occurred only while at work,
which showed that they did not substantially limit her major life
activities. Def.'s Mem. at 14, 17. However, Morris has alleged
that she experiences symptoms of her condition away from the
workplace, see Am. Compl. ¶ 12., the EPA has not argued that
breathing or walking are not major life activities, and the EPA's
position is directly contradicted by the EPA's National
Reasonable Accommodation Coordinator's determination in 2005 that
Morris was disabled by a condition that limited the major life
activities of breathing and walking. The EPA alleged that
Dr. Shamin "recanted" his opinion upon which the Reasonable
Accommodation Coordinator's determination was partly based.
Def.'s Mem. at 16. However, Doctor Shamin did not "recant" his
opinion; he merely acknowledged that he worked with Morris'
attorney to draft a letter addressed to Richards, describing the

nature of Morris's health problems.  Pl.'s Opp'n, Ex. 40 at 122-127.  Dr. Shamin continued to agree with the conclusions of that letter.  Id. at 123.  The EPA has not explained why that determination was incorrect, or why a prior determination by the Agency that a plaintiff was disabled would not, at the very least, create a genuine issue of material fact as to whether a plaintiff was disabled under the Rehabilitation Act.  Therefore, the EPA's argument that there is no genuine dispute that Morris was not disabled fails.

The EPA also argues that Morris was not able to perform the essential functions of her job with a reasonable accommodation, and that her requested accommodation was not reasonable because it would eliminate an essential function of her job.  Def.'s Mem. at 19, 21.  An individual with a disability under the Rehabilitation Act, 29 U.S.C. § 705(20)(B), must be qualified to be protected by the Act – – "that is, he or she, 'with or without reasonable accommodation,' must be able to 'perform the essential functions of the employment position that such individual holds or desires.'"  Taylor v. Rice, 451 F.3d 898, 905 (D.C. Cir. 2006) (quoting 42 U.S.C. § 12111(8), citing 29 C.F.R. § 1630.2(m)).  "An individual who cannot perform the essential duties of his job, even with an accommodation, is not 'qualified' under the statute."  Saunders, 741 F. Supp. 2d at 249 (citing Chinchillo v. Powell, 236 F. Supp. 2d 18, 24 (D.D.C. 2003)).  The "essential

functions" of a job are its fundamental duties based on a number of factors, such as the employer's judgment as to which functions are essential, written job descriptions the employer prepared for the position, the amount of time required to perform the function, the consequences to the employer of not requiring the activity, and the work experiences of past incumbents of the job in question and of similar jobs.  See 29 C.F.R. § 1630.2(n)(3); Saunders v. Galliher & Huguely Assocs., 741 F. Supp. 2d 245, 248-249 (D.D.C. 2010) (stating that "[c]ourts frequently defer to the employer's judgment as to what functions of a job are essential"); Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000) (holding that in the absence of evidence of discriminatory animus, courts "generally give substantial weight to the employer's view of job requirements"); Kalekiristos v. CTF Hotel Mgmt. Corp., 958 F. Supp. 641, 660 (D.D.C. 1997). Often, "an essential function of any government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home) and to complete assigned tasks within a reasonable period of time."  Carr, 23 F.3d at 530.  "'Team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance.'"  Amsel v. Tex. Water Dev. Bd., 464 Fed. Appx. 395, 400 (5th Cir. 2012) (quoting Hypes v. First Commerce Corp., 134 F.3d 721, 727 (5th Cir. 1998)).  Training co-workers and

providing guidance to co-workers are tasks that ordinarily must be performed at an employer's worksite.  See Kiburz v. England, 361 Fed. Appx. 326, 334 (3d Cir. 2010) (stating that the district court properly held that "training, scheduling [and attending meetings], and [providing] guidance [to other staff and managers]" could not be performed from home).

"[A]n employer is not required to provide an employee that accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation."  Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir. 1998) (quoting Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir. 1996)) (internal quotation marks omitted).  "To determine the appropriate reasonable accommodation, the agency should 'initiate an informal, interactive process with the qualified individual with a disability in need of accommodation.'"  Loya v. Sebelius, 840 F. Supp. 2d 245, 258 (D.D.C. 2012) (quoting 29 C.F.R. § 1630.2(o)(3)).  "A party that fails to communicate, by way of initiation or response, may be acting in bad faith."  Woodruff v. Lahood, 777 F. Supp. 2d 33, 41 (D.D.C. 2011).  Employers can demonstrate good faith by meeting with employees who request accommodation, requesting information about the conditions and limitations the employees have, asking employees what they want, considering employees' requests, and offering or discussing available alternatives.  Id. (citing Taylor v. Phoenixville Sch.

Dist., 184 F.3d 296, 317 (3d Cir. 1999)).  However, the
interactive process is not an end in itself, so "[w]hen the
interactive process breaks down 'courts should attempt to isolate
the cause of the breakdown and then assign responsibility' to the
culpable party."  Woodruff, 777 F. Supp. 2d at 42 (quoting
Rehling v. City of Chicago, 207 F.3d 1009, 1015-16 (7th Cir.
2000)).  "[A]ccommodations are reasonable if they allow the
employee to perform the essential functions of the job without
imposing undue hardship on the employer."  Norden v. Samper, 503
F. Supp. 2d 130, 145 (D.D.C. 2007).  The plaintiff bears the
burden to show that the requested accommodation is reasonable on
its face - - the sort of accommodation that normally occurs.
Graffius, 672 F. Supp. 2d at 129.  When a plaintiff can make that
showing, the defendant must demonstrate special circumstances
that the accommodation would impose an undue hardship.  Id.
"Undue hardship" in this context is "an action requiring
significant difficulty or expense[.]"  42 U.S.C. § 12111(10)(A);
see also 29 C.F.R. § 1630.15(d) (stating that "undue hardship" is
an affirmative defense).

     According to the EPA, attendance at EPA offices was an
essential function of Morris' position.  Morris disagrees and
argues that she could perform all of the functions of her
position remotely from her home.  Morris argues that Richards
undermines the EPA's position that attendance at EPA worksites

was an essential function of her position because he
"acknowledged that members of his staff have been allowed to work
from home on a case-by-case basis for limited or time-specific
periods." Pl.'s Opp'n at 11. However, as the EPA points out,
Morris' position description stated that it was "work station
oriented with normal movement throughout the office to perform
assigned tasks [and to use] dedicated specialized equipment,"
that Morris would be required to "coordinate document preparation
efforts and other information liaison specialists when size,
complexity and time constraints require a full team of people to
work on a single Federal Register document package," and that
Morris would be responsible for providing any "necessary training
and/or assistance to Agency personnel working with regulatory
documents." Def.'s Mem. at 19-20. In addition, Morris has not
pointed out that identically situated people with a position like
hers were allowed to work from home. Richards, Morris'
supervisor, stated that Morris' presence in the EPA buildings was
"necessary" and that her job required interaction with the
Federal Register staff and with contractors and vendors that had
to occur in the EPA office space. See Richards' Dep. at 35-37.
While Morris asserts that the EPA could have sent Federal
Register staff, contractors and vendors to her home, requesting
that accommodation would not be reasonable as a matter of law
because it would have eliminated an essential function of Morris'

position, and would impose an undue burden on the agency.  By
Morris' own account, her home is "highly controlled" and "the
people . . . who come to the house on a regular basis" have to
"change their clothes and wash upon entering the house from the
outdoors."  Pl.'s Opp'n, Decl. of Connie Morris ¶ 18.  An
accommodation that requires an agency to send contractors and
staff to an employee's house where they would then be required to
change their clothing and wash would place an undue burden on the
agency.

Morris argues that the opinion in Woodruff v. Peters, 482
F.3d 521 (D.C. Cir. 2007), supports her assertion that her
request to telecommute was a reasonable accommodation.  However,
unlike Morris, the plaintiff in Woodruff was asking merely to
extend workplace accommodations, namely being allowed to set his
own schedule and to take breaks in the middle of the day, that he
had been afforded "de facto" for roughly two years.  Woodruff,
482 F.3d at 536.  Morris has not presented evidence that she was
"de facto" afforded the ability to telecommute from her house for
the extended period of time for which she seeks as an
accommodation.  Morris also argues that the EPA failed to engage
in good faith in the informal interactive process because it did
not "pursue[] the possibility of allowing [Morris] to work from
home on any basis, and/or within other governmental facilities."
(Pl.'s Opp'n at 15.)  However, the EPA attempted to pursue

numerous accommodations for Morris that would have maintained the essential functions of her position.  The EPA did fail to provide Morris with the accommodation she desired, but failure to provide Morris with exactly the accommodation she requested is not, in and of itself, evidence that the EPA did not engage in good faith in the interactive process.  In addition, it is uncontested that Richards consulted with Morris and attempted to determine the cause of her malady, tested the air in various worksites to find one in which Morris could work, and purchased air purifiers and air filters that Morris recommended.  Def.'s Mem. at 4-5.  Any purported breakdown in the interactive process may have been caused by Morris' insistence on telecommuting, but no evidence shows it was caused by any misfeasance or lack of good faith on behalf of the EPA.  Morris was unable to perform the essential functions of her position with reasonable accommodations, and the accommodation she demanded was not reasonable.  The EPA's motion for judgment on Count 1 will be granted.

II.  RETALIATION

In Count 2 of her amended complaint, Morris alleges that from December 2004 until the time her employment was terminated, the EPA retaliated against her for requesting a reasonable accommodation by "taking adverse employment actions against her" including terminating her employment.  Am. Compl. ¶¶ 64-66. However, Morris does not identify the adverse employment actions

she was subjected to other than the termination of her employment, and that Richards "stopped attempting to accommodate her" and "required her to move into a small, exposed cubicle at the Potomac Yards facility . . . [and] began demanding additional medical documentation" in August 2005, after she filed her formal complaint of discrimination. Pl.'s Opp'n at 26. The EPA moves for judgment on this claim, arguing that Morris has not identified a causal connection between the termination of her employment and her protected activity.

"The elements of a claim of retaliation are that the plaintiff engaged in a statutorily protected activity, the employer treated the plaintiff adversely, and a causal connection existed between the two." Fields v. Geithner, 840 F. Supp. 2d 128, 137 (D.D.C. 2012) (citing Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007) (internal citations omitted)). "'Temporal proximity' between a complaint of discrimination and an adverse action, such as termination, can 'support a jury's finding of a causal link.'" Iweala v. Operational Techs. Servs., 634 F. Supp. 2d 73, 83 (D.D.C. 2009) (quoting Patterson v. Johnson, 505 F.3d 1296, 1299 (D.C. Cir. 2007)). "In order to qualify as related, the temporal proximity of the harassment and protected activity must be substantially close." Graham v. Holder, 657 F. Supp. 2d 210, 216 (D.D.C. 2009); see also Harris v. D.C. Water & Sewer Auth., 922 F. Supp. 2d 30, 35 (D.D.C. 2013) (holding that a five-

month delay between protected activity and alleged retaliation
was "simply too long under this Circuit's authority to establish
an inference of causation" based on temporal proximity); Tressler
v. National Railroad Passenger Corp., Civil Action No. 09-2027
(RLW), 2012 WL 5990035, at * 11 (D.D.C. November 30, 2012)
(holding that a delay of either five months or ten months between
protected activity and alleged retaliation was "too lengthy to
establish an inference of causation" based on temporal
proximity); Willingham v. Gonzales, 391 F. Supp. 2d 52, 61-62
(D.D.C. 2005) (holding that a six-month period between the
allegedly retaliatory action and the protected activity was not
temporally proximate); Payne v. Dist. of Columbia Gov't, 722 F.3d
345, 354 (D.C. Cir. 2013) (stating that, in the context of the
District's Whistleblower Protection Act, "[o]nce the time between
a protected disclosure and a negative employment action has
stretched to two-thirds of a year, there is no 'temporal
proximity' that supports a causal connection between the two").
"Absent some tangible effect on the employee's terms and
conditions of employment or other material harm, an employer's
request for medical documentation for the purpose of assessing an
employee's credibility or determining an appropriate
accommodation is not an adverse employment action." Koch, 759 F.
Supp. 2d at 76 (citing Dage v. Johnson, 537 F. Supp. 2d 43, 63-64
(D.D.C. 2008)).

Here, Morris has not pointed to any actions by Richards that could be construed as retaliation. While she claims that "the words and conduct of [Richards] obstructed her efforts to do her job," Pl.'s Opp'n at 26, the record evidence shows that Richards, if anything, attempted to facilitate Morris' ability to perform her job. In addition, Morris argues that roughly ten months after she filed her formal complaint of discrimination, Richards retaliated against her by moving her to a "small, exposed cubicle at the Potomac Yards facility." Pl.'s Opp'n at 26. However, too much time passed between the protected activity and the purported retaliatory act to support an inference of causation under a theory of temporal proximity. Morris also fails to rebut the EPA's legitimate, non-discriminatory reason for terminating her employment – – her decision to be absent without leave for 412 hours between August 2006 and December 2006.

## CONCLUSION

The EPA has shown that Morris could not perform the essential functions of her position with a reasonable accommodation, that Morris' proposed accommodation was not reasonable, and that Morris has not established the elements to support her claim of retaliation. Therefore, the EPA's motion will be granted and judgment will be entered for the EPA. An appropriate final order accompanies this Memorandum Opinion.

SIGNED this 30th day of October, 2013.

                                                  _____/s/_____

                                                  RICHARD W. ROBERTS
                                                  Chief Judge